BILLIE LM ADDLEMAN, #6-3690
TYSON R. WOODFORD, #8-6650
  Hirst Applegate, LLP
  P.O. Box 1083
  Cheyenne, WY 82003
  (307) 632-0541
  baddleman@hirstapplegate.com
  twoodford@hirstapplegate.com

*Counsel for Plaintiffs*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 JUL 12  PM 3: 08

MARGARET BOTKINS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>      *Plaintiffs*,<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br>      *Defendants*. | No. 1:24-cv- 136 - J |

Dated: July 12, 2024

## COMPLAINT FOR REVIEW OF AN AGENCY ACTION
## UNDER THE ADMINISTRATIVE PROCEDURE ACT

The American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, and Western Energy Alliance respectfully submit this complaint against defendants the United States Department of the Interior, the United States Bureau of Land Management, Debra Haaland in her official capacity as Secretary of the Interior, Steve Feldgus in his official capacity as Principal Deputy Assistant Secretary of the Interior, and Tracy Stone-Manning in her official capacity as Director of the Bureau of Land Management, seeking judicial review of the Conservation and Landscape Health Rule (the Rule).

The Rule was published on May 9, 2024, at 89 Fed. Reg. 40308 and became effective on June 10, 2024. It is codified at 43 C.F.R. §§ 1610.72, 6100 *et seq.*

In support of their complaint, plaintiffs allege as follows.

**TABLE OF CONTENTS**

Introduction .................................................................................................. 3

Jurisdiction and Venue ................................................................................. 5

Parties .......................................................................................................... 6

Statutory and Regulatory Background ........................................................ 12

    A.   The Federal Land Policy and Management Act of 1976 ...................... 12

    B.   Mining & minerals ............................................................................. 15

    C.   Livestock grazing ............................................................................... 19

    D.   Timber harvesting .............................................................................. 21

    E.   Areas of Critical Environmental Concern .......................................... 22

The Conservation and Landscape Health Rule ............................................ 23

    A.   The Rule creates a novel conservation lease program .......................... 24

    B.   The Rule prioritizes "intact landscapes" and consideration of "land health" standards across all ecosystems, and it expands the use of ACECs ........ 25

    C.   BLM did not undertake a NEPA analysis ........................................... 28

Plaintiffs' Standing ...................................................................................... 31

Reasons for Vacating the Rule ..................................................................... 33

    A.   The Rule exceeds BLM's statutory authority ..................................... 34

        i.    Conservation is not a "use" under FLPMA ................................ 34

        ii.   Conservation leases conflict with the broader statutory scheme ............... 36

        iii.  In practice, the Rule authorizes BLM to withdraw public lands from use without complying with 43 U.S.C. § 1702 ........................... 38

        iv.  The Rule's new approach to ACECs violates FLPMA ................ 40

        v.   The Rule's failure to provide for public participation in conservation leasing is contrary to FLPMA's requirements ............................ 41

        vi.  The Rule is barred by the Congressional Review Act .................. 42

    B.   The Rule is arbitrary and capricious .................................................. 45

    C.   The Rule violates NEPA ..................................................................... 49

Claims for Relief ......................................................................................... 52

    Count I – Agency Action in Excess of Statutory Authority ...................... 52

    Count II – Arbitrary and Capricious Agency Action ............................... 53

    Count III – Procedural Violations of the Administrative Procedure Act ..... 54

Prayer for Relief .......................................................................................... 55

## INTRODUCTION

1.     The United States manages 640 million acres of land all across the United States—nearly thirty percent of the Nation's land mass. Americans everywhere benefit from these varied federal landscapes, both for their scenic and historical value as well as the rich resources they provide. Public lands, and those who cultivate them, are the bedrock of American productivity. They include vast tracts of woodlands and mountain forests; grasslands and flat plains; and deserts and rocky mesas. These diverse landscapes supply nearly all the resources essential to American daily life, industry, and security—the food we eat, the energy we use, and the materials with which we build.

2.     To ensure the respectful and sustainable management of all that America's public wilderness, rangelands, and forests have to offer, Congress has enacted an array of laws governing both the use and preservation of federally managed public lands. Over the course of more than 150 years, this complex scheme of interlocking statutes has been thoughtfully calibrated to balance important goals of productive land use and environmental protection across the Nation's rich and diverse landscapes.

3.     Many of these statutes provide expressly for the sustainable *use* of federal lands. They include the General Mining Law of 1872, Mineral Leasing Act of 1920, Taylor Grazing Act of 1934, and Federal Land Policy Management Act of 1976 (FLPMA). These laws provide for—and empower the Bureau of Land Management (BLM) to place reasonable conditions on—the productive use of federal lands for everything from mining to livestock grazing, from energy development to siting electric power lines.

4.     In contrast, other statutes expressly provide for the conservation of federal lands. They include, among others, the Yellowstone National Park Act of 1872, Antiquities Act of 1906, National Park Service Organic Act of 1916, National Wildlife Refuge System Act of 1966, Wilderness Act of 1964, and Parks and Public Lands Management Act of

3

1996. Unlike land-use laws that govern the use and development of federal lands and their resources, conservation laws expressly set vast tracts of land aside for preservation and enjoyment by the American public.

5.      These two categories of laws work hand in hand. First, Congress has empowered BLM through FLPMA and related land-use statutes to "regulate . . . the use, occupancy, and development of the public lands" "through easements, permits, leases, licenses, published rules, or other instruments" according to the principle of "multiple use and sustained yield." 43 U.S.C. § 1732(b). In setting the terms and conditions for the use of federal land, BLM may consider conservation, but only as necessary to maintain, in perpetuity, "a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h).

6.      Second, to promote select conservation goals, Congress may (and often does) set the land aside in a separate statute for conservation. Congress has carefully guarded its authority to set aside public lands. Only in the narrowest of circumstances constrained by strict procedural guardrails has it authorized BLM itself to set aside federally managed lands covered by FLPMA for non-use.

7.      This case concerns the Conservation and Landscape Health Rule, which BLM recently promulgated under FLPMA. The Rule establishes two new categories of leases for what BLM has misleadingly called land *use*: mitigation leases and restoration leases (which this complaint sometimes refers to collectively as conservation leases). These are leases for conservation and no more, and they are flatly inconsistent with the statutory scheme that BLM is tasked with implementing. With the Rule, BLM has converted a statute for managing the productive *use* of lands into one of *non*-use, prioritizing conservation values above, and to the exclusion of, the exclusively productive activities that FLPMA has governed for nearly half a century.

4

8.     The Rule is plainly unlawful and must be set aside. Among other things, it interprets the word *use* in FLPMA to include *non*-use; it arrogates to BLM power to set aside land for conservation, which Congress has reserved to itself or elsewhere has granted in tightly limited circumstances; and it authorizes overarching land-use planning determinations—ones that prioritize conservation through mitigation and restoration leases and "areas of critical environmental concern" (ACECs)—without the public involvement that FLPMA expressly requires. The Rule is also arbitrary and capricious, in part because it offers virtually no guidance as to when land can or will be set aside for mitigation or restoration and ACECs. To top it off, the Rule is barred by the Congressional Review Act and was promulgated without complying with the National Environmental Policy Act (NEPA).

9.     Plaintiffs and their members take seriously their obligations to minimize the environmental impacts of their operations and to ensure responsible stewardship of federal lands. Their objection is not to conservation, which is an important and admirable goal; the objection, rather, is to the pursuit of conservation by "unauthorized means," in a regulation that flouts the statutory text. *Public Lands Council v. Babbitt*, 167 F.3d 1287 (10th Cir. 2002). Congress has demonstrated that it knows how to set federal lands aside for conservation or other non-use purposes when that is what it intends—but that manifestly is *not* the purpose of FLPMA.

10.     Because the Rule is fundamentally at odds with FLPMA's core principles and will arbitrarily upset the statutory and regulatory scheme on which plaintiffs and their members have long depended, it must be set aside.

### JURISDICTION AND VENUE

11.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the case involves questions of federal law.

12.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 705-706, and the Court's inherent equitable powers.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because at least one plaintiff resides in this District.

## PARTIES

14.     Plaintiffs are a broad coalition of membership organizations representing the myriad interests of those who use and cultivate federal lands and depend on access to those lands for their livelihoods. Plaintiffs' members have long worked cooperatively with BLM to carry out the major uses of federal lands the FLPMA authorizes—from mineral and coal development to livestock grazing, from forestry to electricity access.

15.     Plaintiff **American Farm Bureau Federation** (AFBF) is a voluntary general farm organization formed in 1919, representing nearly six million member families through Farm Bureau organizations in all 50 states plus Puerto Rico. Its primary function is to advance and promote the interests of farmers and ranchers and their rural communities. This involves advancing, promoting, and protecting the economic, business, social, and education interests of farmers and ranchers across the United States. AFBF has a dedicated staff and expends substantial resources to advocate on many issues before Congress, the Executive Branch, and federal courts to serve the interests of farmers and ranchers. AFBF seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of agricultural land.

16.     Plaintiff **Wyoming Farm Bureau Federation** is the state's largest organization of farmers and ranchers with over 2,500 farmer and rancher member families. The primary goals of the Wyoming Farm Bureau Federation are to represent the voices of Wyoming

6

farmers and ranchers through grassroots policy development and litigation while focusing on protecting private property rights, strengthening agriculture, and supporting farm and ranch families through advocacy, education, and leadership development. The voices of the Federation's members are combined with more than 9,400 associate member families who support agriculture and private property rights and are committed to protecting Wyoming's farms and ranches. The Federation's members live in all 23 Wyoming counties.

17.    The **Natrona County Farm & Ranch Bureau** is a member organization of both the Wyoming Farm Bureau Federation and AFBF. Its goal is to represent the voices of its members through grassroots policy development and litigation while focusing on protecting private property rights, strengthening agriculture, and supporting farm and ranch families through advocacy, education, and leadership development.

18.    Plaintiff **American Exploration & Mining Association** (AEMA) is a 129-year-old, 1,800-member national trade association representing the mineral development and mining industry, with members residing in 46 states. Its members range from the largest independent, global mine owners to small exploration companies. AEMA is the recognized national representative for the exploration sector, the junior mining sector, and mineral developers interested in maintaining access to state and public lands. More than 80 percent of AEMA's members are small businesses. Its mission includes advancing the interests of its members in litigation when necessary to preserve our members' rights and providing educational materials and programming for its members. Many of AEMA's members develop and produce the critical and strategic minerals essential to achieving the U.S.' national defense, energy, and infrastructure goals and needs.

19.    Plaintiff **American Forest Resource Council** (AFRC) is a regional trade association that represents over 50 forest product businesses and forest landowners throughout the West in Oregon, Washington, California, Idaho, Nevada, and Montana. AFRC's pur-

pose is to advocate for sustained-yield timber harvests on public timberlands throughout the West to enhance forest health and resistance to fire, insects, and disease. AFRC does this by promoting active management to attain productive public forests, protect adjoining private forests, and assure community stability. AFRC supports sustainable and environmentally responsible management of public lands, sharing the goal of other stakeholders for sustainable forest management and healthy forests that support various species. AFRC also works to improve federal and state laws, regulations, and policies and decisions regarding access to and management of public forest lands and protection of all forest lands. Because many of AFRC's members do not own private timberland, they depend heavily on federal lands to source raw materials for their milling operations and, therefore, are frequent purchasers of timber sales offered by the BLM. The management of federal lands ultimately dictates not only the viability of their businesses, but also the economic health of the communities in which they operate. The ultimate goal of AFRC's work is to advance its members' ability to practice socially and scientifically responsible forestry on both public and private forest lands.

20.     Plaintiff **American Petroleum Institute** (API) is the primary national trade association that represents all facets of the oil and natural gas industry, which supports nearly 11 million U.S. jobs and 8 percent of the U.S. economy. API's approximately 600 members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine business, and service and supply firms. API's members provide most of the nation's energy and are backed by a growing grassroots movement of millions of Americans. API represents the oil and natural gas industry by advocating for legislation at the federal, state, and local level; educating members of the general public about the benefits that oil and natural gas provide for human health, safety, convenience, and prosperity; engaging with federal and state administrative agencies to

8

promote policies on behalf of the oil and natural gas industry; and engaging in litigation that impacts the oil and natural gas industry. API also provides educational materials and programming for its members relating to oil and natural gas standards and regulations.

21.     Plaintiff **American Sheep Industry** (ASI) is the national trade organization for the American sheep industry. ASI works to protect the interests of all sheep producers, from farm flocks to range operations. ASI represents the interests of more than 80,000 sheep producers throughout the United States, through a federation of 46 state sheep associations as well as individual members. ASI members own and operate their enterprises on lands throughout the United States, relying heavily upon the ability to move livestock between private and federal lands and to use those federal lands. Federal grazing permits are thus critical for sustaining ASI's members' business operations, livelihoods, and way of life. ASI assists its members and the livestock industry more broadly by educating its members and the public on issues related to animal welfare, as well as on government programs and disaster relief, including grazing permits.

22.     Plaintiff **National Cattlemen's Beef Association** (NCBA) is a trade association that represents U.S. cattle producers, with more than 30,000 individual members and several industry organization members. In total, NCBA represents more than 175,000 of America's farmers, ranchers, and cattlemen who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests. To that end, NCBA is committed to assisting its members by disseminating information, meeting with legislators and agencies, drafting and commenting on legislation and agency rules, and, when necessary, participating in litigation in both state and federal courts.

9

23.    Plaintiff **National Mining Association** (NMA) is a national trade association that represents the interests of the mining industry including the producers of most of America's metals, coal, and industrial and agricultural minerals and the hundreds of thousands of workers it employs—before Congress, the administration, federal agencies, the courts, and the media. NMA has more than 250 members, including companies and organizations involved in every aspect of mining in the United States. NMA assists its members and the resource-mining industry more broadly by educating its members and the public. NMA provides educational materials such as statistics, fact sheets, reports, and toolkits to aid in its members' understanding of the complex environmental regulatory scheme governing the mining industry, including the exploration, development, extraction and processing of mineral and energy resources on public lands.

24.    Plaintiff **National Rural Electric Cooperative Association** (NRECA) represents nearly 900 local electric cooperatives and other rural electric utilities. America's electric cooperatives operate at cost and without profit incentive, serving as engines of economic development for 42 million Americans across 56 percent of the Nation's landscape and in 92% of the nation's persistent poverty counties. NRECA strives to anticipate, shape, and respond to changes in technology, law, and public policy that affect its members ability to provide reliable, safe, and affordable electricity across the nation, and to secure the stability of our nation's electric grid NRECA provides its members with a broad range of products and services in the areas of outreach and advocacy, workforce development, and business strategies and employee benefits, and education. NRECA also provides professional development services, including courses and conferences touching on important regulatory developments.

25.    Plaintiff **Public Lands Council** (PLC) represents ranchers who use public lands and are committed to preserving the natural resources and unique heritage of the West. PLC

10

works to maintain a stable business environment for ranchers in the West, where roughly half the land is federally owned and many ranching operations have, for generations, depended on public lands for forage. PLC's membership consists of state and national cattle, sheep, and grasslands associations. It is committed to assisting its members by disseminating information to them and the public; meeting with legislators and agencies; drafting and commenting on legislation and rules; and, when necessary, participating in litigation in both state and federal courts. PLC assists its members and the livestock industry more broadly by educating its members and the public. PLC further provides education related to grazing on federal lands, including several fact sheets. PLC specifically provides educational materials designed to help producers advocate for themselves and navigate the bureaucracies necessary to obtain critical grazing permits.

26.     Plaintiff **Western Energy Alliance** (the Alliance) is the leader and champion for independent oil and natural gas companies in the West, including Colorado, Montana, Nevada, New Mexico, North Dakota, Utah, and Wyoming. Working with a vibrant membership base for over 50 years, the Alliance stands as a credible leader, advocate, and champion of industry. Its expert staff, active committees, and committed board members form a collaborative and welcoming community of professionals dedicated to abundant, affordable energy and a high quality of life for all. Alliance members are independent oil and natural gas producers, the majority of which are small businesses with an average of fourteen employees. The Alliance advocates for access to federal lands for exploration and production of oil and natural gas, and rational, efficient, and effective permitting and leasing processes. It promotes the beneficial use and development of oil and natural gas and represents its membership in federal rulemakings that may affect members' operations on federal, state, and private lands throughout the West. The Alliance assists its members and the resource-mining industry more broadly by educating its members and the public.

11

27.   The Department of the Interior is a Cabinet-level agency of the United States government responsible for administering federal land.

28.   BLM is a sub-agency of the Department. The Department's responsibility for administering federal land throughout the West is delegated to BLM. It is principally responsible for administering FLPMA.

29.   Defendant Debra Haaland is the Secretary of the United States Department of the Interior. She is sued in her official capacity.

30.   Defendant Steve Feldgus is the Principal Deputy Assistant for Land and Minerals Management and oversees BLM. He is sued in his official capacity.

31.   Defendant Tracy Stone-Manning is the Director of the Bureau of Land Management. She is sued in her official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### A.   The Federal Land Policy and Management Act of 1976

32.   FLPMA embodies a national policy that "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." 43 U.S.C. § 1701(a)(12). To that end, FLPMA assigns responsibility to BLM for administering the productive use of 245 million surface acres and 700 million subsurface acres of United States government land. 43 U.S.C. §§ 1731-1732.

33.   BLM's mandate under FLPMA is to "regulate . . . the use, occupancy, and development of the public lands" "through easements, permits, leases, licenses, published rules, or other instruments." *Id.* § 1732(b). For activities not expressly authorized under other statutes, FLPMA's default mechanism for regulating uses on public lands is issuing "long-term leases to permit individuals to utilize public lands for habitation, cultivation, and the development of small trade or manufacturing concerns." *Id.* In exchange for conferring these rights to use public lands, Congress stated a national policy to "receive

fair market value of the use of the public lands and their resources unless otherwise provided for by statute." *Id.* § 1701(9).

34.    FLPMA charges BLM, as a condition of its authority to authorize or issue plans of operation, permits, leases, and rights-of-way, to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). FLPMA authorizes productive and economic use of public lands and ensures environmental protection by preventing unnecessary or undue degradation of federal lands. 43 U.S.C. § 1732(b). These principles are thus a central constraint on BLM's land-management decisions.

35.    *Multiple use* means "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id.* § 1702(c). It requires BLM to "strik[e] a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values.'" *Norton v. South Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

36.    FLPMA identifies "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production" as "principal or major uses." 43 U.S.C. § 1702(l).

37.    *Sustained yield* means "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h). BLM therefore must "control depleting uses over time, so as to ensure a high level of valuable uses in the future." *SUWA*, 542 U.S. at 58. This is consistent with the Act's direction to BLM "to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b).

38.   To achieve these goals, FLPMA requires the agency to "develop, maintain, and, when appropriate, revise land use plans" for individual tracts of public land (43 U.S.C. § 1712(a)), known in BLM regulations as "resource management plans." *See* 43 C.F.R. § 1601.0-5(n). In broad strokes, resource management plans establish, "for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *SUWA*, 542 U.S. at 60; *see also* 43 C.F.R. § 1601.0-5(n)(1)-(3).

39.   FLPMA places great value on transparency and public participation. Congress thus directed BLM to "allow an opportunity for public involvement and by regulation [to] establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." 43 U.S.C. § 1712(f); *see also id.* § 1739(e).

40.   Any proposed use of federal lands must "conform to the approved [resource management] plan." 43 C.F.R. § 1610.5-3(a). But a resource management plan itself does not directly authorize land uses. *See* 43 C.F.R. § 1601.0-5(n); *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010). Instead, a party seeking to use federal lands must submit to BLM a proposal for a land use authorization under the applicable regulations governing the activity. The plaintiffs' uses of federal lands are primarily authorized by statute—such as grazing under the Taylor Grazing Act, coal, oil, and gas extraction under the Mineral Leasing Act, and mining of locatable minerals under the Mining Law of 1872.

41.   Entities additionally may apply to BLM to obtain a right-of-way grant on public lands under FLPMA (43 U.S.C. § 1761) and the Mineral Leasing Act (30 U.S.C. § 185). A right-of-way grant is an authorization to use a specific piece of public land for a certain project, such as roads, pipelines, transmission lines, and communication sites. The

14

grant authorizes a specific use of the land for a specific period of time. *See generally Rights-of-Way, Principles and Procedures*, 70 Fed. Reg. 20970, 20970 (April 22, 2005). For example, applications for proposed electric utility line projects on BLM-administered public lands are processed as "rights-of-way" under Title V of FLPMA.

42.    In issuing rights-of-way, BLM "places a high priority on . . . the protection of resource values." *Id.* Thus, all rights-of-way issued under FLPMA are subject to categorical conditions, including that the holder must "[r]estore, revegetate, and curtail erosion or conduct any other rehabilitation measure BLM determines necessary" within and around the right-of-way; and "[c]ontrol or prevent damage to . . . [s]cenic, aesthetic, cultural, and environmental values, including fish and wildlife habitat." 43 C.F.R. § 2805.12(*i*). All rights-of-way must also comply with any case-specific conditions set by BLM. *Id.*

43.    The procedure to obtain a lease, permit, or right-of-way varies depending on use. FLPMA instructs BLM to prioritize "major and principal uses" of public lands, which are defined to include mining, livestock grazing, oil and natural gas production, and utility rights-of-way. 43 U.S.C. § 1702(*l*). For uses not specifically authorized by statute, parties pursue a land use authorization according to the proposal and application procedures under BLM's general land resource management regulations. *See* 43 C.F.R. §§ 2920 *et seq.*

44.    FLPMA works in conjunction with several other statutes governing specific land uses, each of which contain their own directives and priorities. Plaintiffs' members' industries operate under the following land use frameworks:

**B.    Mining & minerals**

45.    America is home to robust deposits of valuable raw minerals. Mining these and other materials supplies the foundation for American industry and national defense, securing domestic mineral supply chains that reduce the Nation's reliance on foreign mineral trade. Indeed, the political branches have expressly prioritized *increasing* the

domestic mineral supply to combat the dangers of depending on foreign resources for critical American infrastructure. *See, e.g., Biden-Harris Administration Invests $17 Million to Strengthen Nation's Critical Minerals Supply Chain*, Energy.gov (Feb. 15, 2024), https://perma.cc/FE5E-Z3TX.

46.     Congressional recognition of mining rights dates to the California Gold Rush in the mid-nineteenth century. Through the Mining Law of 1872, Congress incentivized the discovery and production of American mineral resources on federally owned lands, providing that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States." 30 U.S.C. § 22. The Mining Law thus confers the right to explore for and, if discovered, extract minerals from a tract of land—and to use adjacent public lands to support operations on lands subject to the Mining Law.

47.     Congress's support for domestic mining has remained steadfast. The Mining and Minerals Policy Act of 1970 declared it is the policy of the United States to "foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, and (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial security and environmental needs." 30 U.S.C. § 21a. And in 1980, Congress enacted the National Materials and Minerals Policy, Research and Development Act because the availability of minerals "is essential for national security, economic well-being, and industrial production." *Id.* § 1601(a). It restated that priority in December 2020, requiring the BLM to "minimize delays in the administration of applicable laws (including regulations) and the issuance of

permits and authorizations necessary to explore for, develop, and produce critical minerals." *Id.* § 1602(8).

48.    FLPMA expressly incorporates Mining Law rights, specifying that it does not "in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under the Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b). It further specifies that "public lands be managed in a manner which recognizes . . . implementation of the Mining and Minerals Policy Act of 1970." 43 U.S.C. § 1701(a)(12).

49.    BLM's surface management regulations govern mineral mining activities under the Mining Law and require careful attention to environmental considerations. *See* 43 C.F.R. §§ 3809 *et seq.* Operations that are "greater than casual use" and create surface disturbance trigger notice procedures (*id.* § 3809.21) or require BLM's authorization for a plan of operations (*id.* § 3809.11). A plan of operation must include "[a] plan for reclamation," including "regrading and reshaping," "mine reclamation," "riparian mitigation," "wildlife habitat rehabilitation," "topsoil handling," "revegetation," "isolation and control of acid-forming, toxic, or deleterious materials," "removal or stabilization of buildings, structures and support facilities," and "post-closure management." *Id.* § 3809.401(b)(3). All such disturbance activities require posting of a reclamation bond and cannot result in unnecessary or undue degradation. *Id.* § 3809.5.

50.    The Mining Law works in parallel with the Mineral Leasing Act of 1920, which removed certain nonmetallic minerals, such as coal, petroleum, and oil shale, from jurisdiction of the Mining Law. The goal of the Mineral Leasing Act is "to promote wise development of . . . natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961).

51.     The Mineral Leasing Act provides that "[d]eposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite . . . , or gas, and lands containing such deposits owned by the United States, . . . shall be subject to disposition" by BLM under the requirements of the Act. 30 U.S.C. § 181. Leasing provisions vary according to the mineral at issue.

52.     Comprehensive regulations govern mineral leases. For oil and natural gas development, it assigns rights according to a three-step planning, leasing, and drilling process. Once BLM prepares a resource management plan for a region that includes mineral leasing, it issues leases on a quarterly basis via a competitive bidding process. *See id.*; 43 C.F.R. §§ 3101.1-2, 3120.1-1, 3120.3-1. A successful lessee obtains "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." 43 C.F.R. § 3101.1-2.

53.     BLM retains discretion to set terms and conditions on any lease, including "reasonable measures . . . to minimize adverse impacts to other resource values" and "land uses or users." 43 C.F.R. § 3101.1-2. Before a lessee may develop oil or natural gas on its lease, it must file an application for a permit to drill. And before granting an application, BLM must ensure it conforms to the resource management plan. *See id.* § 1610.5-3(a).

54.     For coal, the lease by application process is initiated by an applicant and requires conformity with land use plans, consultation with states and surface management agencies, public hearings, environmental analysis and payment of fair market value. *See id.* §§ 3420.3, 3425.4. BLM will hold a lease sale for coal mining only if "the lands containing the coal deposits are included in a comprehensive land use plan or land use analysis." 43 C.F.R. § 3420.1-4(a). After BLM completes activity planning and final consultations, it will publish a notice of the proposed lease sale in the Federal Register. *Id.* § 3422.2(a). Before a lease sale can be held, BLM must prepare an environmental analysis pursuant to the National Environmental Policy Act to account for environmental considerations, including

the requirement to prepare an environmental assessment or a detailed environmental impact statement. *Id.* § 3425.3.

55.   For solid minerals other than coal and oil shale, the Mineral Leasing Act authorizes BLM to issue prospecting permits in areas where prospecting is needed to determine the existence of a minerals deposit (43 C.F.R. § 3501.10(a)) or an exploration license in areas with known deposits of a leasable mineral (*id.* § 3501.10(b)). A lease for solid minerals may be issued only if it conforms with the terms and conditions of an applicable comprehensive land use plan. *Id.* § 3501.17(a). BLM may impose additional conditions on leases to address environmental impacts. *Id.* § 3501.17(b). BLM has also promulgated a separate set of regulations to ensure environmental protection associated with solid minerals mining activities. *Id.* § 3590 *et. seq.*

### C.   Livestock grazing

56.   From the nation's first westward expansion, livestock grazing has marked the American West. Rangelands alone span nearly two-thirds of the federal lands that BLM manages. Grazing generates enormous economic benefits—for the communities that depend on it as well as the American public generally. All the while, grazing carries its own environmental benefits, improving soil quality and reducing sediment erosion.

57.   The Taylor Grazing Act governs the issuance of livestock grazing permits on federal rangelands. It charges BLM with establishing and managing grazing districts, and with issuing grazing permits within those districts; and otherwise with issuing leases on isolated tracts that are not within the bounds of a grazing district. In administering this system, FLMPA directs BLM to prioritize three principal goals: "regulat[ing] occupancy and use" for grazing, "preserv[ing] the land and its resources from destruction and unnecessary injury," and "provid[ing] for the orderly use, improvement, and development of the range." 43 U.S.C. § 315a.

19

58.   "One of the key issues the Taylor Grazing Act was intended to address was the need to stabilize the livestock industry by preserving ranchers' access to the federal lands in a manner that would guard the land against destruction." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999). To achieve this stability, the Grazing Act authorizes BLM to issue grazing permits within certain districts. 43 U.S.C. § 315b; *see also* 43 C.F.R. § 4130.2(a).

59.   Eligible groups or individuals apply for grazing permits with BLM. *See* 43 C.F.R. § 4130.1-1. With limited exceptions, applicants for a grazing permit "must own or control land or water base property." *Id.* § 4110.1(a). Base property is private land that either abuts public land; or "is capable of serving as a base of operation for livestock use of public lands within a grazing district"; or, outside a grazing district where no applicant owns or controls contiguous land, "is capable of being used in conjunction with a livestock operation which would utilize public lands." *See* 43 C.F.R. § 4110.2-1(a)(1)-(2). Ownership of base property entitles an applicant to grazing preference for a specified number of "animal unit months" on public lands. *Id.* § 4110.2-2. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit.

60.   Like leases under the Mineral Leasing Act, "[l]ivestock grazing permits and leases shall contain terms and conditions ... appropriate to achieve management and resource condition objectives for the public lands and other lands administered by (BLM)." 43 C.F.R. § 4130.3(a); *see also* 43 U.S.C. § 1742(a). For every permit or lease, BLM must "specify the kind and number of livestock, the period(s) of use, the allotment(s) to be used, and the amount of use, in animal unit months." *Id.* § 4130.3-1(a).

61.   BLM may also specify other, discretionary conditions designed to "assist in achieving management objectives." *Id.* § 4130.3-2. Conservation objectives are included expressly among conditions that may be imposed or undertaken by a permittee, including a

"[p]rovision for livestock grazing temporarily to be delayed, discontinued or modified to allow for the reproduction, establishment, or restoration of vigor of plants, provide for the improvement of riparian areas to achieve proper functioning condition or for the protection of other rangeland resources and values, . . . or to prevent compaction of wet soils, such as where delay of spring turnout is required because of weather conditions or lack of plant growth." *Id.* § 4130.3-2(f).

62.    BLM's grazing regulations directly incorporate FLPMA standards, requiring BLM to "manage livestock grazing on public lands under the principle of multiple use and sustained yield." *Id.*

63.    Permit holders must adhere to any terms and conditions BLM imposes to maintain a "satisfactory record of performance," without which the agency may refuse to renew the permit. *See* 43 C.F.R. § 4130.1-1(b).

### D.    Timber harvesting

64.    The public lands under BLM's management include 37.6 million acres of forests, approximately 16% of which is timberland. Congress first authorized BLM to dispose of timber from select regions throughout Oregon and California in 1937. *See* 43 C.F.R. § 5400.0-3(a). That authorization was expanded to include all BLM-managed public timberlands in the Materials Act of 1947. *See* 43 U.S.C. § 601.

65.    Consistent with the FLPMA's mandates, BLM must manage timber harvesting "in conformity with the principal of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 2601.

66.    BLM develops plans for timer sales annually, with consideration of "suggestions from prospective purchasers of such timber." 43 C.F.R. § 5410.0-6. It executes

timber sales only after "inviting competitive bids through publication and posting," subject to limited exceptions. 43 C.F.R. § 5401.0-6(a). BLM then executes a sales contract with the highest bidder. *See id.* §§ 5440-5463

### E.    Areas of Critical Environmental Concern

67.    BLM's authority to develop resource management plans under 43 U.S.C. § 1712(a) includes the ability to designate "areas of critical environmental concern," or ACECs. An ACEC is an area "within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

68.    A tract's designation as an ACEC takes priority over other land uses, requiring BLM to impose special management prescriptions to protect and prevent irreparable damage to the relevant and important values. 43 C.F.R. § 1610.7-2(d)(3); *see also id.* § 1711(a) ("The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values . . . giving priority to areas of critical environmental concern."). ACEC designations thus significantly impact users of federally managed lands because they proscribe land uses in a resource management plan that would impair the land features that justify the designation. *See* 43 C.F.R. § 1610.7-2(d).

69.    Under its prior regulations before the Rule's effective date, BLM had set two criteria to designate an area as an ACEC: *relevance*, meaning the area has "a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard"; and *importance*, meaning the area's relevance has "substantial significance and values," generally requiring "qualities of more than local significance and

special worth, consequence, meaning, distinctiveness, or cause for concern." 43 C.F.R. § 1610.7-2(a).

70.    Given their impact on other resource interests, ACEC designations historically have required public notice and comment. They have been adopted as an element of resource planning, and "upon approval of a draft resource management plan, plan revision, or plan amendment involving ACECs," BLM must "publish a notice in the Federal Register listing each ACEC proposed and specifying the resource use limitations, if any, which would occur if it were formally designated." *Id.* A 60-day public-comment period must follow.

71.    FLPMA further requires notification to Congress where "[a]ny management decision or action . . . excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more." 43 U.S.C. § 1712(e)(2). Lands may be removed from mineral entry under the Mining Law only by withdrawal action pursuant to § 1714. *Id.* § 1712(e)(3).

### THE CONSERVATION AND LANDSCAPE HEALTH RULE

72.    This case is a challenge to the Conservation and Landscape Health Rule, which BLM promulgated under FLPMA.

73.    The Rule "establishes the policy for the BLM to build and maintain the resilience of ecosystems on public lands." 89 Fed. Reg. at 40308. It sets out three ways to do so: "(1) protecting the most intact, functioning landscapes; (2) restoring degraded habitat and ecosystems; and (3) using science and data as the foundation for management decision across all plans and programs." *Id.*

74.    At its core, the Rule creates a new "use" for federal lands "on par" with the productive uses subject to FLPMA's multiple use and sustained yield mandate: *conservation.* 89 Fed. Reg. at 40308. Which is to say, non-use.

**A.     The Rule creates a novel conservation lease program**

75.   The primary "tool" the Rule establishes for conservation is a novel leasing program, whereby "individuals, businesses, non-governmental organizations, Tribal governments, conservation districts, and State fish and wildlife agencies," can apply for "restoration" or "mitigation" leases on federal lands. *See* 89 Fed. Reg. at 40321-40322.

76.   The Rule authorizes BLM to issue leases for either (a) "Restoration of land and resources by passively or actively assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed to a more natural, resilient ecological state;" or (b) "Mitigation to offset impacts to resources resulting from other land use authorizations." 89 Fed. Reg. at 40342 (43 C.F.R. § 6102.4(a)(1)). Both categories of leases are to be issued "for a term consistent with the time required to achieve their objective." *Id.* at 40343 (43 C.F.R. § 6102.4(a)(3)). For mitigation, that means "a term commensurate with the impact it is mitigating," without pre-established limit. *Id.* A restoration lease "may be issued for a maximum term of 10 years," subject to renewal. *Id.*

77.   Once BLM issues a restoration or mitigation lease, it "shall not issue new authorizations to use the leased lands if the use would be incompatible with the authorized restoration or mitigation use." *Id.* (43 C.F.R. § 6102.4(a)(4)). The Rule does not define "compatible" or "incompatible." Rather, BLM's "authorized officer retains the discretion to determine compatibility of the renewal of existing authorizations and future land use proposals on lands subject to restoration and mitigation leases." *Id.* (43 C.F.R. § 6102.4(f)). But "[t]he rule does not allow for leases to be issued where an existing, authorized, and incompatible use is [already] occurring." *Id.* at 40321.

78.   The Rule provides several factors the officer must consider in making leasing decisions, including "lease outcomes that are consistent with restoration principles established in the rule; lease outcomes tied to desired future conditions that are consistent with

the management objectives and allowable uses in the governing resource management plan, such as an area managed for recreation or degraded land prioritized for development; collaboration with existing permittees, leaseholders, and adjacent land managers or owners; outreach to or support from local communities; and consideration of environmental justice objectives." *Id.*; *see also id.* at 40343 (43 C.F.R. § 6102.4(d)).

79.    "Applicants are required to submit detailed restoration or mitigation development plans that include information on outreach with existing permittees, lease holders, adjacent land managers or owners, and other interested parties." *Id.* at 40322. But such outreach is not actually required. Indeed, the Rule's application process lacks any requirement for public involvement of any kind—it does not require that BLM publish preliminary conservation leasing decisions in the Federal Register, hold hearings, or allow for or consider comments. The Rule does not even limit restoration and mitigation leases to lands where the resource management plan includes conservation. 89 Fed. Reg. at 40321-40322. The effect is to preclude public involvement even at the plan-adoption stage. *Cf.* 43 C.F.R. § 1610.2(f) (providing for "[p]ublic notice and opportunity for participation in resource management plan preparation").

### B.    The Rule prioritizes "intact landscapes" and consideration of "land health" standards across all ecosystems, and it expands the use of ACECs

80.    The Rule charges BLM with expressly prioritizing "intact landscapes." *See* 89 Fed. Reg. at 40320-40321. It requires BLM "to identify intact landscapes, evaluate alternatives to manage intact landscapes, and identify which intact landscapes or portions of intact landscapes will be managed for protection." *Id.* at 40320. Once so identified, "BLM must manage [those] landscapes to protect their intactness, including habitat connectivity and old-growth forests." *Id.* at 40341 (43 C.F.R. §§ 6102.1(a), 6102.2(b)(3)).

These provisions affirmatively require BLM to manage the lands "through conservation actions." *Id.* (43 C.F.R. § 6102.1(a)(1)).

81.     In addition, "[t]o support conservation actions and decision-making, the rule extends the application of the fundamentals of land health (taken verbatim from the existing fundamentals of rangeland health [applicable to grazing permits]) . . . to all lands managed by the BLM and across all program areas." 89 Fed. Reg. at 40311 (citation omitted); *see* 43 C.F.R. § 4180.1. The fundamentals of land health and related guidelines are "general descriptions of conditions that maintain the health and functionality of watersheds, ecological processes, water quality, and threatened, endangered, and special-status species habitat." *Id.*

82.     The agency is to determine "if a [land health] standard is being achieved, or not achieved" so that it may "inform how a land use may be modified or adapted to improve land health conditions consistent with the fundamentals." *Id.* at 40312. If land health standards are not being achieved, BLM "must take appropriate actions to facilitate achievement or significant progress toward achievement of land health standards as soon as practicable." 43 C.F.R. § 6103.1.2(f)(3).

83.     Directly related, the Rule also creates a new presumption that all potential ACECs that meet the three criteria—relevance, importance, and special management attention—will be designated as such. It further loosens and expands the agency's standards for identifying and designating ACECs. 89 Fed. Reg. at 40325. Under the "importance" factor, for example, BLM is now to consider whether the area "contribute[s] to ecosystem resilience, landscape intactness, or habitat connectivity, in addition to other importance criteria." *Id.*

84.     The Rule also authorizes wide-ranging ACECs without regard to whether attendant land-use restrictions are necessary to protect these important resources. While

ACECs are an important tool allowing BLM to create special management restrictions necessary to protect important, specific resources from irreparable damage, the Rule attempts to sweep them into a mechanism to achieve broad landscape scale general conservation objectives.

85.    Ordinarily, ACECs are baked into the resource management process and thus require public notice and comment, as do all land-use designations. "[U]pon approval of a draft resource management plan, plan revision, or plan amendment involving ACECs," BLM must "publish a notice in the Federal Register listing each ACEC proposed and specifying the resource use limitations, if any, which would occur if it were formally designated." *Id.* § 1610.7-2(b). And a 60-day comment period must follow. *See id.*

86.    The Rule now allows BLM to circumvent these protections entirely, authorizing BLM to entertain ACEC nominations "outside of the [resource management] planning process." 43 C.F.R. § 1610.7-2(*i*)(1). It assigns the State BLM Director "discretion to determine the appropriate time to evaluate whether [a] nomination meets the relevant, important, and special management criteria" for ACEC designation; and if it does, the State Director may *either* "initiate a land use planning process" *or* implement "temporary management" planning "to protect the relevant and important values from irreparable damages." *Id*; *see also id.* at 40338 (43 C.F.R. § 1610.7-2(*i*)(1)(ii)).

87.    If BLM implements "temporary management" planning pursuant to any new ACEC designations, the interim plan can remain in force indefinitely and does not require public participation, as do full resource management plans. All BLM must provide is a "notice" of the interim plan after its adoption. *Id.* § 1610.7-2(i)(1)(ii).

88.    The Rule thus effectively grants State BLM Directors the discretion to designate ACECs unilaterally and impose corresponding land-use restrictions without the opportunity for public comment by interested stakeholders. BLM need not obtain comment

on the impacts that designation of an ACEC and resulting restrictions will have on future land uses. Without notice and comment, the public cannot know what areas will be designated ACECs or what restrictions will be imposed under the designations and restrictions are, for all practical purposes, finalized.

### C.   BLM did not undertake a NEPA analysis

89.    The National Environmental Policy Act (NEPA) "forces government agencies to 'consider every significant aspect of the environmental impact of a proposed action.'" *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978)). And it "mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts." *Citizens' Committee to Save Our Canyons v. U.S. Forest Service*, 297 F.3d 1012, 1021 (10th Cir. 2002).

90.    The centerpiece of this effort is a requirement that, for any "major Federal action[] significantly affecting the quality of the human environment," federal agencies prepare "a detailed statement" on "the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). This is known as an environmental impact statement, or EIS.

91.    The starting point is to determine first whether a particular project is of a type determined categorically to have *no* significant environmental impacts. If it is, the agency is not required to complete an environmental assessment. 40 C.F.R. § 1508.4. Agencies may identify classes of actions that have no significant environmental impacts and are required to list, in their respective NEPA regulations, the categorical exclusions falling within their purview. 40 C.F.R. § 1507.3.

92.    For projects not covered by a categorical exclusion, an agency typically begins its environmental review by preparing an environmental assessment (or EA), which determines whether impacts will be "significant" within the meaning of the statute,

triggering an obligation to prepare an EIS. 40 C.F.R. § 1508.9. An EA includes a written description of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

93.    If the agency concludes in the EA that a proposed action will not have a significant impact on the environment, it issues a finding of no significant impact (FONSI) and is not required to prepare a more fulsome EIS. 40 C.F.R. §§ 1501.4(e), 1508.13 (2018); 40 C.F.R. § 1501.6(a) (2020). The FONSI must briefly explain the reasons why the agency has determined that the project will not have a significant impact.

94.    If an agency determines at any time during the preparation of an EA that the environmental impacts of a "major federal action[]" will be "significant[]," it must prepare an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(e). A notice of intent to prepare an EIS is published in the Federal Register, and the public is afforded a period of at least 45 days to comment. 40 C.F.R. § 1508.22. An EIS is then drafted detailing how the project will affect the environment; addressing comments from the public; and listing "all reasonable alternatives" to the proposed action and explaining why the alternatives were not taken. *See* 40 C.F.R. §§ 1502.14-.16, 1502.19.

95.    The agency must take additional public comment on the draft EIS. 40 C.F.R. § 1503.1. This is followed by a waiting period before the issuance of a Record of Decision (ROD) describing the agency's decision, the alternatives the agency considered, and the agency's plans for mitigation and monitoring, if necessary. 40 C.F.R. § 1505.2.

96.    Congress did not limit NEPA's application to actions that may be harmful to the environment. Rather, its procedural requirements attach to *any* "major Federal actions significantly affecting the quality of the human environment," no matter the nature of the action or its impact. 42 U.S.C. § 4332(2)(C).

29

97.    Here, BLM stated in the proposed rule that it "intend[ed] to apply the Department Categorical Exclusion . . . at 43 CFR 46.210(i) to comply with the [NEPA]." 88 Fed. Reg. at 19596. The agency explained that that exclusion "covers policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." *Id.*

98.    Numerous commentors objected to BLM's reliance on the categorical exclusion. The NMA, for example, noted that invocation of the categorical exclusion is "inherently inconsistent with the BLM's prior practice for planning rules, and a violation of its obligations under NEPA." NMA Comment 13; *see also, e.g.,* API Comment 34 n.151 ("The Associations disagree with BLM's proposed use of a categorical exclusion to address these impacts."); AEMA Comment 25-27 (similar).

99.    In the Rule, BLM rejected these concerns. The agency explained that the "categorical exemption applies because the rule sets out a framework but is not self-executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action." 89 Fed. Reg. at 40333. It noted that "[a]ny future actions, including both land use planning and individual project level decisions . . . will be subject to the appropriate level of NEPA review at the time of that decision." *Id.* It therefore concluded that the "rule is excluded from review under the National Environmental Policy Act under Department Categorical Exclusion (categorical exclusion) at 43 CFR 46.210(i)." *Id.* at 40337.

## PLAINTIFFS' STANDING

100.  The Rule is having immediate, concrete effects on plaintiffs' members. See the exhibits attached hereto, which are incorporated herein as if alleged herein.

101.  Uses and non-uses of federal lands are ordinarily mutually exclusive. If a parcel of land is leased to a person for mitigation or restoration, or set aside for special protection as an ACEC, the parcel generally cannot also be leased for resource and energy development, permitted for livestock grazing or mining, or permitted as a right-of-way for electric utility lines or access roads.

102.  The creation of new categories of land uses introduces new competition for every person that relies on access to and use of federal lands under FLPMA, increasing their operational risks and diminishing their land values. These risks are especially acute in this context because deliberate obstruction and interference is a common tactic for groups that oppose land use and development. Courts have often found competitor standing as sufficient to bring suit under the Administrative Procedure Act (APA). Indeed, "competitor suits are ubiquitous in administrative law." *Corner Post, Inc. v. Board of Governors*, 603 U.S. ___ (July 1, 2024) (Kavanaugh, J., concurring).

103.  It is well settled that market participants "suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them. *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (cleaned up). "Because increased competition almost surely injures [market participant] in one form or another, he need not wait until allegedly illegal transactions hurt him competitively before challenging the regulatory (or, for that matter, the deregulatory) governmental decision that increases competition." *Id.* (cleaned up); *cf. National Credit Union Administration. v. First National Bank & Trust Co.*, 522 U.S. 479, 488 (1998) ("competitors of financial institutions have standing to challenge agency action relaxing statutory restric-

tions on the activities of those institutions"); *id.* at 490 (plaintiffs who "alleged that they would be injured by the competition resulting from the [agency] action, had standing under the APA").

104.   Competitor standing is all the more evident in this case because the Rule is having an immediate impact on company operations and land values.

105.   For ranchers who rely on federal lands for grazing, the Rule has an immediate and concrete effect on the value of base property. Base-property status follows the land and increases its value. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference. But the Rule immediately reduces the value of base property by introducing new competition for land use, meaning new risk that grazing permits will not be granted or will be more limited in scope because grazing is incompatible with mitigation and restoration.

106.   Companies that engage in coal, oil, and natural gas or other solid minerals development, as well as mineral exploration and mining, likewise face an immediate, concrete impact on their operations. Prior to nominating and obtaining a lease under the Mineral Leasing Act or staking claims or securing a plan of operations under the Mining Law, they must invest significant financial resources in exploratory research to determine which parcels of land have resources that warrant putting capital at risk. This requires devoting considerable time and money identifying where to expand their operations based on geology, infrastructure, and technology.

107.   Because of the Rule, however, mining and oil and gas companies are having to divert resources immediately to accommodate the increased risks introduced by new competition for federal land rights. By creating a new category of leases for public land, and by introducing mid-plan ACECs without notice and comment, the Rule brings new parties

into the market for public lands: individuals seeking restoration leases, mitigation leases, or mid-plan ACEC designations to block timber cutting, oil and natural gas development, mineral exploration and mining activities, and other land uses. This new competition has immediately changed the risk profile that companies must consider when deciding whether to devote their limited resources to exploration and development activities.

108.   The Rule also immediately increases risk for years-long project planning processes that electric cooperatives undertake to secure the electric grid. This is chilling investment into grid hardening and expansion projects as electric utilities work to meet growing demand, incorporate new and renewable sources of energy into the grid, and harden the grid against threats including wildfire. Further, compliance requirements associated with the Rule result in increased maintenance and operation costs for existing electric infrastructure which can lead to increased consumer-member rates.

109.   Moreover, in light of the new competition for resources and increased risks of obstruction and interference by interests opposed to land use or development, plaintiffs' members must expend resources monitoring for applications or nominations for leases proposed for mitigation or restoration or for ACECs on parcels that overlap or threaten to interfere with their existing or intended future leases.

<div align="center">

**REASONS FOR VACATING THE RULE**

</div>

110.   The Rule is a textbook violation of the APA. First and most fundamentally, it reflects an action in excess of statutory authority. Beyond that, the Rule is arbitrary and capricious. If that were not enough, BLM violated the procedural rules of the road for major rulemakings. By any path or all of them, the Rule must be vacated.

### A.   The Rule exceeds BLM's statutory authority

#### i.   Conservation is not a "use" under FLPMA

111.   FLPMA is fundamentally a land *use* statute. It charges BLM with managing the "use, occupancy, and development of the public lands" (43 U.S.C. § 1732(b)) "under principles of multiple use and sustained yield" (*id.* § 1732(a)). The Act identifies general uses to include "habitation, cultivation, and the development of small trade or manufacturing concerns." *Id.* § 1732(b). It elsewhere defines "principal or major uses" to "include [and be] limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation and timber production." *Id.* § 1702(l). Congress did not identify conservation as a "use."

112.   The Rule extra-statutorily designates conservation as a "use" and promotes this new "conservation use" to "a use *on par* with other uses" under FLPMA. 89 Fed. Reg. at 40308 (emphasis added). It defines "restoration" (which is a "tool[] to achieve conservation," 89 Fed. Reg. at 40308 n.2) as "the process or act of conservation by *passively* or actively assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed to a more natural, native ecological state." *Id.* at 40341 (43 C.F.R. § 6101.4(w) (emphasis added)). It defines "protection" or mitigation as "the act or process of conservation by maintaining the existence of resources while preventing degradation, damage, or destruction." *Id.* at 40340 (43 C.F.R. § 6101.4(t)).

113.   FLPMA authorizes BLM to issue leases and permits for productive uses of federal lands only. The ordinary meaning of a land "use" compels this conclusion, as does the statute's consistent and exclusive reference to productive uses. Inasmuch as BLM is concerned to ensure responsible and sustainable use of natural resources, its role is, to the extent allowed by law, only to impose reasonable lease or permit conditions to prevent unnecessary or undue degradation. 43 U.S.C. § 1732(b). That is to say, under the scheme

34

of leases and permits for *uses*, conservation is not a land use in its own right; it is, instead, a value to be considered in the *management of* land uses.

114.  Neither restoration nor mitigation, nor conservation more generally, is a "use" within the meaning of Section 1732(b). The Rule's creation of restoration and mitigation "uses" under FLPMA, and its practical elevation of those (non)uses to principal or major uses under the Act, contravenes the statute's text.

115.  This conclusion is confirmed by FLMPA's statement of purpose, which specifies that it is the policy of the United States that BLM shall "receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute." 43 U.S.C. § 1701(9). Charging rents for resources makes sense only if the land is being used for productive ends. The Rule flouts this purpose by providing that "BLM may waive or reduce administrative cost recovery, fees, and rent of a restoration lease if the restoration lease is not used to generate revenue or satisfy the requirements of a mitigation program (e.g., selling credits in an established market), and if the restoration lease will enhance ecological or cultural resources or provide a benefit to the general public." 43 C.F.R. § 6102.4(j). This provision expressly conflicts with FLPMA's stated purpose to generate revenue for the American public from federal lands.

116.  That conservation is not a "use" within the meaning of Section 1732(b) is confirmed further by other statutes that operate in parallel with FLPMA. These other statutes provide expressly for the conservation of federal lands. They include, among others, the Yellowstone National Park Act of 1872, the Antiquities Act of 1906, National Park Service Organic Act of 1916, National Wildlife Refuge System Act of 1966, Wilderness Act of 1964, and Parks and Public Lands Management Act of 1996. Unlike FLPMA, which is concerned with productive uses of federal land, these other laws set vast tracts of land aside for preservation and conservation. These laws confirm that when Congress

wishes to set land aside for conservation, it says so expressly. And given the substantial economic and social consequences of doing so, it generally reserves that power to itself and does not delegate it to agency bureaucrats.

117.  The major questions doctrine lends further support to this conclusion. When an agency "assert[s] highly consequential power beyond what" the legislative text clearly authorizes, "both separation of powers principles and a practical understanding of legislative intent" counsel against "read[ing] into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Just so here. Given all the textual and structural indications that Congress did not intend to grant BLM far-reaching power to set aside sprawling tracts of federal land for conservation at whim, BLM "must—under the major questions doctrine—point to 'clear congressional authorization' to regulate in that manner." *Id.* at 732. Here, there is none.

118.  The Tenth Circuit held as much in *Public Lands Council v. Babbitt*, 167 F.3d 1287 (2002). There, it concluded that "none of th[e] statutes" at issue in that case, including FLPMA, "authorizes permits intended exclusively for 'conservation use.'" *Id.* at 1308. To be sure, conservation is a "permissible end" for BLM to pursue, but "permissible ends . . . do not justify unauthorized means." *Id.* BLM repeats its error in *Babbitt*. BLM may not issue "permits intended exclusively for 'conservation use.'" *Id.*

119.  The agency's contrary decision is foreclosed by plain text and is not entitled to deference under any circumstance. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

### ii.  Conservation leases conflict with the broader statutory scheme

120.  The Rule conflicts with the statutory scheme. When Congress intends to authorize BLM to set land aside so that it cannot be developed or used by agricultural, industrial, mining, or energy interests, it says so expressly. For example, Congress has

expressly established the National Landscape Conservation System, National Wilderness System, National Historic and Scenic Trails System, National Wild and Scenic Rivers System, National Recreation Areas, National Conservation Areas, and National Parks System. It has reserved exclusively to itself the power to add public lands to the tracts protected under those schemes and has never delegated such authority to BLM.

121.   By creating a new conservation lease system that authorizes low-level BLM officers unilaterally to set aside large tracts of federal land for long-term restoration and mitigation, BLM has arrogated to itself a power that Congress has reserved for itself: the power to set aside public lands for conservation.

122.   FLPMA empowers BLM to issue resource management plans that exclude one or more principal or major uses from covered tracts. *See* 43 U.S.C. § 1712(e). But if a resource management plan excludes "one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more," it must be reported to Congress, which may reject the plan by simple resolution. *Id.* § 1712(e)(2).

123.   By expanding the concept of "use" under FLPMA to include conservation (*i.e.*, the withdrawal of lands from "incompatible" active uses), BLM has arrogated to itself a power that Congress expressly withheld: the power to exclude one or more principle or major uses for longer than two years, without reporting to Congress.

124.   At bottom, BLM lacks free-floating authority to issue leases for conservation set-asides, which is a power that Congress has guarded as its own. When Congress does intend for BLM to exclude productive uses of land, it does so expressly and subject to strict procedural safeguards. The Rule is thus incompatible with the statutory scheme. The Court must therefore "greet [BLM's] assertions of extravagant statutory power" with extreme skepticism. *West Virginia*, 597 U.S. at 724.

### iii.   In practice, the Rule authorizes BLM to withdraw public lands from use without complying with 43 U.S.C. § 1702

125.   FLPMA allows the Secretary to withdraw federal lands from public use and to reserve them for another purpose. A "withdrawal" is the "withholding [of] an area of Federal land from settlement, sale, location, *or entry*, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C. § 1702(j) (emphasis added).

126.   The Secretary may effectuate withdrawals "only in accordance with the provisions and limitations of" Section 1714(a). If BLM receives an application for withdrawal, or seeks to withdraw lands on its own initiative, it must "publish a notice in the Federal Register" (42 U.S.C. § 1714(b)(1)) and hold a public hearing (*id.* § 1714(h)). Withdrawals aggregating five thousand acres or more require congressional notification, and the statute authorizes Congress to reject the withdrawal by concurrent resolution. *Id.* § 1714(c)(1). Additionally, the Secretary may not delegate his withdrawal authority; he may so delegate "only to individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate." *Id.* § 1714(a).

127.   With these restrictions on approval authority and requirements for public notice, opportunity for a hearing, and Congressional review, Congress strictly circumscribed the Secretary's authority to set aside lands otherwise available for use.

128.   The restoration and mitigation leasing program under the Rule would circumvent these carefully delineated procedures, allowing low-level BLM bureaucrats to effectuate effective withdrawals for most, if not all, productive uses of federal lands without any of FLPMA's procedural protections for formal withdrawals. The Rule is clear that once a restoration and mitigation lease is issued, BLM is "preclud[ed] from issuing

new authorizations to use the leased lands if the use would be incompatible with the authorized restoration or mitigation use set forth in the lease." 89 Fed. Reg. at 40322; *see also id.* at 40343 (43 C.F.R. § 6102.4(a)(4)).

129.  These are withdrawals by another name. All mineral, coal, and oil, and gas development would be precluded, as would be rights-of-way for critical infrastructure such as transmission lines and pipelines. *See* 89 Fed. Reg. at 40310 (suggesting that "sustainable recreation, grazing, and habitat management" are likely compatible with "conservation use" but not resource development); *cf. Richardson v. BLM,* 565 F.3d 683, 710 (10th Cir. 2009) ("A parcel of land cannot both be preserved in its natural character and mined.").

130.  This Court has previously held that BLM cannot suspend principal uses such as mineral resource development or utility rights-of-way over swaths of federal land without adhering to Section 1714's withdrawal procedures. In *Mountain States Legal Foundation v. Hodel*, 668 F. Supp. 1466 (D. Wyo. 1987), BLM had suspended mineral leasing in certain national forests and delayed processing pending lease applications based on the land's "environmental sensitivity and the pending completion of further environmental documentation." *Id.* at 1469. The Court held that the Secretary's "mineral leasing discretion is not so broad as to allow [him] to refuse to act upon lease applications and . . . thereby effectively removing the lands from the operation of the Mineral Leasing Act without following the proper procedural requirements of the withdrawal provisions." *Id.* at 1474.

131.  Considering the text of Section 1714, the Court emphasized that a "withdrawal" under FLPMA includes "withholding an area of Federal land from . . . entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public value in the area." *Mountain States Legal Foundation,* 668

F. Supp. at 1473 (quoting 43 U.S.C. § 1702(j)). The Court held that "the acts of suspension of mineral leasing and the unreasonable delay in mineral leasing in [designated national forests] fall squarely within the definition of withdrawal for purposes of the [FLPMA]." *Id.*

132.   Granting a lease for a conservation use would "withhold [that] area of Federal land" from "entry" under the general land laws to "limit activities under those laws in order to maintain other public value"—that is, conservation. For the reasons this Court gave in *Mountain States*, that scheme effectuates an extra-statutory withdrawal of federal lands, and it thus exceeds the agency's authority.

### iv.   The Rule's new approach to ACECs violates FLPMA

133.   Through FLPMA, Congress authorized BLM to designate ACECs as "areas within the public lands where special management attention" is needed "to protect and prevent" harm to important resources. 43 U.S.C. § 1702(a). BLM's resource management plans must prioritize and protect ACECs. *Id.* § 1712(c)(3). But recognizing the disruptive effect of setting aside tracts of land for special protection, Congress required BLM to use notice-and-comment rulemaking to establish ACECs through the resource management planning process itself. *Id.* §§ 1712(f), 1739(e).

134.   By authorizing ACECs separate from the resource management planning process, the Rule flouts the system of public participation required by the statute. The temporary ACEC designation process, which is purely at the discretion of the State BLM Director, allows for the institution of ACECs without notice and comment, until a new land management planning process is initiated. 89 Fed. Reg. 40330. But the initiation of new land management planning process often takes *decades*, effectively allowing for procedurally invalid ACECs to remain in place indefinitely.

135.   This is especially problematic because (1) the Rule allows for the adoption of "temporary" ACECs without the environmental analyses required under the resource

management planning process; (2) lowers the substantive threshold for granting ACECs; and (3) authorizes the removal of an ACEC in the resource management planning process only if the original conditions warranting its initial adoption are "no longer present" 89 Fed. Reg. 40338 (43 C.F.R. § 1610.7–2(d), (*i*), (k)). The net result is to allow the adoption of temporary ACECs with almost no procedural protections, and subsequently to place the burden on commenters to disprove the need for the ACEC—despite that the ACEC was initially adopted without the proper environmental analysis. This new process in effect turns the ACEC process upside down.

###### v.     The Rule's failure to provide for public participation in conservation leasing is contrary to FLPMA's requirements

136.   Closely related, the Rule's scheme for issuing conservation leases is unlawful because it omits a critical feature that FLPMA requires: public participation in land use planning. FLPMA requires "public input on long-range issues . . . as well as on day-to-day issues" and "promotes early public participation at the 'formulation' stage, before the decision is made." *Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1072 (D. Idaho 2020).

137.   By including this provision in the FLPMA, Congress "expect[ed] [BLM] to provide means for input by the interested public before decisions are made" and "respond to public opinion." H. R. Rep. No. 94-1163 at § 202 (1976). And while the "extent of public participation" required may vary case to case, "some expenditures will always be justified to insure public exposure of proposed decisions." *Id.*

138.   BLM must and does provide public-participation opportunities for all major leasing and permitting decisions. *See, e.g.*, 43 C.F.R. § 4130.2(b) (grazing); *id.* § 3420.3-1(d) (coal); *id.* § 3809.411(c) (mine plan of operations); *id.* § 5040.2 (sustained-yield forest

unit decisions); *Western Watersheds*, 441 F. Supp. 3d at 1072 (describing public-participation in oil and natural gas leasing).

139. The Rule details a start-to-finish application process that omits public involvement. *See* 89 Fed. Reg. at 40342-40343 (43 C.F.R. § 6102.4(b)-(d)). This failure to provide for public involvement violates FLPMA. *See* 43 U.S.C. §§ 1712(f), 1739(e).

140. Public notice to the interested public—particularly plaintiffs' members, who hold competing interests in federal lands—is especially important when the authorizing officer's decision to issue a restoration or mitigation lease has the effect of precluding "incompatible" uses. 89 Fed. Reg. at 40322, 40343 (43 C.F.R. § 6102.4(a)(4)). Without a regulatory definition of "incompatible" or an explanation of how BLM officers will determine compatibility, plaintiffs' members' only opportunity to understand how a proposed conservation use will impact their prospective interests in lands would be through public participation in BLM's decision-making process—an opportunity which is not provided for under the Rule.

### vi. The Rule is barred by the Congressional Review Act

141. The Congressional Review Act (CRA) "creates an expedited process through which Congress can repeal rules promulgated by federal agencies." *Citizens for Constitutional Integrity v. United States*, 57 F.4th 750, 754 (10th Cir. 2023). Before a rule becomes effective, the promulgating agency must present to each House of Congress a copy of the rule and "a concise general statement relating to the rule, including whether it is a major rule." 5 U.S.C. § 801(a)(1)(A). If Congress enacts a joint resolution of disapproval and the President either does not veto the joint resolution or Congress overcomes the veto, the rule "shall not take effect (or continue)." *Id.* § 801(b)(1).

142. If Congress disapproves a rule under the CRA, the rule "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule

may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(2). A CRA disapproval thus operates as a "withdrawal of statutory grant[]" or a limitation on the agency's authority to act. *Citizens for Constitutional Integrity*, 57 F.4th at 764.

143.   In 2016, BLM promulgated a rule titled Resource Management Planning, which was colloquially referred to as "Planning 2.0." *See Final Rule: Resource Management Planning*, 81 Fed. Reg. 89670 (Dec. 12, 2016). The Planning 2.0 Rule made a number of changes to BLM's regulations that are substantially the same as the Rule here:

(a.)   The Planning 2.0 Rule adopted a "landscape-scale approach to resource management," calling for resource management plans to be "applied at a broader regional context." 81 Fed. Reg. at 89585-89586. It defined "landscape" as "an area of land encompassing an interacting mosaic of ecosystems and human systems characterized by a set of common management concerns" that "is not defined by the size of the area, but rather by the interacting elements that are relevant and meaningful in a management context." *Id.* at 89662. And it directed BLM officers, in preparing resource management plans, to "consider and document . . . areas of large and intact habitat." *Id.* at 89667.

(b.)   The Planning 2.0 Rule adopted a new "mitigation" requirement, which is nowhere contained in FLPMA itself. 81 Fed. Reg. at 89585, 89594. Under Planning 2.0, "[m]itigation means the sequence of avoiding impacts, minimizing impacts, and compensating for remaining unavoidable impacts." *Id.* at 89962. BLM explained that it would "support effective implementation of the regional mitigation policy by ensuring that . . . the mitigation hierarchy process is applied in the development and implementation of a resource management plan." *Id.* at 89586.

144.   On March 27, 2017, Congress passed a joint resolution disapproving the Planning 2.0 Rule. Pub. L. No. 115-12, 131 Stat. 76 (Mar. 27, 2017). Introducing the

disapproval resolution in the Senate, Senator Murkowski explained that "it is important to always remember that" FLPMA "mandates a multiple-use mission for BLM lands." 163 Cong. Rec. S1609 (daily ed. Mar. 7, 2017). She noted that "BLM lands are not national parks or wildlife refuges," or "wild and scenic rivers or wilderness." *Id.* Instead, "BLM lands are working lands," which "are valuable—not because they might contain a Mount Denali ... or the Grand Canyon—but rather because these lands contain energy and minerals and they can be used." *Id.* Congress thus rejected the Planning 2.0 Rule.

145.   Core elements of the Rule are "substantially the same" (5 U.S.C. § 801(b)(2)) as corresponding elements of the Planning 2.0 Rule.

(a.)   Both rules prioritize landscape-level planning and mitigation, which are otherwise foreign to BLM's resource management regulations. The Rule's approach to mitigation mirrors the Planning 2.0 concepts of avoidance, minimization, and compensation. And the Rule's focus on landscape-level needs, intactness, and connectivity mirrors the Planning 2.0 concept of a landscape-scale approach to resource management. More generally, both rules prioritize non-use over use and result in de facto withdrawal of public lands from productive use, in violation of BLM's multiple-use mandate.

(b.)   In the same substantive way as Planning 2.0, the Rule here tasks BLM with "identifying and managing areas for landscape intactness" and directs the agency to consider the "fundamentals of land health" as they bear on vast ecosystems and habitats. *Id.* 89 Fed. Reg. at 40308, 40311. The Rule defines "landscape" nearly identically as Planning 2.0, as "an area that is spatially heterogeneous in at least one factor of interest which may include common management concerns or conditions" that "is not defined by the size of the area, but rather by the interacting elements that are relevant and meaningful in a management context." *Id.* at 40340.

(c.)  The Rule further defines both "intact landscape" and "intactness" (89 Fed. Reg. at 40340 (43 C.F.R. § 6101.4)), elevates "landscape intactness, or habitat connectivity" as a central consideration in the identification of ACECs (89 Fed. Reg. at 40338 (43 C.F.R. § 1610.7-2(d)(2))), and directs BLM officers, in preparing resource management plans, to identify and consider "intact landscapes within the planning area, taking into consideration habitat connectivity" (89 Fed. Reg. at 40341 (43 C.F.R. § 6102.2)). *See also, e.g.,* 89 Fed. Reg. at 40313 (the Rule requires "BLM to consider ecosystem resilience, landscape-level needs, and rapidly changing landscape conditions in designating and managing ACECs").

(d.)  The Rule here restores the Planning 2.0 Rule's focus on mitigation by authorizing mitigation leases. In particular, it directs BLM officers to "apply [a] mitigation hierarchy to avoid, minimize, and compensate . . . for adverse impacts to resources when authorizing uses of public lands." 89 Fed. Reg. 40346 (43 C.F.R. § 6102.5.1). *See also id.* at 40311 ("the rule requires the BLM to apply a mitigation hierarchy").

146.  At bottom, the Rule rewraps the essential elements of Planning 2.0 in new paper. Congress wrote the CRA broadly to prevent such evasions by agencies, requiring only substantial similarity rather than identity. Because the Rule is substantially the same as a rule Congress has rejected under the CRA, BLM's readoption of substantially the same regulations Congress has already disapproved is contrary to law and must be set aside.

**B.  The Rule is arbitrary and capricious**

147.  The Rule is arbitrary and capricious in at least four ways.

148.  *First,* the Rule's seismic change in land-use policy goes unacknowledged and unexplained. Although the Rule sharply departs from nearly 50 years of settled practice and policy, BLM repeatedly describes the Rule as merely "clarifying" that conservation is a land-use on par with FLPMA's principal or major uses. *E.g.,* 89 Fed. Reg. at 40313.

45

149.   While BLM has always, and properly, considered conservation in establishing limits on authorized land uses, it has never designated "conservation" as a "use" itself, "on par" with productive, major and principal uses. Conservation has never had a preclusive effect on other land uses, where a wholly independent lease for a conservation use can effectively preclude any "incompatible" principal use for years at a time. *See* 89 Fed. Reg. at 40322; *see also id.* at 40343 (43 C.F.R. § 6102.4 (a)(4)).

150.   To be sure, agencies are free to change their policy positions, consistent with the terms of any governing statute. *See Exxon Corp. v. Lujan*, 970 F.2d 757, 762 n.4 (10th Cir. 1992) ("The law does not require an agency to stand by its initial policy decisions in all circumstances."). But for an agency to act reasonably in doing so, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Station*, 556 U.S. 502, 515 (2009). BLM does not show this awareness, instead disguising the titanic changes that the Rule implements as mere "clarifications" of existing policy.

151.   BLM says that its "ability to manage for multiple use and sustained yield of public lands depends on the resilience of ecosystems across those lands—that is, the ability of the ecosystems to withstand disturbance." 89 Fed. Reg. at 40308. And "[e]stablishing and safeguarding resilient ecosystems has become imperative as the public lands experience adverse impacts from climate change." *Id.* That is nothing new at all, and it does not address the supposed insufficiency of permit or lease conditions—including mitigation, protection, or reclamation efforts under the plans themselves. BLM thus does not explain why its existing tools for promoting conservation and addressing threats such as climate change are inadequate to reach its stated goals. And the Supreme Court has held that "climate change," however legitimate a concern, does not excuse unlawful rulemakings. *See generally West Virginia, supra.*

152.   Nor did the agency address "serious reliance interests [on its prior policy] that must be taken into account." *Fox Television*, 556 U.S. at 515. Introduction of major new administrative obstacles to obtaining leases and permits will have devastating impacts on entities that have long relied on BLM's prior policies concerning federal land use. The agency did not address those reliance interests, as it was required to do. On the contrary, it brushed them aside, certifying simply that "[t]he rule does not affect any existing use of public lands, nor does it impose restrictions on future use." 89 Fed. Reg. at 40334. And although the agency acknowledged in its economic analysis that the Rule will "increase restoration and mitigation activity on public lands and could affect other land uses if they are incompatible with the restoration or mitigation activity or may otherwise cause non-attainment of land health standards," it ultimately declined to consider the impact of that consideration in the rulemaking. *Economic Analysis* 27.

153.   Because the agency neither acknowledged its shift in policy nor explained why it is necessary, and it failed to meaningfully address reliance interests on the status quo ante, the Rule is arbitrary and capricious. *See Fox Television*, 556 U.S. at 515.

154.   **Second,** the Rule is arbitrary and capricious because BLM did not respond to major comments. For instance, many comments asserted that the Rule would violate FLPMA by allowing BLM to withdraw public lands from use by unauthorized means and without undergoing the withdrawal process as specified by Congress in FLPMA. *E.g.*, API Comment 20; AEMA Comment 13; NMA Comment 9; NRECA Comment 5-6, 9, 12-13; Alliance Comment 6. BLM offers no response. In fact, it does not so much as acknowledge the issue. This failure alone is additionally unlawful. *See Perez v. Mortgage Bankers Association*, 575 U.S. 92, 96 (2015) (agencies must "consider and respond to significant comments received during the period for public comment").

155.  *Third*, BLM's creation of a restoration and mitigation leasing program that omits public participation is arbitrary and capricious for treating conservation leases differently from leases or permits for land use. BLM has promulgated regulations providing for public involvement in leasing and permitting decision for all other land uses, consistent with 43 U.S.C. §§ 1712(f), 1739(e). Its unexplained departure from that practice here, treating its new conservation leases unlike all other land uses without acknowledgement or explanation, is arbitrary and capricious. *In re FCC 11-161*, 753 F.3d 1015, 1142 (10th Cir. 2014) ("The arbitrary-and-capricious standard requires an agency to 'provide an adequate explanation to justify treating similarly situated parties differently.'").

156.  *Fourth,* the Rule's leasing program is arbitrary and capricious because it does not offer meaningful guidance for affected parties. "Administrative action is arbitrary and capricious if it fails to articulate a comprehensible standard" and "offers no meaningful guidance to affected parties." *ACA International v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (quotation marks omitted). That is the case here. The Rule does not define "incompatible." Nor does it offer any guidance as to what standards BLM officers will exercise in deciding whether a proposed land use is "incompatible" with a conservation lease.

157.  The preamble to the Rule is itself inconsistent on this point. First BLM says that "[m]any uses are compatible with different types of conservation use," including "grazing." 89 Fed. Reg. at 40310. Later, BLM says that "proposed activities in a restoration or mitigation lease [may] not be compatible with grazing." 89 Fed. Reg. at 40327.

158.  The Rule offers the regulated public no guidance as to how they might predict whether land under a conservation lease is "compatible" with a proposed actual use. A rule that leaves affected parties in the dark as to how it will operate in practice is invariably arbitrary and capricious. *Hikvision USA v. FCC*, 97 F.4th 938, 950 (D.C. Cir. 2024)

(agency's definition of a critical term was arbitrary and capricious because it "fail[ed] to provide comprehensible guidance about what [fell] within [its] bounds").

### C.   The Rule violates NEPA

159.   NEPA and its implementing regulations require agencies to prepare an EIS for all "major federal actions." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4. NEPA's procedural requirements are mandatory, and "ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Winter v. NRDC, Inc.*, 541 U.S. 752, 757 (2004).

160.   The Rule easily qualifies as a "major federal action" requiring an EIS. CEQ regulations specify that "major federal actions" include "new or revised agency rules, regulations, *plans*, *policies*, or *procedures*." 40 C.F.R. § 1508.1(q)(2) (emphasis added). The same regulations specify that major federal actions "tend to" be "formal documents establishing an agency's policies which will result in or substantially alter agency programs" or "plans . . . which prescribe alternative uses of Federal resources, upon which future agency actions will be based." *Id.* § 1508.1(q)(3)(i), (ii).

161.   "As required by Section 102(2)(C) of NEPA, [EISs] are to be included in every . . . Federal action[] significantly affecting the quality of the human environment." 40 C.F.R. § 1502.3. NEPA's implementing regulations explain that an EIS "may be prepared for programmatic Federal actions, such as the adoption of new agency programs." 40 C.F.R. § 1502.4(b).

162.   BLM invokes a categorical exclusion to avoid a NEPA analysis. 89 Fed. Reg. at 40337 (citing 43 C.F.R. § 46.210(i)). In the relevant regulation, the Department has specified that rules "that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either

collectively or case-by-case" are excluded from NEPA's requirements." Here BLM concluded that the Rule is "administrative and procedural in nature" and that it therefore will not "directly result in any environmental effects." categorical exclusion Documentation, at 1.

163.  "Once an agency establishes categorical exclusions," the Court must still set aside "its decision to classify a proposed action as falling within a particular categorical exclusion . . . if a court determines that the decision was arbitrary and capricious." *Citizens' Committee*, 297 F.3d at 1023.

164.  BLM's reliance on the categorical exclusion was arbitrary and capricious, as it is inconsistent with the regulatory language and context.

165.  *First,* the Rule is not "procedural in nature." categorical exclusion Doc 1. These categories within the exclusion mirror the APA's exemption of "rules of agency organization, procedure, or practice" from the requirements of notice-and-comment rulemaking. 5 U.S.C. § 553(b)(4)(A); *see also* Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg. 61292, 61304 (Oct. 15, 2008) (describing "procedural rules" as emblematic of the actions covered by the categorical exclusion). Procedural rules are at bottom "internal house-keeping measures." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1035 (D.C. Cir. 2023).

166.  *Second,* the Rule is not "administrative." *See Administrative*, Merriam-Webster (2024) ("relating to the management of a company, school, or other organization"). The Rule here is substantive—it establishes information BLM must consider, the ways it will consider it, and creates entirely new land management categories establishing property interests for which a host of entities and individuals may now apply to remove public lands from congressionally authorized uses for decades. And it has direct and immediate impacts on regulated parties, including by modifying the requirements of resource management

plans. Rules like this one that implement a change to a regulatory framework "qualify as 'substantive' action" and "meet the relatively low threshold to trigger some level of environmental analysis under [NEPA]." *California ex rel. Lockyer v. Department of Agriculture*, 575 F.3d 999, 1013 (9th Cir. 2009).

167.   BLM's invocation of the categorical exemption is arbitrary and capricious inasmuch as it is conclusory and unreasoned. It makes no sense to interpret a categorical exclusion that covers regulations "of an administrative, financial, legal, technical or procedural nature" to cover a rule that revises BLM's substantive land-management priorities and "provides an overarching framework for multiple BLM programs." 89 Fed. Reg. at 40308.

168.   BLM's invocation of the categorical exclusion is arbitrary and capricious because it is inconsistent with its past practice. In both 1978 and 1983, BLM prepared an EA to evaluate its planning rules' potential environmental effects. *See Public Lands and Resources; Planning, Programming, and Budgeting*, 44 Fed. Reg. 46386 (Aug. 7, 1979); *Planning Programming, Budgeting; Amendments to the Planning Regulations; Elimination of Unneeded Provisions*, 48 Fed. Reg. 20364 (May 5, 1983).

169.   *Finally,* BLM's invocation of the categorical exclusion is arbitrary and capricious because "extraordinary circumstances" apply. 43 C.F.R. § 46.210. In the categorical exclusion documentation, BLM provided cursory analysis in a tabular format for each circumstance. *See* CX Documentation, at 2-4. But many of BLM's analyses misdescribe the Rule and ignore its real-world impacts. The categorical exclusion does not apply because the Rule will:

(a.)   "[h]ave highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources" (43 C.F.R. § 46.215(c));

(b.) "[h]ave highly uncertain and potentially significant environmental effects" (*id.* § 46.215(d));

(c.) "[e]stablish a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects" (*id.* § 46.215(e)).

170. Because BLM's invocation of the categorical exclusion was arbitrary and capricious, and because it failed to conduct an EA or prepare an EIS, the Rule violates NEPA.

### CLAIMS FOR RELIEF

### Count I –
### Agency Action in Excess of Statutory Authority

171. Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

172. Under the APA, courts must set aside agency action that is in excess of statutory authority. 5 U.S.C. § 706.

173. The Rule exceeds BLM's statutory authority and is contrary to law under FLPMA by, among other things:

(a.) interpreting "uses" under FLPMA to include non-uses such as conservation, mitigation, and restoration;

(b.) elevating the "uses" of conservation, mitigation, and restoration to the status of a "principal or major use" under the Act;

(c.) arrogating to BLM the power to set aside land for non-use through both leases and ACECs, despite that Congress has reserved that power to itself or otherwise granted it expressly and in limited circumstances, subject to strict procedural checks that the Rule does not observe;

(d.) arrogating to BLM power to adopt ACECs outside the resource management planning process, without notice and comment;

(e.) authorizing low-level BLM officers in effect to "withdraw" public lands from productive use without observing the procedural requirements established by law;

(f.) promulgating a regulation substantially the same as the Planning 2.0 Rule, which was disapproved by Congress under the Congressional Review Act.

174.   For these reasons and all others to be developed in plaintiffs' opening brief, the Rule exceeds BLM's statutory authority and must be set aside.

### Count II –
### Arbitrary and Capricious Agency Action

175.   Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

176.   Under the APA, courts must set aside agency action that is arbitrary or capricious. 5 U.S.C. § 706.

177.   The Rule is arbitrary and capricious in that it:

(a.)   does not adequately explain substantial changes in agency policy, including impacts on the status quo ante and reliance interests;

(b.)   fails to provide affected parties with meaningful guidance on how the Rule will operate in practice;

(c.)   deprives the public an opportunity to participate in or otherwise comment on conservation leasing decisions and "temporary" resource management plans that may remain in place for indefinite periods of time;

(d.)   failed to respond to significant comments made during the public comment period relating to matters of central relevance to the Rule and genuinely casting doubt on the reasonableness of its position; and

(e.)  relied on a categorical exclusion to avoid a NEPA review, despite that the categorical exclusion does not apply as a matter of fact or law.

178.  For these reasons and all others to be developed in plaintiffs' opening brief, the Rule is arbitrary and capricious and must be set aside.

## Count III –
### Procedural Violations of the Administrative Procedure Act

179.  Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

180.  Under the APA, courts must set aside agency action that is undertaken without observance of procedure required by law. 5 U.S.C. § 706(2).

181.  The Rule was promulgated without observance of procedures required by law in that BLM failed to conduct a required environmental analysis or prepare an EIS, as required by NEPA.

182.  For this reason and all others to be developed in plaintiffs' opening brief, the Rule was adopted without observance of procedure required by law and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs ask the Court to enter judgment in their favor and:

(a.)   set aside the Rule;

(b.)   declare the Rule to be unlawful and void;

(c.)   enjoin defendants from enforcing, implementing, or otherwise carrying out the Rule;

(d.)   award plaintiff its attorney's fees and costs; and

(e.)   award such other and further relief as the Court may deem just and proper.


Dated: July 12, 2024                              Respectfully submitted,

_____

BILLIE L.M. ADDLEMAN, #6-3690
TYSON R. WOODFORD, #8-6650
   Hirst Applegate, LLP
   P.O. Box 1083
   Cheyenne, WY 82003
   (307) 632-0541
   baddleman@hirstapplegate.com
   twoodford@hirstapplegate.com m

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>                                        *Plaintiffs*,<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; and Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br>                                        *Defendants.* | No. 1:24-cv-_____ |

**DECLARATION OF SHELBY HAGENAUER IN SUPPORT OF
PLAINTIFFS' COMPLAINT**

I, Shelby Hagenauer, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am Senior Director, Government Affairs at the American Farm Bureau Federation ("AFBF"). I am authorized to make this declaration on AFBF's behalf, and I am familiar with the activities and mission of AFBF and the priorities and concerns of its members.

3.      AFBF is a voluntary general farm organization formed in 1919, representing nearly 6 million member families through Farm Bureau organizations in all 50 states plus Puerto Rico,

1

including members who are directly and adversely impacted by the rule challenged in this case. Each state Farm Bureau is an independent entity, affiliated with AFBF through a membership agreement. Individual and family Farm Bureau members are associate members of AFBF.

4.     AFBF's primary function is to advance and promote the interests of farmers and ranchers and their rural communities. This involves advancing, promoting, and protecting the economic, business, social, and education interests of farmers and ranchers across the United States. AFBF has a dedicated staff and expends substantial resources to advocate on many issues before the public, Congress, the Executive Branch, and federal courts to serve the interests of farmers and ranchers. AFBF seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of agricultural land or federal lands available for multiple use.

5.     Advocating against and challenging the Rule falls within AFBF's mission to advance its members' longstanding interests in their grazing rights on federal lands.

6.     I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the U.S. Department of the Interior, Bureau of Land Management's ("BLM") final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the "Rule"). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses permitted under federal law, including grazing permits issued by BLM under the Taylor Grazing Act.

7.     AFBF filed extensive legal, policy, and economic comments in response to BLM's notice of proposed rulemaking. Grazing Coalition Comments in Response to the Bureau of Land Management's Notice of Proposed Rulemaking Related to Conservation and Landscape Health,

Docket No. BLM-2023-0001 (July 5, 2023); Coalition Comments from Alaska Chamber of Commerce et al. in Response to the Bureau of Land Management's Notice of Proposed Rulemaking Related to Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

8.      AFBF assists its members and the livestock industry more broadly by educating its members and the public. AFBF has expended resources to educate its members on the complexities and uncertainties of the Rule.

9.      Many AFBF members will be directly affected by the Rule. AFBF's members rely on federal lands in the American West to operate and sustain their businesses. Specifically, our members have relied on and will continue to rely on federal grazing permits that allow them to move their livestock throughout and graze on such lands. These members reside and operate throughout millions of acres of federal land, including vast tracts that the Rule now makes available for restoration leases and mitigation leases.

10.     By creating new categories of leases over tracts of public land for restoration and mitigation, BLM has altered the conditions for multiple uses of such lands, increasing competition (and thus risk) for longstanding users of the land, such as AFBF's members.

11.     The Rule is inflicting direct costs on AFBF as an organization and on its members. AFBF invests in assisting its members on matters related to their grazing operations on federal lands. Among other things, it undertakes education and training efforts to ensure its members are apprised of the current state of the law with respect to grazing permits.  AFBF has spent and will continue spending money educating its members on the Rule, as is its mission. An order vacating the Rule would save AFBF those added costs.

3

12.     Moreover, AFBF and its members will have to expend time and money to monitor proposals for mitigation or restoration leases on parcels that overlap or threaten to interfere with existing or intended future grazing permits. Where such proposals are made, AFBF and its members will have to review the proposals to determine any potential impacts to their grazing permits, and make decisions including whether to participate in or oppose such leases. The Rule will thus have a direct and immediate impact on the work AFBF and its members must do to limit the interference with its members' grazing permits under the Rule.

13.     In addition, AFBF members have regularly expressed uncertainty over how the vague language in the rule applies to current and future grazing permits for lands in and around their farmlands. To avoid the loss of permits, these members will need to expend resources to determine whether and when the parcels on which they rely will be subject to mitigation or restoration leases, and the consequences those leases have for grazing permits on that land.

14.     The Rule also is affecting the value of real property owned by AFBF members. To apply for grazing permits from BLM, applicants must own or control "base property." Base property is private land that either abuts public land; or "is capable of serving as a base of operation for livestock use of public lands within a grazing district"; or—outside a grazing district where no applicant owns or controls contiguous land—"is capable of being used in conjunction with a livestock operation which would utilize public lands...." *See* 43 C.F.R. § 4110.2-1(a)(1)-(2). Ownership of base property entitles an applicant to grazing preference for a specified number of "animal unit months" on public lands. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit. AFBF's members own base property throughout the American West.

4

15.     BLM's determination of base-property status follows the land. It does not belong to the owner or applicant personally. BLM regulations specify that "[w]hen a permit or lease terminates because of a loss of ownership or control of a base property, the grazing preference shall remain with the base property." 43 C.F.R. § 4110.2-1(e). Because base-property status follows the land and confers valuable benefits on the land, base property status increases the value of the land itself. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

16.     The Rule threatens ranchers' and farmers' interests in base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits and leases. By creating new categories of leases over tracts of public land for restoration and mitigation—tracts that otherwise would be open to grazing—the Rule makes it less likely that grazing permits will be issued as a general matter and thus reduces the premium that prospective buyers place on base-property status. Put another way, the Rule makes it less likely that base status on any given tract of private land will in fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied directly reduces the value of the base-status premium, and thus directly reduces the value of base property held by our members.

17.     Additionally, the Rule's new approach to Areas of Critical Environmental Concern (ACEC) risks significantly limiting ranchers' use of public lands. Particularly concerning is the ability for outside groups to nominate new ACECs outside of the land use planning process, after which BLM may implement "temporary" restrictions that materially impact ranchers' ability to use the relevant public land. 43 C.F.R. § 1610.7-2(i)(1)(ii).

18.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated; AFBF would no longer have to devote time and money to education, training, or monitoring; and AFBF's members' land values would be left undisturbed.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _____

Date: __6 / 25 / 2024_____

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior; and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br>*Defendants.* | No. 1:24-cv-_____ |

**DECLARATION OF CAROLYN L. MCINTOSH IN SUPPORT OF
PLAINTIFFS' COMPLAINT**

I, Carolyn L. McIntosh, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the 2024 President of the Board of Trustees of the American Exploration & Mining Association (AEMA), located in Spokane Valley, Washington. I am authorized to make this declaration on AEMA's behalf, and I am familiar with the activities and mission of AEMA and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

3.      Founded in 1895, AEMA is a national association representing the mineral development and mining industry. With members spanning 46 states, including Wyoming, as well

1

as 7 Canadian territories and 10 other countries, AEMA is a national voice for the exploration sector, the junior mining sector, as well as mineral developers interested in maintaining access to public lands. It represents the entire mining life cycle, from exploration through production to reclamation and closure.

4.      AEMA's 1,800 members have extensive first-hand experience with exploring for mineral deposits, finding and developing mineral deposits, permitting exploration and mining projects, operating mines, reclaiming mine sites, and ensuring that exploration and mining projects comply with all applicable federal and state environmental laws and regulations. More than 80 percent of AEMA's members are small businesses or work directly for small businesses.

5.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. The new leases made available under the Rule are designed to compete against and interfere with other uses, such as mining claims for mineral exploration and development under the Mining Law of 1872, 30 U.S.C. §§ 22 *et seq.* (General Mining Law).

6.      AEMA participated in the rulemaking process, commented on the proposed Rule, and has engaged in education of its members on the complexities and ambiguities of the Rule. *See* AEMA Comments BLM Proposed Rule on Conservation and Landscape Health Proposed Rule, Docket No. BLM-2023-0001 (June 30, 2023).

7.      The majority of AEMA's members rely on federal lands, predominantly in the American West, to operate and help sustain their enterprises. Specifically, members that are U.S. citizens have and will continue to rely on the right to stake mining claims and explore for valuable mineral deposits on federal lands that are "open to exploration." Such lands are only available in 19 of the 50 states: Alaska, Arizona, Arkansas, California, Colorado, Florida, Idaho, Louisiana, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming. Moreover, nearly two-thirds (61.5%) of all federal lands have been withdrawn from mineral entry for national parks, national monuments, wilderness, and other conservation purposes. Depending upon the minerals our members seek to produce and the location of the mineral deposit, some of AEMA's members lease federal lands under the Minerals

2

Leasing Act for Acquired Lands of 1947, 30 U.S.C. §§ 351-359, and other mineral leasing laws (Mineral Leasing Laws). Members further depend on easements across BLM lands for access to conduct mineral exploration and production on privately owned property.

8.    Before staking mining claims or applying for a mineral lease, AEMA member companies invest substantial funds in exploratory research to identify parcels of land containing resources for extraction. For example, they conduct land surveys, seismic data collection and analysis, and aerial exploration, and core drilling and analysis, among other techniques. These exploratory efforts are resource intensive. As documented by the National Research Council and National Academy of Science (NAS), discovering a hardrock mineral deposit requires extensive exploration and development drilling because the location, depth, mineral grade, and economic viability of hardrock mineral deposits is generally unknown.[1]

9.    Mitigation leases and restoration leases are designed to compete with mining claims and mineral leases. In effect, mitigation and restoration leases withdraw public lands from mineral exploration or development. By creating these new categories of leases on public lands, the Rule has created additional competition for limited public land. Increased competition reduces AEMA's members' access to public lands for exploration and reduces certainty that their investments to identify lands amenable to mineral development will translate into valuable mineral deposits. While stating the obvious, minerals may only be developed and produced where they exist. The NAS also reports that probabilistically 1,000 mineral targets must be identified and evaluated to discover a single deposit that economically can be developed into a mine. *Id.* at 24. This added risk and uncertainty is influencing how and when AEMA's members' are willing to commit their limited time and money on exploration efforts. In particular, members are less likely to commit resources to intensive up-front efforts like exploration drilling, which must be conducted and paid for to identify the existence and extent of a mineral deposit. Thus, the Rule is directly impacting their operations.

10.    The Rule pertains to AEMA's mission to advance its members' longstanding interests in access to and use of public lands to run their businesses. The Rule further results in

---

[1] *"Hardrock Mining on Federal Lands,"* National Academy Press (1999), page 135, available at https://nap.nationalacademies.org/download/9682.

direct expenses for AEMA, which advocates for and assists its members on matters related to their use of public lands. For example, AEMA already has devoted resources to continuing education programming to educate its members about the Rule and its impacts and requirements.

11.     Because the Rule introduces a new category of competition for mining claims and mineral leases on federal lands and provides a new, illegal mechanism for *de facto* withdrawal of public land from mineral entry, AEMA's members will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with their existing or intended future mineral exploration or development plans. If such nominations are made, AEMA members will have to determine whether to oppose or participate in the process for issuing any such leases. The Rule will thus have a direct and immediate adverse impact on the work AEMA's members must do to limit the Rule's interference with their land use rights and prospects.

12.     An order of the Court vacating the Rule would redress these harms. The increased mineral withdrawals and added competitive risks that the Rule introduces would be alleviated, and AEMA's members would no longer have to expend resources to monitor and contest leases that interfere with their mining claims and rights under the General Mining Law. Nor will AEMA have to continue educating its members about the Rule and its impact on federal land management or their operations. I declare under penalty of perjury that the foregoing is true and correct.

Signed by: _____

Name & Title: Carolyn L. McIntosh, AEMA President, 2024

Date: June 21, 2024 _____

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

|  |  |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance, <br><br> *Plaintiffs,* <br><br> v. <br><br> United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; and Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management,* <br><br> *Defendants.* | No. 1:24-cv-_____ |

**DECLARATION OF HOLLY HOPKINS IN SUPPORT OF
PLAINTIFFS' COMPLAINT**

I, Holly Hopkins, hereby declare as follows:

1.     I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.     I am Vice President at the American Petroleum Institute ("API") in Washington, D.C. I am authorized to make this declaration on API's behalf, and I am familiar with the activities and mission of API and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

1

3.      API is the primary national trade association that represents all facets of the oil and natural gas industry, which supports nearly 11 million U.S. jobs and 8 percent of the U.S. economy. API represents the oil and natural gas industry by advocating for legislation at the federal, state, and local level, by educating members of the general public about the benefits that oil and natural gas provide for human health, safety, convenience, and prosperity, by engaging with federal and state administrative agencies to promote policies on behalf of the oil and natural gas industry, and by engaging in litigation that could impact the oil and natural gas industry. API also provides educational materials and programming for its members relating to oil and gas standards and regulations.

4.      API's approximately 600 members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine business, and service and supply firms. API's members provide most of the nation's energy and are backed by a growing grassroots movement of millions of Americans.

5.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. The new leases made available under the Rule are designed to compete against and interfere with other uses, such as leases for oil and gas extraction issued by BLM under the Mineral Leasing Act of 1920.

6.      API participated in the rulemaking process, commented on the proposed Rule, and has engaged in education of its members on complexities and ambiguities of the Rule. *See* American Petroleum Institute et al., Comments on the Bureau of Land Management's Conservation and Landscape Health Proposed Rule, Docket No. BLM-2023-0001 (July 5, 2023).

7.      Some of API's members rely on federal lands in the American West to operate and help sustain their enterprises. Specifically, members have and will continue to rely on oil and gas leases that are necessary for them to explore and extract these resources. Members further depend on easements across BLM lands to conduct oil and gas exploration and production on privately owned property.

8.      Before applying for a lease, member companies invest substantial funds in exploratory research to identify parcels of land containing resources for extraction. For example, they conduct land surveys, seismic data collection and analysis, and aerial exploration, among other techniques. These exploratory efforts are resource intensive.

9.      Mitigation leases and restoration leases are designed to compete with oil and gas leases. By creating these new categories of leases on public lands, the Rule has created additional competition for limited public land. Increased competition reduces API's members' certainty that their investments to identify lands amenable to oil and gas extraction will translate into actionable leases and permits. This added risk and

2

uncertainty is influencing how and when API's members' are willing to commit their limited time and money to exploration efforts. In particular, members are less likely to commit resources to intensive up-front efforts like seismic surveys, which must be paid for without first obtaining a lease. Thus, the Rule is directly impacting their operations.

10.     The Rule pertains to API's mission to advance its members' longstanding interests in access to and use of public lands to run their businesses. The Rule further results in direct expenses for API, which advocates for and assists its members on matters related to their use of public lands. For example, API already has devoted resources to continuing education programming to educate API's members about the Rule and its impacts and requirements.

11.     Because the Rule introduces a new category of competition for leases on federal lands, API's members will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with their existing or intended future leases. If such nominations are made, API members will have to determine whether to oppose or participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work API's members must do to limit the Rule's interference with their land use rights and prospects.

12.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and API's members would no longer have to monitor and strategize. Nor will API have to continue educating its members about the Rule and its impact on federal land management or their operations.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by: _____

Name & Title: __Holly Hopkins, VP Upstream Policy__

Date: __6/4/24_____

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming Farm
Bureau Federation, Natrona County Farm & Ranch
Bureau, American Exploration & Mining Association,
American Forest Resource Council, American
Petroleum Institute, American Sheep Industry
Association, National Cattlemen's Beef Association,
National Mining Association, National Rural Electric
Cooperative Association, Public Lands Council, *and*
Western Energy Alliance,

                               *Plaintiffs*,

v.

United States Department of the Interior; United States
Bureau of Land Management; Debra Haaland *in her
official capacity as Secretary of the Interior*; Steve
Feldgus *in his official capacity as Principal Deputy
Assistant Secretary of the Interior*; *and* Tracy Stone-
Manning *in her official capacity as the Director of the
Bureau of Land Management*,

                               *Defendants*.

No. 1:24-cv-_____

## DECLARATION OF ANDY GEISSLER IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Andy Geissler, hereby declare as follows:

      1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

      2.      I am the Federal Timber Program Director at the American Forest Resource Council (AFRC), and I am authorized to make this declaration on AFRC's behalf, and I am familiar with the activities and mission of AFRC and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

      3.      AFRC is a regional trade association that represents over 50 forest product businesses and forest landowners throughout the West in Oregon, Washington, California, Idaho, Nevada, and Montana. AFRC's purpose is to advocate for sustained-yield timber harvests on

1

public timberlands throughout the West to enhance forest health and resistance to fire, insects, and disease. The ultimate goal of AFRC's work is to advance its members' ability to practice socially and scientifically responsible forestry on both public and private forest lands. AFRC accomplishes this goal by promoting active management to attain productive public forests, protect adjoining private forests, and assure community stability. AFRC also works to improve federal and state laws, regulations, and policies and decisions regarding access to and management of public forest lands and protection of all forest lands.

4.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will interfere with uses BLM officers consider "incompatible" with the conservation use.

5.      AFRC participated in the rulemaking, commented on the proposed Rule, and has worked to educate and inform its members on the Rule's implications, complexities, and ambiguities. *See* AFRC, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (June 23, 2023).

6.      AFRC's members will be directly impacted by this Rule. Because many of AFRC's members do not own private timberland, they depend heavily on federal lands to source raw materials for their milling and logging operations and, therefore, are frequent purchasers of timber sales offered by the BLM. The management of federal lands ultimately dictates not only the viability of their businesses, but also the economic health of the communities in which they operate.

2

7.      Sun Mountain Lumber is a family operated business that has had a steady presence in the timber products industry in the state of Montana since 1976. Sun Mountain Lumber's Deer Lodge location currently employs 157 people at its stud mill and fingerjoint facility. On November 1, 2023, Sun Mountain Lumber purchased R-Y Timber's sawmill in Livingston, Montana, preserving the much-needed milling infrastructure and the jobs they support. The Livingston sawmill was one of the largest mills operating in central and eastern Montana. Sun Mountain does not own its own private timberlands in Montana and therefore relies heavily on a predictable and steady supply of public timber, including that which is sold by the BLM. Over the last six fiscal years (2018 to 2023), Sun Mountain utilized 16.7 MMbf of timber from BLM land in Montana to supply their mills.

8.      Boise Cascade is headquartered in Boise, Idaho, and since its founding in 1957, has grown to become a leading manufacturer and distributor of building materials in North America, with mills located in Idaho, Oregon, Washington, Louisiana, Alabama, North Carolina, South Carolina, and Canada. Boise Cascade owns and operates four mills in Western Oregon, employing just over 700 workers with family-wage jobs that provide health care and other benefits. Boise Cascade's White City and Medford mills are located near the center of the Medford District and rely heavily on BLM timber sales for their production and capacity needs. Over the last six fiscal years (2018 to 2023), Boise Cascade purchased 61.5 MMbf off the Medford District. Boise Cascade does not own or manage any private timberlands in Western Oregon and therefore relies heavily on a predictable and steady supply of public timber, including that which is sold by the BLM.

9.      Mineral Creek Logging and Hauling (Mineral Creek) was founded in 2010 by Dustin De Atley. Mineral Creek employs 32 full-time employees with family-wages and invests

3

heavily into the surrounding rural communities through youth sponsorships and local-sourcing of their parts and fuel. As a full-operation logging company, Mineral Creek purchases and executes timber sale contracts from start to finish, including road building and maintenance, logging, hauling, and forest residual cleanup. Mineral Creek prides itself on being great stewards of the forest and considers its operations as integral to maintaining and improving forest health and resiliency—particularly because they can use low impact machinery to process smaller trees and material that would otherwise be left on the forest floor to contribute to future hazardous fuels loading. Mineral Creek needs approximately 30 MMbf per year to remain operational. Mineral Creek would like to increase its production and operations, but the company is constrained by a shortage of timber supply. Mineral Creek could harvest and process 35 MMbf annually at fully operational levels. Mineral Creek does not own or manage any private timberlands in Western Oregon and therefore relies heavily on a predictable and steady supply of public timber, including that which is sold by the BLM to supply sustainable timber to its facilities. On average, 80 percent of its annual timber consumption comes from federal timberlands. Over the past six fiscal years (2018 to 2023), Mineral Creek purchased 31.6 MMbf off the Medford District.

10. Swanson Group, Inc. is a consolidation of multiple family-owned businesses that have been independently supporting Oregon communities since 1951, and collectively as Swanson Group since 2001. Swanson Group is a major private employer in the communities in which its manufacturing facilities operate and takes pride in providing many family-wage jobs to those rural communities. Currently, Swanson Group employs 801 employees spread throughout its Glendale (plywood), Roseburg (stud mill), and Springfield (plywood) facilities. On average, Swanson Group hires 20 contract loggers, each of which work with a crew size of about 10 people. Swanson Group wishes to increase its production to boost profitability, but the company is heavily

4

dependent on public lands to supply raw materials to its facilities and is constrained by a shortage of sustainable timber. Over the past six fiscal years (2018 to 2023), Swanson Group purchased 8.5 MMbf off the Medford District. Swanson Group does not own or manage any private timberlands in Western Oregon and therefore relies heavily on a predictable and steady supply of public timber, including that which is sold by the BLM to supply sustainable timber to its facilities.

11.    BLM timber sales in Montana and Western Oregon are advertised for sale 30 days prior to auction. During these 30 days, our members invest significant financial resources to review the sale packages, visit the sale area to cruise the timber and develop volume estimates, solicit bids from sub-contractors, secure bid bonds, and finalize their bid amount. Our members routinely factor in costs associated with risk and competition to these bids. Among those risks include delay of contract award due to litigation from special interest groups and direct action against timber sales by special interest groups.

12.    The Rule creates new categories of land use called mitigation leases and restoration leases. By creating these new categories for leases over public lands, the Rule has created additional risk and competition that AFRC's members will have to factor into their competitive bidding process. The same special interest groups that litigate timber sale decisions and physically block the implementation of sold timber sales can now wield restoration and mitigation leases as another tool to halt or delay timber sales that our members depend on. These actions not only represent a risk to our members but are also a form of competition for use of the lands where timber sales are planned and advertised.

13.    The Rule also alters the manner in which Areas of Critical Environmental Concern (ACEC) are considered, analyzed, and implemented by the BLM. Prior to the Rule, ACECs were generally considered through the management plan revision process that included robust public

5

engagement.  Any consideration of new ACECs outside of the planning process would include a 60-day public comment period.  The Rule eliminates this 60-day public comment period and requires the State Director to respond to any new ACEC nomination by either initiating a new land use planning process or providing temporary management consistent with the applicable resource management plan.  This new process would allow any special interest group to simply nominate an ACEC on top of an advertised timber sale that they wish to block to compel the State Director to create temporary management in a manner that would likely halt the planned timber sale.

14.    These additional layers of risk and competition for resource use created by leases and ACEC nominations on top of advertised timber sales will compel our members to a.) modify their bid price that may put them at a competitive disadvantage, and/or b.) allocate resources to secure timber products from sources beyond BLM lands.  An informational bulletin dated May 30, 2024, and distributed to all BLM employees identifies the consideration of ACEC nominations and implementation of interim management and the processing of restoration and mitigation leases as "immediate" implementation actions.  Therefore, any timber sale planned and advertised from this point forward is subject to these new layers of risk and competition.

15.    These new risks and competitive factors, coupled with the existing risks and competitive factors, have already compelled our members in Southwest Oregon to expand the reach of their purchasing circle to secure timber volume beyond their historic reach.  For example, in January of this year, Boise Cascade purchased a timber sale off the Coos Bay BLM District to source raw material for their Medford and White City mills.  That timber sale is located approximately 150 miles away from those facilities, which is far beyond their standard purchasing circle and represents an added cost to doing business.

6

16.     The Rule also causes direct expense to AFRC as an organization. It is part of AFRC's mission to assist its members on matters related to their operations on federal lands. AFRC has already dedicated resources toward educating and informing its members on the impacts the Rule will have on their operations. AFRC has prepared member bulletins focused on the Rule, presented summaries of the Rule to its Board of Directors, and responded to numerous inquiries from specific members on the likely impacts of the Rule once finalized.

17.     AFRC also will have to expend time and money to monitor new ACEC nominations and monitor applications for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with timberlands that would otherwise source materials for their members' operations.  Since the new Rule eliminates direct public engagement on new ACEC nominations by stripping the 60-day comment period, AFRC will have to dedicate time to regularly communicate with the State Director to monitor new nominations.  Any time the BLM eliminates avenues that foster public engagement, an additional onus is placed on interested members of the public to stay informed and engaged.  The Rule will thus have a direct and immediate impact on the work AFRC must do to limit the Rule's interference with its members' land use rights and prospects.

18.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and AFRC would no longer have to devote time and money to education, training, or monitoring.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by: _____

Name & Title: Andrew Geissler
              Federal Timber Program Director

7

Date: 7-2-24

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

American Farm Bureau Federation, Wyoming
Farm Bureau Federation, Natrona County Farm &
Ranch Bureau, American Exploration & Mining
Association, American Forest Resource Council,
American Petroleum Institute, American Sheep
Industry Association, National Cattlemen's Beef
Association, National Mining Association, National
Rural Electric Cooperative Association, Public
Lands Council, *and* Western Energy Alliance,

*Plaintiffs,*

v.

United States Department of the Interior; United
States Bureau of Land Management; Debra
Haaland *in her official capacity as Secretary of the
Interior;* Steve Feldgus *in his official capacity as
Principal Deputy Assistant Secretary of the Interior,*
*and* Tracy Stone-Manning *in her official capacity as
the Director of the Bureau of Land Management,*

*Defendants.*

No. 1:24-cv-_____

---

**DECLARATION OF PETER ORWICK IN SUPPORT OF
PLAINTIFFS' COMPLAINT**

I, Peter Orwick, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could
testify to the facts stated herein.

2.      I am Executive Director of the American Sheep Industry Association ("ASI").
I am authorized to make this declaration on ASI's behalf, and I am familiar with the
activities and mission of ASI and the priorities and concerns of its members. I am
personally familiar with the facts stated herein.

1

3.      ASI is the national trade organization for the American sheep industry. ASI works to protect the interests of all sheep producers, from farm flocks to range operations. ASI represents the interests of more than 80,000 sheep producers throughout the United States, through a federation of 44 state sheep associations as well as individual members. ASI's roots trace to 1865 and the first national livestock association.

4.      ASI members own and operate their enterprises on lands throughout the United States. They rely heavily upon the ability to move livestock between private and federal lands and to use those federal lands. As a result, federal grazing permits are critical or sustaining ASI's members' business operations, livelihoods, and way of life.

5.      ASI assists its members and the livestock industry more broadly by educating its members and the public on issues related to animal care and welfare and animal health. ASI further provides education related to government programs and disaster relief, including grazing permits. ASI specifically provides educational materials concerning the risks associated with livestock operations and their intersections with government programs, including their Targeted Grazing Handbook.

6.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses permitted under federal law, including grazing permits issued by BLM under the Taylor Grazing Act.

7.      ASI commented on the proposed Rule and engaged in education of its members on complexities and ambiguities of the Rule. *See* Grazing Coalition Comments in Response to the Bureau of Land Management's Notic of Proposed Rulemaking Related to Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

8.      To apply for grazing permits from BLM, applicants must own or control "base property." Base property is private land that either abuts public land; or "is capable of serving as a base of operation for livestock use of public lands within a grazing district" or—outside a grazing district where no applicant owns or controls contiguous land—"is capable of being used in conjunction with a livestock operation which would utilize public

2

lands." See 43 C.F.R. § 4110.2 1(a)(1) (2). To have property recognized as base property, an applicant must go through BLM's approval process. Once approved, ownership of base property entitles an applicant to grazing preference for a specified number of "animal unit months" on public lands. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit. ASI's members own base property throughout the American West.

9.      BLM's determination of base-property status follows the land. That is to say, it does not belong to the owner or applicant personally. BLM regulations specify that "[w]hen a permit or lease terminates because of a loss of ownership or control of a base property, the grazing preference shall remain with the base property." 43 C.F.R. § 4110.2-1(e). Because base-property status follows the land and confers valuable benefits on the land, base property status increases the value of the land itself. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

10.      The Rule threatens ASI's members' interests in base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits and leases. By creating new categories of leases over tracts of public land for restoration and mitigation—tracts that otherwise would be open to grazing—the Rule makes it less likely that grazing permits will be issued as a general matter and thus reduces the premium that prospective buyers place on base-property status. Put another way, the Rule makes it less likely that base status on any given tract of private land will in fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied directly reduces the value of the base-status premium, and thus directly reducing the value of base property held by our members.

11.      Moreover, by a creating new categories of leases over tracts of public land for restoration and mitigation, BLM has altered the competitive conditions for private use of such lands, increasing competition (and thus risk) for longstanding users of the land, such as ASI's members.

12.      The Rule's new approach to Areas of Critical Environmental Concern (ACEC) will significantly limit ASI's members' use of public lands. Outside groups can,

under the Rule, nominate new ACECs outside of the land use planning process. This will allow BLM to implement "interim" restrictions that materially impact ranchers' ability to use the relevant public land (43 C.F.R. § 1610.7-2(c)(3)) without public participation. ASI and its members have previously been able to participate in relevant administrative processes for ACECs. Under the Rule, BLM will now be able to implement restrictions based on ACECs without public participation of any kind.

13.    Advocating against and challenging the Rule falls within ASI's mission to advance its members' longstanding interests in their grazing rights. The Rule is thus inflicting direct costs on ASI as an organization. ASI invests in assisting its members on matters related to their grazing operations on federal lands. Among other things, it undertakes education and training efforts to ensure its members are apprised of the current state of the law with respect to grazing permits. ASI has spent and will continue spending money bringing its members up to speed on the Rule, as is its mission. An order vacating the Rule would save ASI those added costs.

14.    ASI also will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its members' existing or intended future grazing permits. If such nominations are made, ASI will have to determine whether to participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work ASI must do to limit the interference with its members' grazing permits under the Rule.

15.    An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and ASI would no longer have to devote time and money to education, training, or monitoring.

Signed by: _____

Name & Title: _Peter Chuck – Executive Director_

Date: _June 24, 2024_

Signed under penalty of perjury.

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming Farm
Bureau Federation, Natrona County Farm & Ranch
Bureau, American Exploration & Mining Association,
American Forest Resource Council, American
Petroleum Institute, American Sheep Industry
Association, National Cattlemen's Beef Association,
National Mining Association, National Rural Electric
Cooperative Association, Public Lands Council, *and*
Western Energy Alliance,

*Plaintiffs*,

v.

United States Department of the Interior; United States
Bureau of Land Management; Debra Haaland *in her
official capacity as Secretary of the Interior*; Steve
Feldgus *in his official capacity as Principal Deputy
Assistant Secretary of the Interior*; and Tracy Stone-
Manning *in her official capacity as the Director of the
Bureau of Land Management*,

*Defendants*.

No. 1:24-cv-_____

## DECLARATION OF KATIE SWEENEY IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Katie Sweeney, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to
the facts stated herein.

2.      I am executive vice president and chief operating officer at the National Mining
Association ("NMA"). I have been employed by NMA for more than 30 years and have decades

1

of engagement on policies that impact mining on federal lands. I am authorized to make this declaration on NMA's behalf, and I am personally familiar with the facts stated herein.

3.      The NMA is a national trade association that represents the interests of the mining industry including the producers of most of America's metals, coal, and industrial and agricultural minerals—before Congress, the administration, federal agencies, the courts, and the media.

4.      The NMA has over 250 members. NMA's members include, among others, the Navajo Transitional Energy Company and Barrick Gold/Nevada Gold Mines, which are submitting declarations in support of NMA's standing.

5.      The NMA is the only national trade organization that serves as the voice of the U.S. mining industry and the hundreds of thousands of American workers it employs before Congress, the federal agencies, the judiciary, and the media, advocating for public policies that will help America fully and responsibly utilize its vast natural resources.

6.      NMA's members frequently conduct mining activities on lands managed by the federal government and therefore, the NMA engages in education, advocacy, and regulatory processes on behalf of its members related to resource extraction on public lands.

7.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule equates nonuses of federal lands with uses identified by Congress under the Federal Land Policy and Management by, among other things, allowing persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses regulated

by BLM, such as hardrock mining activities under the General Mining Laws and leases for coal or other solid minerals under the Mineral Leasing Act of 1920.

8.      NMA participated in the rulemaking process, commented on the proposed Rule, and has engaged in education of its members on complexities and ambiguities of the Rule. *See* National Mining Association, Comments on Bureau of Land Management Conservation and Landscape Health Proposed Rule, Docket No. BLM-2023-0001 (July 5, 2023).

9.      NMA's members rely on federal lands in the American West to operate and sustain their enterprises. For example, federal lands account for as much as 86 percent of the land area in certain Western states and these same states account for 75 percent of our nation's hardrock metals and minerals production. Similarly, much of the nation's coal and phosphate production comes from federal leases in Western states. Specifically, members have and will continue to rely on BLM plans of operations for hardrock minerals and leases for coal or other solid minerals that are necessary for exploration and development of resources throughout federal lands. Members further depend on easements across BLM lands to conduct mining activities on state or privately owned property.

10.      Before submitting a plan of operations for hardrock minerals, member companies engage in a years-long capital-intensive process of exploration as concentrations of useful minerals that are rich enough to form ore deposits are rare with approximately 1 out of 1,000 deposits having the qualities that allow them the chance of being transformed into an operating mine. Exploration and other pre-development activities such as baseline environmental studies, economic feasibility studies, engineering design studies and permitting activities are resource intensive often exceeding hundreds of millions of dollars.

11.     As more data is available about the location of federal coal and other leasable solid minerals, less costs are spent on exploration, but the remaining pre-lease development activities are similar to hardrock mining in regards to capital expenditures required.

12.     The Rule creates new categories of land use called mitigation leases and restoration leases. By creating these new categories for leases over public lands, the Rule has created additional competition for limited public land. Increased competition reduces NMA's members' certainty that their investments to identify lands amenable to mining will translate into actionable hardrock plans of operations and coal and other solid mineral leases. As new mining operations are either restricted or banned on more than half of all federally owned public lands, this added risk is already influencing how and when NMA's members' are willing to commit their limited time and money to exploration and/or other pre-development activities.

13.     The Rule pertains to NMA's mission to advance its members' longstanding interests in access to and use of public lands to run their businesses.

14.     The Rule also causes direct expense to NMA as an organization. NMA invests in advocating for and assisting its members on matters related to their mining activities on federal lands. The NMA will have to develop an advocacy and educational campaign specific to the threats posed by the rule in an effort to engage with the BLM and Congress to minimize such threats. The NMA will be required to dedicate resources to gather additional data to credibly support that campaign and develop a suite of new tools to communicate that data, including reports, fact sheets, website content and social and digital media materials. The NMA will also need to develop education and training materials for members on the Rule's new leasing process to allow them to understand their ability to participate in the auction process.

15.    NMA also will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its members' existing or intended future hardrock mining or coal and other solid mineral leases. If such nominations are made, NMA will have to determine whether to participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work NMA must do to limit the Rule's interference with its members' land use rights and prospects.

16.    An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and NMA would no longer have to devote time and money to advocacy, education, training, or monitoring.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by:   *Katie Sweeney*

Name & Title: Executive Vice President & Chief Operating Officer

Date: June 14, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>       *Plaintiffs*,<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; and Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br>       *Defendants*. | No. 1:24-cv-_____ |

**DECLARATION OF LOUIS FINKEL IN SUPPORT OF**
**PLAINTIFFS' COMPLAINT**

I, Louis Finkel hereby declare as follows:

1.  I am senior vice president of government relations at the National Rural Electric Cooperative Association ("NRECA"). I am over the age of 18 years old, and I am competent to testify concerning the matters stated herein. The facts set forth in this Declaration are based on my personal knowledge and information that I have reviewed and rely upon in the ordinary course of my work. I am authorized to make this Declaration on NRECA's behalf, and I am familiar with

1

the activities and mission of NRECA and the priorities and concerns of its members. If called and sworn as a witness, I could and would competently testify to the matters discussed in this declaration.

2.     I have been employed at NRECA since 2019. I hold a bachelor's degree from George Washington University. I have more than 25 years' experience working on a wide range of federal and state policy matters. Prior to joining NRECA, I served in executive positions leading government affairs programs for CVS Health Corporation, the American Petroleum Institute and the Grocery Manufacturers Association. I also served as a staff member for several members of Congress, including as chief of staff for the Committee on Science and Technology for the U.S. House of Representatives. As the senior vice president of government relations at NRECA, I am responsible for overseeing all aspects of the organization's advocacy before Congress and federal agencies, and I am member of the Association's executive leadership team.

3.     This Declaration is submitted in support of NRECA's Complaint regarding the U.S. Bureau of Land Management's ("BLM") Final Rule entitled, *Conservation and Landscape Health*, 89 Fed. Reg. 40308 (May 9, 2024) ("Rule"). I have reviewed and am familiar with the Rule and the Complaint filed in this case. I understand that the lawsuit challenges the Rule.

4.     NRECA participated in the rulemaking, commented on the proposed Rule, and has engaged in education of its members on complexities and ambiguities of the Rule.[1]

### NRECA AND ITS MEMBERS

5.     NRECA is the national trade association representing nearly 900 not-for-profit electric cooperatives and other electric utilities. NRECA was formed in 1942 by rural electric cooperative leaders to provide a unified voice for electric cooperatives and to represent their

---

[1] *See* NRECA, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

2

interests in Washington, D.C. NRECA's mission is to promote, support, and protect the community and business interests of electric cooperatives. NRECA advocates on behalf of its members before Congress and federal agencies, including the U.S. Department of the Interior ("DOI"). NRECA's member cooperatives include 64 generation and transmission ("G&T") cooperatives and 832 distribution cooperatives.[2]

6.      America's electric cooperatives comprise a unique sector of the electricity industry. These not-for-profit entities are independently owned and democratically governed by the people they serve. They exist in rural areas, where low populations and incomes have not attracted for-profit power companies. Electric cooperatives are focused on providing affordable, reliable, and safe electric power to rural communities.

7.      Each cooperative is governed by a board of directors elected from its membership. The G&T cooperatives generate and transmit power to distribution cooperatives which then provide that power to consumer-members. Collectively, G&T cooperatives generate and transmit power to nearly 80% of distribution cooperatives, which in turn provide power directly to consumer-members at the "end of the line"—*i.e.*, the location where electricity is consumed. The remaining distribution cooperatives obtain power directly from other generation sources within the electric utility sector. Both distribution and G&T cooperatives share an obligation to serve their consumer-members by providing affordable, reliable, and safe electric service.

8.      Most electric cooperatives are considered small entities by the U.S. Small Business Administration under the Regulatory Flexibility Act, which requires agencies to analyze the effects of their regulations on entities including small businesses, small not-for-profits, and small governmental jurisdictions. As such, cooperatives depend on processes such as the Regulatory

---

[2] National Rural Electric Cooperative Association, *Electric Co-op Facts and Figures* (April 19, 2024), https://tinyurl.com/y89bvn4e ("Co-op Facts").

3

Flexibility Act ("RFA") to ensure that the impacts of government rules and other actions on electricity supply and rates are fully vetted by government agencies.

9.      Electric cooperatives provide power to one in eight Americans and serve as engines of economic development for 42 million people across 56% of the nation's landmass. They own and maintain 2.7 million miles, or 42 percent, of the nation's electric distribution lines and serve large expanses of the United States that are primarily residential and typically sparsely populated, including large areas of our nation's public lands in the Western United States.

10.     Those characteristics make it comparatively more expensive for rural electric cooperatives to operate than the rest of the electric sector, which tends to serve more compact, industrialized, and densely populated areas.

11.     Since electric cooperatives serve areas with low population density, costs are borne across a base of fewer consumers and by families that spend more of their limited resources on electricity than do comparable customers of municipal-owned or investor-owned utilities serving higher density areas. Using data from the U.S. Energy Information Administration and other sources, NRECA estimates that rural electric cooperatives serve an average of eight consumers per mile of line and collect annual revenue of approximately $19,000 per mile of line. In contrast, for the rest of the industry, the averages are 32 customers and approximately $79,000 in annual revenue per mile of line.

12.     Many cooperative consumer-members are among those least able to afford higher electricity rates. Electric cooperatives serve 92% of persistent poverty counties in the United States.[3] In 2022, the average (mean) household income for electric cooperative consumer-members was 12% below the national average.

---

[3] Co-op Facts, *supra* n.1.

4

13.     The electricity supplied by cooperatives is vital to rural economies, including those in and around our nation's public lands. Rural development requires access to affordable and reliable electric power. Regulations that are not cost-effective and increase the cost of that electricity, or that threaten its availability and reliability, thus pose serious threats to economies in large regions of America.

14.     As not-for-profit entities, electric cooperatives are unique in the way that they are financed. Cooperatives have no equity shareholders who can bear the costs of increased permitting requirements, vegetation management costs, stranded generation assets, or investment in new or alternative generation resources. Cooperatives do not have a rate of return on equity as do investor-owned utilities. All costs are passed through directly to each cooperative's consumer-members via increased electric rates.

15.     Because of their not-for-profit nature, cooperatives operate on thin financial margins and maintain minimal cash reserves for anticipated operating expenses and unforeseen events. Should operating or infrastructure project costs rise due to increased regulatory compliance costs, cooperatives either must (1) rely on debt sourced from entities such as the U.S. Department of Agriculture's Rural Utilities Service ("RUS"), which is often subject to loan restrictions and lengthy approval processes, including National Environmental Policy Act ("NEPA") review, for projects; or (2) raise rates for their consumer-members. In either instance all costs, including the costs of borrowing, are necessarily passed on to cooperatives' consumer-members at the end of the line who bear the cost of regulations through increased electric rates.

## COOPERATIVE OPERATIONS ON PUBLIC LANDS

16.     Rural communities—including those based upon ranching, mining, and recreation—across the Western United States depend upon the safe, affordable, and reliable

5

electricity that cooperatives provide to power and safeguard their livelihoods, health and safety, and economic stability.

17.     NRECA's members operate tens of thousands of miles of electric transmission and distribution lines across BLM-managed lands. The vast amount of BLM-managed public lands in rural America, and their checkerboard nature, necessarily requires cooperatives to obtain Rights-of-Way ("ROWs") across BLM lands in order to fulfill their mission of providing reliable, affordable, and safe electricity to rural communities.

18.     Cooperatives submit applications for generation, transmission, and distribution ROWs on BLM-administered public lands pursuant to the Federal Land Policy and Management Act ("FLPMA") and in accordance with 43 C.F.R. § 2800, et seq.[4]

19.     BLM must approve such ROW applications and renewals. Each ROW is subject to conditions and holds the ROW holder liable for damages arising from their operations.[5]

20.     BLM is required to manage public lands under FLPMA's mandate of "Multiple Use and Sustained Yield" ("MUSY"), thus maximizing *use* of our Nation's public lands "so that they are utilized in the combination that will best meet the present and future needs of the American people."[6] To implement MUSY, Congress specifically directed BLM in FLPMA to prioritize specific *major and principal uses* of public lands, including mining, domestic livestock grazing, oil and gas production. and utility ROWs.[7]

21.     Cooperatives utilize ROWs across BLM-managed public lands under the doctrine of MUSY, and they depend upon FLPMA's consistent prioritization of utility ROWs as a principal

---

[4] 43 U.S.C. 1761(a)(4).

[5] *Id.*

[6] 43 U.S.C. §§ 1701(a)(12); 1732(a) (emphasis added).

[7] *Id.* at § 1702(l) (emphasis added).

use of public lands in their operations, budgeting, and project planning processes. The ability of cooperatives to secure, access, operate on, and maintain ROWs is necessary not only to meet current power needs but also to accommodate the increasing demand for electricity required to enable new loads, including artificial intelligence, data centers, the onshoring of manufacturing and electrification of the economy, incorporating new and renewable sources of energy into the grid, and mitigating for risks such as wildfire.

22.     Cooperatives must access their ROWs and maintain their infrastructure on an ongoing basis in order to identify and remove hazardous vegetation; inspect infrastructure; and repair and replace equipment where necessary to ensure that that poles, lines, and other critical infrastructure meet operational and safety standards. Access points and access roads to ROWs are required to conduct these operation and maintenance activities, and heavy equipment must sometimes be moved into and around ROWs to complete tree trimming, maintenance, and other processes essential to maintaining service.

23.     Cooperatives also frequently must improve or "harden" their grid to make electric infrastructure more resilient in areas at risk of wildfire or other adverse incidents. This can include replacing a wooden pole with a metal pole; undergrounding power lines; and reducing hazardous vegetation in and around their ROWS, including trees infringing on powerlines or at risk of falling onto electric infrastructure.

24.     In an increasingly more electrified world where more energy is needed to meet growing demand, cooperatives also must expand their infrastructure in existing and new ROWs to incorporate new and renewable sources of energy into the electric grid. Planning for expansion and hardening projects must occur years in advance due to financing and permitting timelines.

25.     BLM must approve many of the above detailed processes on an activity-by-activity basis, including vegetation management activities, grid hardening and maintenance activities, and

7

cooperative access to and movements within the ROWs.[8] These approvals often are time-consuming and arduous under existing regulations. Obtaining approval for the removal of even a single hazardous tree can take months or years in some cases; approval to replace a wooden pole with a metal pole in an existing ROW or to create an access road or access point to an existing ROW can require a full NEPA review process, some of which take years to complete.[9]

26.     In meetings with NRECA, BLM has cited the complexity of its regulatory requirements and reduced staffing availability for delays in processing and approving new and renewed ROWs, and utility operations and maintenance requests. Implementation of regulatory requirements and approval processes also differ between BLM headquarters in Washington, D.C. and regional offices throughout the country. This inconsistency creates uncertainty for cooperatives operating across multiple jurisdictions. And the delays imposed by BLM on cooperative maintenance, operations, and grid hardening and expansion projects has directly contributed to increased risks for wildfire events and other disruptions to electric reliability.

27.     The addition of this detailed Rule, which upends all past BLM decision-making and use prioritization processes, is yet another hurdle in an already complex BLM regulatory landscape. It creates further staffing strain and inconsistency in the agency. Cooperatives are encountering even more uncertainty in navigating BLM approval processes, and suffering delays in access, operation, and maintenance approvals. There is increasing uncertainty and confusion in project planning and permitting processes and more inconsistency in implementation and approval processes between regions. As a result of such delay and confusion, cooperatives' risks, and project timelines and investments increase.

---

[8] *See* 43 C.F.R. § 2800 *et seq.*

[9] National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

28.    Cooperatives that operate on BLM-managed lands are particularly concerned about wildfire risk. Delayed BLM approvals for grid hardening projects and vegetation management activities increase utility vulnerabilities to wildfire events. Cooperatives are strictly liable for up to $2.88 million per incident for wildfires in and around their infrastructure, even if they are not deemed negligent.[10] Liabilities in such amounts can create severe financial distress for many cooperatives and may create challenges in obtaining sufficient insurance coverage and access to capital. BLM has thus far been unable to resolve electricity industry concerns regarding delayed approvals for wildfire mitigation and grid hardening activities. This Rule further complicates and delays those cooperative efforts to reduce wildfire risk.

29.    Cooperatives also are concerned about the additional regulatory burden placed on them by this Rule in an already highly-regulated landscape as well as how BLM is implementing this Rule in conjunction with other BLM activities in terms of staffing, consistency of rules with each other, and consistency of implementation across regions. For example, many cooperatives that operate on BLM-managed lands also are or will be subject to a recently released Draft Sage Grouse Resource Management Plan.[11] That complex Plan covers most of the western U.S. and similarly dictates how and where users of public lands operate. It places an additional layer of complex regulatory requirements governing operations upon the exact same lands already subject to the complex compliance requirements of this Rule and other existing BLM rules.

30.    BLM's inability to timely and effectively approve cooperative wildfire mitigation activities, ROW authorizations and renewals, grid hardening and expansion activities, and regular operation and maintenance activities under its existing regulatory framework already jeopardizes

_____

[10] 43 C.F.R. § 2807.12.

[11] *See* Notice of Availability of the Draft Resource Management Plan Amendment and Environmental Impact Statement for Greater-Sage Grouse Rangewide Planning, 89 Fed. Reg. 18963 (Mar. 15, 2024).

safety and the supply of reliable electricity. The addition of yet another regulatory hurdle, in the form of the Rule, creates further regulatory and operational uncertainty for cooperatives who already must navigate complex, slow, inconsistent, multilayered, and challenging BLM regulatory requirements and bureaucratic processes. The Rule results in increased compliance costs and increased delays in approvals for necessary operations and maintenance activities. The Rule may even jeopardize cooperatives' ability to serve some areas.

31.     In this period of increasing electrification, supply chain shortages, global tension and security threats, and economic uncertainty, it is critical that BLM conducts the proper due diligence to assesses the potential impacts that this fundamental shift in how it manages rights-of-way and generation on public lands would have on electricity rates, reliability, and service; and the impacts that changes to rates or reliability would have on rural communities, persistent poverty counties, and businesses across the nation.

32.     Here, BLM also failed to adequately engage with stakeholders by conducting a thorough Regulatory Flexibility Act ("RFA") analysis for the Rule.[12] Nor did BLM prepare a required Statement of Energy Effects ("SEE").[13] As a result of BLM's failure to comply with these procedural requirements, the Rule's adverse impact on energy prices and availability, as well as its adverse effect on cooperatives and the rural communities they serve were not considered by BLM in the rulemaking process.

---

[12] *See* Regulatory Flexibility Act, Pub. L. 96-354; 94 Stat. 1164 (1980); Exec. Order No. 13211 (2001) ("RFA"). *See also* 89 Fed. Reg. at 40333– 34.

[13] *See* 89 Fed. Reg. at 40337.

## THE RULE'S IMPACT ON RURAL ELECTRIC COOPERATIVES

33.     The doctrine of MUSY has long guided the management and use of our nation's public lands. MUSY's emphasis on use, and FLPMA's designation of utility ROWs as a major and principal use of public lands, create a foundation of regulatory stability upon which cooperatives' operations and future planning have long depended.  Continued prioritization of utility ROWs as a major or principal use of BLM-managed public lands under FLPMA is critical to the stability of our electric grid and cooperatives' ability to operate, maintain, and expand the grid to accommodate current and future electricity demand.

34.     The Rule unlawfully requires BLM to now prioritize conservation in BLM decision-making, and it designates conservation as a new principal use of public lands on par, or even above, utility ROWs. It also requires that all uses of BLM-managed public lands be "compatible" with conservation.[14] Determinations about "compatibility" are left to the discretion of BLM, resulting in significant operational uncertainty for cooperatives in and around BLM-managed public lands. Cooperatives are adversely impacted by this critical transformation of MUSY and FLPMA from authorizing cooperative *use* of public lands, to instead centering conservation and *non-use* as BLM's primary land management consideration.  Critical investment in grid hardening and expansion projects to enable electric demand is being chilled.

35.     The Rule also expands BLM's authority to withdraw potentially millions of acres of public lands from non-conservation uses by designating Areas of Critical Environmental

---

[14] *See, e.g.* 89 Fed. Reg. at 40343, 40310.

Concern ("ACECs").[15] The Rule indicates that BLM will not seek congressional approval to withdraw these areas from public use and that such designations may be indefinite.[16]

36.    Even before finalizing the Rule, BLM proposed drastic restrictions on electric utility uses of public lands in some of its Resource Management Plan ("RMP") processes. For example, in its Draft RMP for the Rock Springs, Wyoming Region, BLM proposes to designate a large ACEC and to have ROW exclusion areas across millions of acres in Wyoming.[17] BLM further proposes to place restrictions on ROW width as well as electric infrastructure height and color.[18] Line undergrounding, which often is not financially or geographically feasible for many cooperatives, also may be required.[19] Cooperatives are concerned that this may only be the beginning, and that BLM will use its expanded authority under the Rule to even further restrict utility uses of public lands by designating more ACECs.

37.    The Rule also indicates that BLM will not conduct public notice and comment processes; or perform Regulatory Flexibility Act analyses or Statements of Energy Effects when designating ACECs beyond the regular RMP process.[20] Such failure on the part of BLM to engage in due diligence for ACEC designations will result in unlawful agency decision-making based on incomplete information. Cooperatives thus must operate and plan for the future under significant uncertainty about what areas of their service territories will be designated ACECs and how their operations will be restricted or even prohibited in such areas.

---

[15] 89 Fed. Reg. at 40325, 40313.

[16] *Id. See also,* 43 U.S.C. §§ 1702 (j); 1714 (requiring Congressional approval for BLM land withdrawals of five thousand or more acres).

[17] *See* 88 Fed. Reg. 56654 (Aug. 18, 2023).

[18] *Id.*

[19] *Id.*

[20] *Id.*

38.     This expanded use and scope of ACEC authority could preclude or limit transmission and distribution ROWs that provide electricity service to rural America. Project costs will increase in order to avoid areas designated as ACECs or to comply with increased restrictions on use in such areas.

39.     The Rule also will allow persons, including concerned individuals and non-governmental organizations, to apply for "restoration leases" and "mitigation leases" on BLM-managed lands.[21] This program allows interference with, or even enables parties to block, use of BLM-managed public lands for other purposes, including utility ROWs, generation projects, and related operations. The availability and use of the leasing scheme subjects cooperatives to additional regulatory and operational uncertainty as well as increased project and compliance costs.

40.     By withdrawing lands from use via ACECs and mitigation and restoration leasing, BLM is reducing the land available for utility ROWs and other uses. Reduction in available land creates unnecessary competition between users of public lands and increased project costs for cooperatives for lands not subject to such restrictions.

41.     The Rule also will subject cooperatives to mitigation requirements for use of BLM-managed public lands, in order to "avoid, minimize, and compensate for all impacts to public land resources."[22] Any mitigation requirements for electricity rights-of-way, operations, or generation facilities necessarily increases costs of cooperative operation and project budgets which then increases rates that must be shouldered by electric co-operative consumer-members—many of whom live in persistent poverty counties.

---

[21] 89 Fed. Reg. at 40342–45.

[22] *Id.* at 40346.

42.     Additional mitigation costs also chill grid expansion and hardening projects which is particularly concerning as cooperatives navigate supply chain shortages, increased electricity demand, and the need for expanded and hardened electric infrastructure.

43.     The Rule also imposes land health standards on all BLM lands and program areas.[23] Electric cooperative ROWs operate across tens of thousands of miles of BLM managed lands, and cooperatives already dedicate significant funding and effort in maintaining their ROWs and infrastructure via vegetation management operations and regular maintenance and upgrades.

44.     Imposition of land health standards across tens of thousands of miles of electricity ROWs results in increased maintenance, operation, monitoring, and reporting costs. The volume of cooperative ROWs that are subject to these standards may, quite simply, make implementing and monitoring such standards impossible.

45.     The imposition of land health standards also jeopardizes electric reliability and safety in some areas. Cooperatives are obligated under FLPMA to conduct vegetation management activities, including mowing, timber and slash removal, and applications of herbicide, among other actions, to safeguard powerlines and protect against wildfire and power outages.[24] Should landscape health standards be applied across all ROWs, such necessary activities will be even more highly regulated or restricted in some areas, which increases costs and jeopardizes reliability and safety across electric systems.

46.     Vacating the Rule would redress these harms to NRECA and its members.

---

[23] *Id.* at 40323–25.

[24] *See* 43 U.S.C. § 1772.

\*        \*        \*

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this __7__ day of July, 2024, in <u>Arlington, VA.</u>

Louis Finkel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming Farm
Bureau Federation, Natrona County Farm & Ranch
Bureau, American Exploration & Mining Association,
American Forest Resource Council, American
Petroleum Institute, American Sheep Industry
Association, National Cattlemen's Beef Association,
National Mining Association, National Rural Electric
Cooperative Association, Public Lands Council, *and*
Western Energy Alliance,

<p style="text-align:center;">*Plaintiffs*,</p>

*v.*

United States Department of the Interior; United States
Bureau of Land Management; Debra Haaland *in her
official capacity as Secretary of the Interior*; Steve
Feldgus *in his official capacity as Principal Deputy
Assistant Secretary of the Interior*; *and* Tracy Stone-
Manning *in her official capacity as the Director of the
Bureau of Land Management*,

<p style="text-align:center;">*Defendants*.</p>

No. 1:24-cv-_____

## DECLARATION OF KATHLEEN SGAMMA IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Kathleen Sgamma, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the President of Western Energy Alliance (the Alliance). I am authorized to make this declaration on the Alliance's behalf, and I am familiar with the activities and mission of the Alliance and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

<p style="text-align:center;">1</p>

3.      The Alliance is the leader and champion for independent oil and natural gas companies in the West, including Colorado, Montana, Nevada, New Mexico, North Dakota, Utah, and Wyoming. Working with a vibrant membership base for over 50 years, the Alliance stands as a credible leader, advocate, and champion of industry. Our expert staff, active committees, and committed board members form a collaborative and welcoming community of professionals dedicated to abundant, affordable energy and a high quality of life for all. Alliance members are independent oil and natural gas producers, the majority of which are small businesses with an average of fourteen employees.

4.      The Alliance advocates for access to federal lands for exploration and production of oil and natural gas, and rational, efficient, and effective permitting and leasing processes. The Alliance promotes the beneficial use and development of oil and natural gas, and represents its membership in federal rulemakings that may affect members' operations on federal, state, and private lands throughout the West. The Alliance assists its members and the resource-mining industry more broadly by educating its members and the public.

5.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands and to nominate ACECs outside the management planning process. BLM will also be able to implement new "temporary" protections outside the planning process. These leases and new ACEC designations will compete against and interfere with other uses, such as leases for oil and natural gas development issued by BLM under the Mineral Leasing Act of 1920.

2

6.     The Alliance commented on the proposed Rule and has engaged in education of its members on the complexities and ambiguities of the Rule. *See* Joint Trades, Comments on BLM's Proposed Rulemaking on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

7.     The Alliance's members rely on federal lands in the American West to operate and sustain their enterprises. Specifically, members have and will continue to rely on oil and gas leases that are necessary for them to explore and produce throughout such lands. Members depend on rights-of-way across BLM lands to conduct development activities on privately owned property.

8.     Before nominating or acquiring a lease, Alliance members invest significant time and resources evaluating leases and conducting exploratory research. These costs include investments in evaluating prospective leases, conducting geologic research, conducting due diligence, nominating parcels, assessing the financial potential, budgeting capital allocation, creating exploration and development strategies, investing in or contracting for critical infrastructure, and other background work to determine whether to nominate and pursue leases at upcoming competitive sales, as well as evaluating them after acquisition.

9.     Mitigation leases and restoration leases, along with "temporary" ACEC protections outside the planning process, will compete with oil and natural gas leases. By creating these new categories for leases on public lands, the Rule has created additional competition for limited public land. Increased competition reduces the Alliance's members' certainty that their investments to identify lands amenable for development will translate into actionable leases and permits. This added risk and uncertainty is influencing how and when the Alliance's members' are willing to commit their limited time and money to exploration efforts. Thus, the Rule is directly and immediately impacting their operations.

3

10.     The Rule pertains to the Alliance's mission to advance its members' longstanding interests in and access to public lands to run their businesses. In this way, the Rule also causes direct expense to the Alliance as an organization. The Alliance invests in advocating for reasonable access to federal lands for exploration and production of oil and natural gas, and rational, efficient, and effective permitting processes. The Alliance promotes the beneficial use and development of oil and natural gas in the West and represents its membership in federal rulemakings that affect members' operations on federal, state, and private lands. The Alliance educates Congress about the impacts of federal public lands rules. For instance, I appeared as a witness before the House Committee on Natural Resources regarding the Rule on June 15, 2023 and September 19, 2023.

11.     In light of new competition for the right to use federal land for mitigation and restoration, the Alliance also will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its members' existing or intended future leases. If such nominations are made, the Alliance will have to spend time and resources protesting those that compete with our members' current or prospective leaseholds. The Rule will thus have a direct and immediate impact on the work the Alliance must do to adapt to the new competitive landscape and limit the Rule's interference with its members' land use rights and prospects.

12.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and the Alliance would no longer have to devote time and money to addressing competitive conservation leases.

Signed by: _____

Name & Title: __Kathleen Sgamma, President_____

Date: ____June 24, 2024_____

Signed under penalty of perjury.

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*, <br><br> *Defendants*. | No. 1:24-cv-_____ |

## DECLARATION OF KEN HAMILTON IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Ken Hamilton, hereby declare as follows:

1.     I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.     I am Executive Vice President at the Wyoming Farm Bureau Federation (WYFB). I am authorized to make this declaration on WYFB's behalf, and I am familiar with the activities and mission of WYFB and the priorities and concerns of its members.

3.     Founded in 1920, the WYFB is Wyoming's largest organization of farmers and ranchers. It is a grassroots membership organization representing over 10,000 members in all 23

1

Wyoming counties, including over 2,500 famer/rancher member families and 7,600 associate member families who support the agricultural industry and its property rights. WYFB's famer/rancher member families are directly and adversely impacted by the rule challenged in this case.

4.     The agricultural industry drives Wyoming's regional and statewide economies and preserves the state's unique landscapes and natural beauty. WYFB's primary function is to advance and promote the interests of Wyoming's farmers and ranchers through grassroots policy development. This involves advancing, promoting, and protecting the economic, business, social, and educational interests of farmers and ranchers across Wyoming. WYFB seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of the state's agricultural land.

5.     Advocating against and challenging the Rule falls within WYFB's mission to advance its members' longstanding interests in their grazing rights on federal lands.

6.     I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses permitted under federal law, including grazing permits issued by BLM under the Taylor Grazing Act.

7.     WYFB provided extensive comments on BLM's notice of proposed rulemaking opposing the rule as drafted, joining the Wyoming Association of Conservation Districts (Comments by Wyoming Association of Conservation Districts in Response to the Bureau of Land

Management's Notice of Proposed Rulemaking Related to Conservation and Landscape Health, Docket No. BLM-2023-0001 (June 22, 2023)); and a nationwide coalition of agricultural organizations (Grazing Coalition Comments in Response to the Bureau of Land Management's Notice of Proposed Rulemaking Related to Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023)).

8.      WYFB assists its members and the livestock industry more broadly by educating its members and the public. WYFB has expended resources to educate its members on the complexities and uncertainties of the Rule.

9.      Many WYFB members are immediately and directly affected by the Rule. WYFB's members rely on federal lands throughout Wyoming to operate and sustain their businesses. Specifically, our members have relied on and will continue to rely on federal grazing permits that allow them to move their livestock throughout and graze upon such lands. These members reside and operate throughout millions of acres of federal land, including vast tracts that the Rule now makes available for restoration leases and mitigation leases.

10.     By a creating new categories of leases over tracts of public land for restoration and mitigation, BLM has altered the conditions for multiple use of such lands, increasing competition (and thus risk) for longstanding users of the land, such as WYFB's members.

11.     The Rule is inflicting direct costs on WYFB as an organization and on its members. WYFB invests in assisting its members on matters related to their grazing operations on federal lands. Among other things, it undertakes education and training efforts to ensure its members are apprised of the current state of the law with respect to grazing permits. WYFB has spent and will continue spending money educating its members on the Rule, as is its mission. An order vacating the Rule would save WYFB those added costs.

12. Moreover, WYFB and its members will have to expend time and money to monitor proposals for mitigation or restoration leases on parcels that overlap or threaten to interfere with existing or intended future grazing permits. Where such applications are made, WYFB and its members will have to review the proposals to determine any potential impacts to their grazing permits and make decisions including whether to participate in or oppose such leases. The Rule will thus have a direct and immediate impact on the work WYFB and its members must do to limit the interference with its members' grazing permits under the Rule.

13. In addition, WYFB members are uncertain how the vague language in the rule applies to current and future grazing permits for lands in and around their farmlands. To avoid the rules of loss of permits, these members will need to expend resources to determine whether and when the parcels on which they rely will be subject to mitigation or restoration leases, and the consequences those leases have for grazing permits on that land.

14. The Rule also is affecting the value of real property owned by WYFB members. To apply for grazing permits from BLM, applicants must own or control "base property." Base property is private land that either abuts public land; or "is capable of serving as a base of operation for livestock use of public lands within a grazing district"; or—outside a grazing district where no applicant owns or controls contiguous land—"is capable of being used in conjunction with a livestock operation which would utilize public lands." *See* 43 C.F.R. § 4110.2-1(a)(1)-(2). Ownership of base property entitles an applicant to grazing preference for a specified number of "animal unit months" on public lands. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit. WYFB's members own base property throughout Wyoming.

4

15.     BLM's determination of base-property status follows the land. It does not belong to the owner or applicant personally. BLM regulations specify that "[w]hen a permit or lease terminates because of a loss of ownership or control of a base property, the grazing preference shall remain with the base property." 43 C.F.R. § 4110.2-1(e). Because base-property status follows the land and confers valuable benefits on the land, base property status increases the value of the land itself. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

16.     The Rule threatens ranchers' and farmers' interests in base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits and leases. By creating new categories of leases over tracts of public land for restoration and mitigation—tracts that otherwise would be open to grazing—the Rule makes it less likely that grazing permits will be issued as a general matter and thus reduces the premium that prospective buyers place on base-property status. Put another way, the Rule makes it less likely that base status on any given tract of private land will in fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied directly reduces the value of the base-status premium, and thus directly reduces the value of base property held by our members.

17.     The Rule's new approach to Areas of Critical Environmental Concern (ACEC) introduces additional risk to and competition with ranchers' use of public lands. Particularly concerning is the ability for outside groups to nominate new ACECs outside of the land use planning process, after which BLM may implement "temporary" restrictions that materially impact

ranchers' ability to use the relevant public land and may remain in place indefinitely. 43 C.F.R. § 1610.7-2(i)(1)(ii).

18.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and WYFB would no longer have to devote time and money to education, training, or monitoring; and WYFB's members' land values would be left undisturbed.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _Ken Hamilton_

Date: _27-June-2024_

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming Farm
Bureau Federation, Natrona County Farm & Ranch
Bureau, American Exploration & Mining Association,
American Forest Resource Council, American
Petroleum Institute, American Sheep Industry
Association, National Cattlemen's Beef Association,
National Mining Association, National Rural Electric
Cooperative Association, Public Lands Council, *and*
Western Energy Alliance,

        *Plaintiffs,*

*v.*

United States Department of the Interior; United States
Bureau of Land Management; Debra Haaland *in her
official capacity as Secretary of the Interior*; Steve
Feldgus *in his official capacity as Principal Deputy
Assistant Secretary of the Interior*; *and* Tracy Stone-
Manning *in her official capacity as the Director of the
Bureau of Land Management,*

        *Defendants.*

No. 1:24-cv-_____

---

## DECLARATION OF GARY HEIBERTSHAUSEN IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Gary Heibertshausen, hereby declare as follows:

1.  I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.  I am a partner in Willow Creek Partners, LLP. I am authorized to make this declaration on Willow Creek Partners' behalf. I am personally familiar with the facts stated herein.

3.  Willow Creep Partners LLP is made up of Williams Ranches (50%) and Gary and Joyce Heibertshausen (25% each).

4.  Willow Creek Partners, LLP is a member of Powder River-Carter County Farm Bureau, Montana Farm Bureau Federation, and American Farm Bureau Federation.

1

5.      Williams Ranches owns property and Willow Creek Partners, LLP raises livestock in Carter County, MT.

6.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses, such as grazing undertaken pursuant to permits issued by BLM under the Taylor Grazing Act.

7.      Willow Creek Partners LLP leases 6 allotments (some have been consolidated) encompassing over 11,000 acres in Carter County, MT. Pursuant to these permits, I pay money to the federal government to graze my sheep on public lands.

8.      Access to public lands for livestock grazing is crucial to the success of my business. There is a long history of grazing livestock on federal lands, and Willow Creek Partners depends on its grazing permits to remain financially solvent. Many ranches rely on their own acres and federal grazing permits. The Taylor Grazing Act put tens of millions of acres of public land into grazing districts and smaller units, or allotments. Ranches like Willow Creek Partners apply for renewable 10-year permits to graze on these allotments. Each permittee must own their own base property near the allotment to be eligible and must pay for their use. Not just anyone can graze their livestock on public lands.

9.      If Willow Creek Partners could not graze its livestock on federal land, we would be forced to sell our sheep and cease operating as a ranch.

10.     The final Rule has created substantial risk and uncertainty for ranchers, including Willow Creek Partners. Under the Rule, we can no longer be certain that the public lands on which we currently rely for grazing will remain available for grazing over the coming years. We will have to compete with new categories of leases for access to public lands for grazing livestock.

11.     Willow Creek Partners owns base property in Montana. The value of the land turns in part on its statute as base property. If it were not base property, it would be worth less than it is.

12.     Base-property status follows the land and increases the value of the land. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

13.     Because Willow Creek Partners now must compete with individuals and NGOs seeking leases for mitigation and restoration, the value of its base property has decreased. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits for nearby public lands. By creating new categories of leases over tracts of public land for restoration and mitigation, the Rule increases the overall risk that grazing permits might be denied. It thus reduces the value that prospective buyers assign to base-property status. That is because the Rule makes it less likely as a general matter that base status on any given tract of private land will in fact result in the granting of grazing permits on

2

nearby land. This increased risk that grazing permits will be denied reduces the value of the base-status premium, and thus directly reduces the value of Willow Creek Partners' property.

14.     Because it now must compete with individuals and NGOs seeking leases for mitigation and restoration, Willow Creek Partners will have to expend time and money to monitor nominations for such leases over parcels that overlap or threaten to interfere with Willow Creek Partners' existing or intended future grazing permits. If such nominations are made, Willow Creek Partners will have to determine whether to participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work Willow Creek Partners must do to limit the interference that is likely to result from the Rule on Willow Creek Partners' grazing permits.

15.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and Willow Creek Partners would no longer have to devote time and money to training or monitoring around the Rule.

Signed: _____

Date: 06 | 26 | 2024 _____

Signed under penalty of perjury.

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br><div align="center">*Plaintiffs,*</div><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br><div align="center">*Defendants.*</div> | No. 1:24-cv-_____ |

## DECLARATION OF THADDEUS DOCKERY IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Thaddeus Dockery, hereby declare as follows:

1.     I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.     I am the owner of Dockery Ranch and Dockery LLC. I am authorized to make this declaration on Dockery Ranch and Dockery LLC's behalf. I am personally familiar with the facts stated herein.

3.     Dockery Ranch and Dockery LLC are members of Fremont County Farm Bureau, Wyoming Farm Bureau Federation, American Farm Bureau Federation, and Public Lands Council.

1

4.      Dockery Ranch and Dockery LLC owns property and raises livestock in the central region of Wyoming.

5.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses, such as grazing undertaken pursuant to permits issued by BLM under the Taylor Grazing Act.

6.      I currently hold two grazing permits encompassing approximately 93,000 acres in Fremont County, Wyoming. Pursuant to these permits, I pay money to the federal government to graze my cattle on public lands.

7.      Access to public lands for livestock grazing is crucial to the success of my business. There is a long history of grazing livestock on federal lands, and Dockery Ranch and Dockery LLC depend on their grazing permits to remain financially solvent. Many ranches rely on their own acres and federal grazing permits. The Taylor Grazing Act put tens of millions of acres of public land into grazing districts and smaller units, or allotments. Ranches like Dockery Ranch and Dockery LLC apply for renewable 10-year permits to graze on these allotments. Each permittee must own their own base property near the allotment to be eligible and must pay for their use. Not just anyone can graze their cattle on public lands.

8.      If Dockery Ranch and Dockery LLC could not graze their livestock on federal land, we would be forced to sell our land and cease operating as a ranch.

9.      The final Rule has created substantial risk and uncertainty for Dockery Ranch and Dockery LLC. Under the Rule, we can no longer be certain that the public lands on which we currently rely for grazing will remain available for grazing over the coming years. We will have to compete with new categories of leases for access to public lands for grazing livestock.

10.     This increases competition, and the risk that it has introduced, is having an immediate impact on our property. Dockery Ranch and Dockery LLC own base property in Wyoming. The value of the land turns in part on its statute as base property. If it were not base property, it would be worth less than it is. Base-property status follows the land and increases the value of the land. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

11.     The Rule reduces the value of Dockery Ranch and Dockery LLC's base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits for nearby public lands. By creating new categories of leases over tracts of public land for restoration and mitigation, the Rule introduces new risks with respect to whether grazing permits will be issued and thus reduces the practical and economic value that prospective buyers assign to base-property status. That is because the Rule makes it less likely as a general matter that base status on any given tract of private land will in

2

fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied reduces the value of the base-status premium. Thus, in addition to creating new competition and risk for use of federal laws, the Rule directly reduces the value of Dockery Ranch and Dockery LLC's property.

12.     Because they now must compete with individuals and NGOs seeking leases for mitigation and restoration, Dockery Ranch and Dockery LLC will have to expend time and money to monitor nominations for such leases over parcels that overlap or threaten to interfere with Dockery Ranch and Dockery LLC's existing or intended future grazing permits. If such nominations are made, Dockery Ranch and Dockery LLC will have to determine whether to protest or otherwise participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work Dockery Ranch and Dockery LLC must do to limit the interference that is likely to result from the Rule on Dockery Ranch and Dockery LLC's grazing permits.

13.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and Dockery Ranch and Dockery LLC would no longer have to devote time and money to training or monitoring around the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _____

Date: _6 - 26 - 2024_

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming
Farm Bureau Federation, Natrona County Farm
& Ranch Bureau, American Exploration &
Mining Association, American Forest Resource
Council, American Petroleum Institute,
American Sheep Industry Association, National
Cattlemen's Beef Association, National Mining
Association, National Rural Electric
Cooperative Association, Public Lands Council,
*and* Western Energy Alliance,

No. 1:24-cv-_____

*Plaintiffs,*

*v.*

United States Department of the Interior; United
States Bureau of Land Management; Debra
Haaland *in her official capacity as Secretary of
the Interior*; Steve Feldgus *in his official capacity
as Principal Deputy Assistant Secretary of the
Interior*; *and* Tracy Stone-Manning *in her official
capacity as the Director of the Bureau of Land
Management,*

*Defendants.*

## DECLARATION OF SCOTT KOSSERT IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Scott Kossert, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to
the facts stated herein.

2.      I am President of the Natrona County Farm and Ranch Bureau (NCFRB). I am
authorized to make this declaration on NCFRB's behalf, and I am familiar with the activities and
mission of NCFRB and the priorities and concerns of its members.

1

3.      NCFRB is a regional component of the Wyoming Farm Bureau Federation (WYFB). Natrona County, which includes Casper, Wyoming, is the state's second-most populous county.

4.      Founded in 1920, the WYFB is Wyoming's largest organization of farmers and ranchers. It is a grassroots membership organization representing nearly 12,000 members in all 23 Wyoming counties, including over 2,500 famer/rancher member families and 9,400 associate member families who support the agricultural industry and its property rights. WYFB's famer/rancher member families are directly and adversely impacted by the rule challenged in this case.

5.      The agricultural industry drives Wyoming's regional and statewide economies and preserves the state's unique landscapes and natural beauty. WYFB's primary function is to advance and promote the interests of Wyoming's farmers and ranchers through grassroots policy development. This involves advancing, promoting, and protecting the economic, business, social, and education interests of farmers and ranchers across Wyoming. WYFB seeks to promote the development of reasonable and lawful environmental regulations and regulatory policy that affect the use and development of the state's agricultural land.

6.      WYFB's county components serve the statewide association's objectives by harnessing the policy interests and concerns of local farmers and ranchers. The policies to which WYFB commits its resources originate at the county level. Members propose policy resolutions to their county bureau, such as NCFRB. NCFRB members then research and analyze the proposal, making recommendations where appropriate. NCFRB then votes whether to pass the proposal onto the state level.

2

7.      Advocating against and challenging the Rule falls within NCFRB's mission to advance its members' longstanding interests in their grazing rights on federal lands.

8.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses permitted under federal law, including grazing permits issued by BLM under the Taylor Grazing Act.

9.      NCFRB assists its members and the livestock industry more broadly by educating its members and the public. NCFRB has expended resources to educate its members on the complexities and uncertainties of the Rule.

10.     NCFRB members will be directly affected by the Rule. NCFRB's members rely on federal lands in Natrona County to operate and sustain their businesses. Specifically, our members have relied on and will continue to rely on federal grazing permits that allow them to move their livestock throughout and graze upon such lands. These members reside and operate throughout millions of acres of federal land, including vast tracts that the Rule now makes available for restoration leases and mitigation leases.

11.     By a creating new categories of leases over tracts of public land for restoration and mitigation, BLM has altered the conditions for multiple use of such lands, increasing competition (and thus risk) for longstanding users of the land, such as NCFRB members.

12.     The Rule is inflicting direct costs on NCFRB as an organization and on its members. NCFRB invests in assisting its members on matters related to their grazing operations

on federal lands. Among other things, it undertakes education and training efforts to ensure its members are apprised of the current state of the law with respect to grazing permits. NCFRB has spent and will continue spending money educating its members on the Rule, as is its mission. An order vacating the Rule would save NCFRB those added costs.

13.    Moreover, NCFRB and its members will have to expend time and money to monitor proposals for mitigation or restoration leases on parcels that overlap or threaten to interfere with existing or intended future grazing permits. Where such applications are made, NCFRB and its members will have to review the proposals to determine any potential impacts to their grazing permits and make decisions, including whether to participate in or oppose such leases. The Rule will thus have a direct and immediate impact on the work NCFRB and its members must do to limit the interference with its members' grazing permits under the Rule.

14.    In addition, NCFRB members are unsure of how the vague language in the rule applies to current and future grazing permits for lands in and around their farmlands. To avoid the rules of loss of permits, these members will need to expend resources to determine whether and when the parcels on which they rely will be subject to mitigation or restoration leases, and the consequences those leases have for grazing permits on that land.

15.    The Rule also is affecting the value of real property owned by NCFRB members. To apply for grazing permits from BLM, applicants must own or control "base property." Base property is private land that either abuts public land; or "is capable of serving as a base of operation for livestock use of public lands within a grazing district"; or—outside a grazing district where no applicant owns or controls contiguous land—"is capable of being used in conjunction with a livestock operation which would utilize public lands." *See* 43 C.F.R. § 4110.2-1(a)(1)-(2). Ownership of base property entitles an applicant to grazing preference for a specified number of

4

"animal unit months" on public lands. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit. NCFRB's members own base property in Natrona County.

16.     BLM's determination of base-property status follows the land. It does not belong to the owner or applicant personally. BLM regulations specify that "[w]hen a permit or lease terminates because of a loss of ownership or control of a base property, the grazing preference shall remain with the base property." 43 C.F.R. § 4110.2-1(e). Because base-property status follows the land and confers valuable benefits on the land, base property status increases the value of the land itself. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

17.     The Rule threatens ranchers' and farmers' interests in base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits and leases. By creating new categories of leases over tracts of public land for restoration and mitigation—tracts that otherwise would be open to grazing—the Rule makes it less likely that grazing permits will be issued as a general matter and thus reduces the premium that prospective buyers place on base-property status. Put another way, the Rule makes it less likely that base status on any given tract of private land will in fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied directly reduces the value of the base-status premium, and thus directly reduces the value of base property held by our members.

18.     The Rule's new approach to Areas of Critical Environmental Concern (ACEC) introduces additional risk to and competition with ranchers' use of public lands. Particularly

5

concerning is the ability for outside groups to nominate new ACECs outside of the land use planning process, after which BLM may implement "temporary" restrictions that materially impact ranchers' ability to use the relevant public land and may remain in place indefinitely. 43 C.F.R. § 1610.7-2(i)(1)(ii).

19.    An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and NCFRB would no longer have to devote time and money to education, training, or monitoring; and NCFRB members' land values would be left undisturbed.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _Scott Lemmt_  *President National County Farm and Ranch Bureau*

Date: _6-27-2024_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>       *Plaintiffs*,<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,<br><br>       *Defendants*. | No. 1:24-cv-_____ |

## DECLARATION OF GREG MAGER IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Greg Mager, hereby declare as follows:

1.  I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am a Director of Technical Services with the Navajo Transitional Energy Company ("NTEC"). I am authorized to make this declaration on NTEC's behalf. I am personally familiar with the facts stated herein.

3.      NTEC is a member of the National Mining Association.

4.      NTEC is the largest Native American owned coal producer in the United States, and the third largest United States thermal coal producer overall. NTEC's sole shareholder is the Navajo Nation. NTEC was founded to promote the responsible development of the Navajo Nation's resources, as well as new sources of energy, power, and transmission. NTEC is committed to the development of the economic, financial, social, and cultural well-being of the Navajo Nation and its members.

5.      NTEC owns and operates four coal mines that serve energy customers across the United States: (i) the Navajo Mine located within the Navajo Nation; (ii) the Antelope Mine located in Wyoming; (iii) the Cordero Rojo Mine also located in Wyoming; and (iv) the Spring Creek mine located in Montana. The Antelope Mine, Cordero Mine, and the Spring Creek Mine will be referred to herein as the "PRB Mines."

6.      NTEC employs approximately 1400 individuals and remits approximately $180,000,000.00 in annual wages and benefits. In addition, NTEC remits hundreds of millions of dollars annually in royalties and taxes. For example, in 2023, NTEC remitted approximately $225,000,000.00 in royalties and taxes to the Navajo Nation, the Federal Government, the States of Wyoming and Montana, and local county governments.

7.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the "Rule"). I further understand that

the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on Federal lands. These leased lands will be mutually exclusive of lands included in leases issued by BLM for coal under the Mineral Leasing Act of 1920. Persons seeking restoration leases and mitigation leases will therefore compete for access to and use of Federal lands with entities like NTEC.

8.      NTEC relies on federal lands in Wyoming and Montana for its operations. Specifically, NTEC is the current lessee of significant tracts of Federal coal deposits in both Montana and Wyoming.  There are significant coal deposits embedded within the Federal lands immediately surrounding NTEC's PRB Mines.  To extend the life of NTEC's PRB Mines, NTEC will need to acquire additional Federal coal leases.  The process of obtaining a new Federal coal lease is expensive and time consuming, and often further delayed by litigation challenging the issuance of any Federal coal lease.  Thus, to extend the life of NTEC's PRB Mines, NTEC must begin the process of examining Federal coal leasing in the immediate near term.

9.      Prior to submitting a lease application/modification for coal NTEC must invest significant internal and external financial resources in exploration activities to delineate the tracts of land to be nominated. For example, when examining whether to obtain a new Federal coal lease, NTEC will prepare a detailed Pre-Feasibility Study ("PFS").  The purpose of the PFS is to evaluate tract configuration alternatives and make a final recommendation of the final tract configuration and nomination/acquisition timing.  The development of a PFS is a time-consuming and costly endeavor that can cost NTEC well over $5,000,000.00.

10.     To initiate a PFS, NTEC will compile an internal team that consists of geologists, mining engineers, land professionals, commercial/marketing representatives, environmental permitting specialists, legal, and, eventually, management.  The first step in analyzing a potential

coal deposit is the review of existing coal deposit information from existing wellbore data usually compiled by the U.S. Geological Survey. Thereafter, NTEC will retain a drilling contractor to obtain additional coal deposit samples. If the deposit is located on Federal lands, NTEC must obtain a Federal Application for Permit to Drill ("APD"), which in itself is a time consuming and arduous process requiring a National Environmental Policy Act review prior to approval of the APD. Once the APD is approved, NTEC's contractor will obtain the necessary core samples that enable NTEC to evaluate the coal in a specific tract.

11.     After the core samples are collected, NTEC will have the core samples evaluated by an external expert to determine the coal quality, depth of the coal deposit, thickness of the coal deposit, and other items. These results will also be reviewed by NTEC's internal geologists and experts. Thereafter, NTEC will perform internal modeling to determine strip ratios required to produce the identified coal deposit. Strip ratios refer to the amount of waste (overburden) that must be removed for NTEC to access the coal deposit.

12.     In addition to reviewing the core samples, NTEC will also retain third-party experts to perform desk-top reviews of the tracts being analyzed, which evaluate: (i) known cultural, historical, or archaeological resources; and (ii) the presence of any sensitive wildlife or plant species.

13.     NTEC will also review the surface topography to evaluate existing infrastructure on the tract that could benefit or hinder potential mining operations. For example, existing infrastructure such as utility lines or pipelines need to be evaluated to determine if relocation is required to support mining operations. Similarly, the presence of existing access roads or electrical utility lines must be evaluated to determine whether such infrastructure could possibly benefit mining operations. Moreover, if the area being evaluated is also subject to existing oil and gas

leases, which it generally is, NTEC must negotiate agreements authorizing NTEC to mine through the area so as not to hinder existing wellbores and pipelines.

14.     When examining strip ratios, surface issues, and existing infrastructure, NTEC must develop possible mining methods for the identified tracts. This includes forecasting the high-dollar capital and operational expenditures required to develop the identified deposit.

15.     The last stage of the PFS requires NTEC to evaluate the commercial and marketing potential of the identified deposit.    The PFS concludes with the net present value of each alternative. In simple terms, net present value is the difference between the present value of cash inflows and the present value of cash outflows over a period of time.    Sensitivities are also developed for the various cases and a risk register is prepared.    Finally, a recommendation is prepared for management, and management determines whether to proceed with attempting to obtain a certain coal deposit and the lands adjacent to the deposit that would be needed to support mining operations.

16.     It is only after the PFS process concludes that NTEC will move forward with potentially nominating a Federal tract for the issuance of a possible Federal coal lease. By creating a new category of leases for public land, the Rule will bring an entirely new category of lease-seekers into the market—individuals and non-governmental organizations seeking to block resource extraction and other development with restoration leases and mitigation leases. This creates new and additional competition for access to and use of public land, introducing a new risk that public lands on which resource-extraction opportunities have been identified will be nominated and auctioned off for mitigation or restoration instead.    The issuance of these new restoration and mitigation leases will close the door on NTEC's possible acquisition and development of embedded coal reserves located within such tracts.

17.     This new competition is having an immediate impact on NTEC's planning and operations. Most immediately, it has changed the risk profile that NTEC must consider when deciding whether to devote its limited resources to exploration activities. For instance, on a moving forward basis, NTEC will be less willing under the Rule to commit resources to the particularly expensive development of a PFS. Such activities are riskier under the Rule because they may "tip off" individuals or non-governmental organizations interested in restoration leases and mitigation leases, reducing the likelihood that NTEC will be unable to obtain a lease from BLM when it locates extractable minerals. The Rule thus makes it more challenging economically to invest money up-front, meaning that NTEC is shifting resources away from more expensive exploratory endeavors and instead seeking protective permits on larger tracts of land where NTEC already holds leases.

18.     In light of new competition for the right to use Federal land for mitigation and restoration, NTEC will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its existing or intended future leases. This is particularly true for the Federal lands located near NTEC's existing PRB Mines.  For example, under the Rule, it's possible such Federal lands could be nominated and leased as restoration and/or mitigation tracts; thereby, immediately eliminating NTEC's ability to extend the life of its existing PRB Mines.  If such nominations are made, NTEC will have to spend time and resources protesting these competing nominations. The Rule will thus have a direct and immediate impact on the work the NTEC must do to adapt to the new competitive landscape and limit the Rule's interference with its land use rights and prospects.

19.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and NTEC would no longer have to devote time and money to education, training, or monitoring.

Signed _Greg Morgan_   Date: _6-10-24_

Signed under penalty of perjury.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming
Farm Bureau Federation, Natrona County Farm
& Ranch Bureau, American Exploration &
Mining Association, American Forest Resource
Council, American Petroleum Institute,
American Sheep Industry Association, National
Cattlemen's Beef Association, National Mining
Association, National Rural Electric
Cooperative Association, Public Lands Council,
*and* Western Energy Alliance,

*Plaintiffs,*

*v.*

United States Department of the Interior; United
States Bureau of Land Management; Debra
Haaland *in her official capacity as Secretary of
the Interior*; Steve Feldgus *in his official capacity
as Principal Deputy Assistant Secretary of the
Interior*; and Tracy Stone-Manning *in her official
capacity as the Director of the Bureau of Land
Management,*

*Defendants.*

No. 1:24-cv-_____

---

### DECLARATION OF KEVIN CREEL, BARRICK GOLD OF NORTH AMERICA, INC.,
### IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Kevin Creel, hereby declare as follows:

1.     I am over the age of eighteen. If called as a witness in this action, I could testify to

the facts stated herein.

2.     I am Vice President of North American Discoveries. I am authorized to make this

declaration on Barrick Gold of North America, Inc. (Barrick) and Nevada Gold Mine LLC's

(NGM's) behalf. I am personally familiar with the facts stated herein.

1

3.      Barrick is a member of the National Mining Association (NMA) and American Exploration & Mining Association (AEMA).

4.      NGM is a joint venture between a Barrick affiliate and Newmont Corporation, controlled by Barrick. Newmont is also a member of NMA and AEMA.

5.      NGM operates the largest gold-producing complex in northern Nevada, in addition to several mineral exploration and development projects across thousands of acres of public lands. NGM's expansive assets in northern Nevada include ten underground mines, twelve open pits, two autoclave facilities, two roasting facilities, four oxide mills, four heap leach facilities, and numerous exploration projects.

6.      NGM employs more than 7,000 men and women at operations across Nevada and in its offices in Elko and Henderson. In 2022, NGM's investment in Nevada totaled more than $2.7 billion, including $302 million in state taxes, $1.07 billion in personnel costs, $1.31 billion in goods and services purchased in Nevada, and $17.9 million in community investments. Barrick also owns several ranches throughout its mining portfolio.

7.      In Nevada, NGM owns and is authorized to use as part of its grazing permits hundreds of thousands of acres of public and private ranchland now used for livestock production that is also recognized as high-value habitat for sagebrush obligate species.

8.      Additionally, Barrick operates several mineral exploration and development projects across thousands of acres of federal public lands in Nevada, Montana, Idaho, and Arizona, along with a reprocessing project in Montana.

9.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM's) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the

Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leased lands will be mutually exclusive of lands included in plans of operation approved by BLM under the Mining Law and the Federal Land Policy and Management Act (FLPMA). Persons seeking restoration leases and mitigation leases will therefore compete for access to and use of federal lands with entities like Barrick and NGM.

10.     Barrick and NGM rely on access to federal lands in the American West for its operations. Specifically, they perform operations and exploration activities on lands managed by the BLM across Nevada. They also operate ranches on a combination of public and private lands in conjunction with grazing leases reviewed and authorized by BLM. Further, Barrick and NGM are evaluating and planning for renewable energy projects to assist with their transition to cleaner sources of energy; those projects rely in part on access to public lands as well.

11.     Prior to submitting a plan of operations for BLM approval, Barrick and NGM must invest significant financial resources in exploration activities to find concentrations of minerals economic enough to investigate further. Approximately 1 out of 1,000 deposits have the qualities that allow them the chance of being transformed into an operating mine. Commercial deposits are getting deeper and harder to find. Exploration activities include a broad spectrum of field work at the earliest stages of a project advancing towards drilling as targets are identified on the property. Field work varies depending on the geology of a given area, but generally includes geologic mapping, geochemical sampling and analysis, and a range of potential geophysical techniques. From this broad scale reconnaissance work targets are then advanced through reverse circulation or diamond core drilling where concepts are tested at depth for potential mineral deposits. If successful, drilling may ramp up to feasibility level work which is used to define the extent and

economics of a mineral deposit, as well as a significant financial commitment to advance the project.

    a.   For example, Barrick's Fourmile exploration project in Nevada is over 2000 feet below ground surface, meaning that every drill hole costs between $500,000 and $1 million. The surface footprint of the deposit is 3000 feet by 650 feet. The mineralized rock, or "ore body" is an irregular shape inside of the surface footprint – one half mile deep and between thirty and two hundred feet wide. Ore bodies like these are very difficult and expensive to find. It takes years—often decades—and hundreds of millions of dollars to turn a successful exploration target into a mine.

    b.   NGM's Goldrush project was originally identified as prospective through drilling in the mid-1980s, but not pursued at that time. In the early 2000s, based on better knowledge and better drilling, plus other technology, teams were able to identify true ore grade mineralization. By 2021, over $459 million, 1200 drill holes, and extensive environmental studies later, NGM was able to apply for a permit from BLM to mine this deep ore body. It was not until December 2023 that NGM received a record of decision from BLM to allow it to construct the project and proceed towards initial production.

12.    By creating a new category of leases for public land, the Rule will bring an entirely new category of lease-seekers into the market—individuals and non-governmental organizations seeking to block mineral extraction and other development with restoration leases and mitigation leases. This creates new and additional competition for access to and use of public land, introducing a new risk that public lands that are currently open for exploration and development under the mining laws will be nominated and auctioned off for mitigation or restoration instead.

4

13.     This new competition is anticipated to have an immediate impact on Barrick and NGM's planning and operations. Most immediately, it will change the risk profile that Barrick and NGM must consider when deciding whether to devote its limited resources to exploration activities on public lands in the United States. For instance, on a moving forward basis, Barrick and NGM may be less willing under the Rule to commit resources to particularly expensive exploratory activities such as advanced stage drilling. Such activities could be riskier under the Rule because they may "tip off" individuals or non-governmental organizations interested in restoration leases and mitigation leases, reducing the likelihood that Barrick and NGM will successfully secure a plan of operations from BLM when it locates extractable minerals.

14.     In light of new competition for the right to use federal land for mitigation and restoration, Barrick and NGM will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its existing or intended future leases. If such nominations are made, Barrick and NGM will have to spend time and resources protesting these competing nominations. Therefore, the Rule is anticipated to have a direct and immediate impact on the work Barrick and NGM must do to adapt to the new competitive landscape and limit the Rule's interference with its land use rights and prospects.

15.     The Rule may also require Barrick and NGM to devote resources to training and educating its employees on the new leasing standards set by the Rule, including how the Rule will impact the risk profiles of future investment opportunities.

16.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and Barrick and NGM would no longer have to devote time and money to education, training, or monitoring.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _____ Date: ____June 18, 2024____

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance, | No. 1:24-cv-_____ |

*Plaintiffs,*

v.

United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management*,

*Defendants.*

**DECLARATION OF DANIEL MCCLENDON ON BEHALF OF GARKANE ENERGY COOPERATIVE IN SUPPORT OF PLAINTIFFS' COMPLAINT**

I, Daniel McClendon, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the Chief Executive Officer at Garkane Energy Cooperative ("Garkane"). I am authorized to make this declaration on Garkane's behalf, and I am familiar with the activities and

1

mission of Garkane and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

3.      Garkane is a member-owned, not-for-profit electric cooperative that provides electrical service across 16,000 square miles in six counties in South-Central Utah and two counties in North-Central Arizona. Our service territory includes four national parks, more than any other utility in the country. Our territory also encompasses two national monuments; a national recreation area, three national forests; and two Indian tribes as well as several rural communities. Garkane serves approximately 15,800 meters over 2,700 miles of distribution and transmission line. Our members range from residential users to business owners, ranchers and a small amount of mining operations with a total load in excess of 70 MW.

4.      We estimate that 90% of our territory is controlled by the Federal Government, much of which is administered by the U.S. Bureau of Land Management ("BLM"). Due to the checkerboard nature and vast quantity of BLM land holdings in Garkane's service territory, Garkane necessarily must operate within rights-of-way on BLM managed lands in order to provide electricity to the rural communities and industries in its service territory. Garkane currently has 24 BLM managed accounts spread throughout our service territory.

5.      I have reviewed and am familiar with the Complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the "Rule").

6.      Garkane is a member of the National Rural Electric Cooperative Association ("NRECA"). NRECA participated in the rulemaking, commented on the proposed Rule, and has engaged in education of its members on complexities and ambiguities of the Rule. *See* NRECA, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

2

7.      Garkane's applications for proposed electric utility line projects on BLM-administered public lands are processed as "rights-of-way" (ROWs) under Title V of the Federal Land Policy and Management Act (FLPMA) and in accordance with 43 C.F.R. § 2800, *et seq.* With BLM-managed lands comprising more than 70% of Garkane's service territory, Garkane is often required to file new applications or to renew existing ROW authorizations.

8.      In reviewing applications for ROWs for electric utility lines, BLM considers the Multiple Use and Sustained Yield" mandate, which directs the Agency to prioritize the authorization of "major and principle uses" of public lands including, but not limited to electric utility ROWs, recreation, grazing, timber, and mineral development.

9.      Garkane relies on BLM's mandate of Multiple Use and Sustained Yield, which mandates electric utility rights-of-way as a major use, for operational certainty in obtaining, renewing, and operating within its rights-of-way across BLM-managed lands to ensure a reliable and affordable supply of electricity for rural communities in Nevada and Utah.

10.      To ensure continued reliability of electric service, it is imperative that Garkane is allowed to continue to operate on BLM lands as necessary to serve its member-consumers. This includes the ability to access, operate, and maintain existing infrastructure; conduct vegetation management and wildfire mitigation; and to harden and expand infrastructure as necessary to accommodate growing electricity demand; and to incorporate new and renewable sources of energy into the electric grid; and to mitigate for wildfire and other risks.

11.      Each year Garkane spends in excess of $500,000 for right-of-way vegetation management and wildfire mitigation across its vast service territory. A significant cost for a not-for-profit utility.

12.      I understand that the Rule would require all users of BLM-managed land, including electric utilities, to adhere to landscape health standards across their areas of use. Complying with

3

land health standards will require significant adjustments to Garkane maintenance, operations, and vegetation management processes across our over 16,000 square miles of service territory at additional expense to our member consumers. The implementation of land health standards also may disrupt the timing of and tools used in maintenance and operations processes to ensure the safety and reliability of our infrastructure. The imposition of land health standards burdens our ability to budget and plan for future vegetation management operations.

13.    I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will interfere with other uses, such the siting and operation of electric utility rights-of-way and infrastructure as authorized under FLPMA. Such disruptions inject uncertainty into planning processes, and will chill our ability to plan for expansion of our electric grid in order to accommodate increased electrification of our daily lives, and to utilize new and renewable sources of energy.

14.    I also understand that the Rule will expand BLM's authority to designate Areas of Critical Environmental Concern ("ACEC"), which also may interfere with the siting and operation of electric utility rights-of-way across large areas of land. Because BLM will not be required to follow public notice and comment procedures for ACEC designations, impacts to electric reliability and Garkane's operations will not be considered in such designations.

15.    Though Garkane has a good working relationship with our local BLM office, BLM's existing implementation of FLPMA already creates challenges and regulatory uncertainty for Garkane, including delays of several years for new utility lines or rights-of-way; approvals for vegetation management; and delays for grid hardening and wildfire mitigation projects. This Rule injects additional regulatory uncertainty into those processes and will result in further delays.

4

16.     BLM's other regulatory actions, including Sage Grouse Resource Management Plans, also place restrictions on use throughout Garkane's service territory. The Rule will further compound those restrictions on utility uses of public lands and will create even more operational uncertainty and increased cost for Garkane. Multiple restrictions on use also may further delay permitting and other processes.

17.     The Rule's requirement that uses of BLM lands be "compatible" with conservation further complicates existing, challenging approval processes. Determining what activities are compatible with conservation creates additional operational uncertainty.

18.     The Rule causes direct expense to Garkane as an organization. It will have to expend time and money to comply with landscape health standards, data and monitoring requirements, mitigation requirements, more extensive permitting requirements and time frames, ACEC designations, and to monitor and participate in nominations for proposed mitigation or restoration leases on parcels that overlap or threaten to interfere with Garkane's existing or intended future ROWs.

19.     An order of the Court vacating the Rule would redress these harms.

Signed by: _____

Name & Title: DANIEL R. MCCLENDON / CEO

Date: 6/26/2024

Signed under penalty of perjury.

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

<table>
<tr>
<td>

American Farm Bureau Federation, Wyoming
Farm Bureau Federation, Natrona County Farm
& Ranch Bureau, American Exploration &
Mining Association, American Forest Resource
Council, American Petroleum Institute,
American Sheep Industry Association, National
Cattlemen's Beef Association, National Mining
Association, National Rural Electric
Cooperative Association, Public Lands Council,
*and* Western Energy Alliance,

<div align="center">

*Plaintiffs*,

</div>

*v.*

United States Department of the Interior; United
States Bureau of Land Management; Debra
Haaland *in her official capacity as Secretary of
the Interior*; Steve Feldgus *in his official capacity
as Principal Deputy Assistant Secretary of the
Interior*; *and* Tracy Stone-Manning *in her official
capacity as the Director of the Bureau of Land
Management*,

<div align="center">

*Defendants*.

</div>

</td>
<td>

No. 1:24-cv-_____

</td>
</tr>
</table>

### DECLARATION OF THAD S. BALLARD ON BEHALF OF WELLS RURAL ELECTRIC COMPANY IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Thad S. Ballard, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the Chief Executive Officer at Wells Rural Electric Company ("WREC"). I am authorized to make this declaration on WREC's behalf, and I am familiar with the activities

<div align="center">1</div>

and mission of WREC and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

      3.      WREC a member-owned, not-for-profit electric cooperative that provides electrical service across 1,400 miles of power line to 10,552 square miles of Northeastern Nevada and part of Tooele County in Utah.

      4.      WREC provides electricity to 6,254 accounts. Our members range from residential users to business owners, casinos, ranchers, and mining operations with a total load in excess of 140 megawatts.

      5.      WREC operates 111 miles of overhead transmission voltage powerline, 102 miles of underground distribution voltage powerline and 1,204 miles of overhead distribution voltage powerline, totaling 1,417 miles, to serve its members.

      6.      67% of WREC's service territory is public land managed by the U.S. Bureau of Land Management ("BLM"). Due to the checkerboard nature and vast quantity of BLM land holdings in WREC's service territory, WREC necessarily must operate within rights-of-way on BLM managed lands in order to provide electricity to the rural communities and industries in its service territory.

      7.      I have reviewed and am familiar with the Complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the "Rule").

      8.      WREC is a member of the National Rural Electric Cooperative Association ("NRECA"). NRECA participated in the rulemaking, commented on the proposed Rule, and has engaged in education of its members on complexities and ambiguities of the Rule. *See* NRECA, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

2

9.     WREC also participated in the rulemaking, commented on the proposed Rule, and has analyzed how the Rule may impact its operations and electric reliability in its service territory. *See* WREC, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

10.     WREC's applications for proposed electric utility line projects on BLM-administered public lands are processed as "rights-of-way" (ROWs) under Title V of the Federal Land Policy and Management Act (FLPMA) and in accordance with 43 C.F.R. § 2800, *et seq.* With BLM-managed lands comprising more than two-thirds of WREC's service territory, WREC is often required to file new applications or to renew existing ROW authorizations.

11.     In reviewing applications for ROWs for electric utility lines, BLM considers the "Multiple Use and Sustained Yield" mandate, which directs the Agency to prioritize the authorization of "major and principle uses" of public lands including, but not limited to electric utility ROWs, recreation, grazing, timber, and mineral development.

12.     WREC relies on BLM's mandate of Multiple Use and Sustained Yield, which mandates electric utility rights-of-way as a major use, for operational certainty in obtaining, renewing, and operating within its rights-of-way across BLM-managed lands to ensure a reliable and affordable supply of electricity for rural communities in Nevada and Utah.

13.     To ensure continued reliability of electric service, it is imperative that WREC is allowed to continue to operate on BLM lands as necessary to serve its member-consumers. This includes the ability to access, operate, and maintain existing infrastructure; conduct vegetation management and wildfire mitigation; and to harden and expand infrastructure as necessary to accommodate growing electricity demand; and to incorporate new and renewable sources of energy into the electric grid; and to mitigate for wildfire and other risks.

3

14.     Each year WREC spends in excess of $100,000 for right-of-way vegetation management and wildfire mitigation across its vast service territory. A significant cost for a not-for-profit utility.

15.     I understand that the Rule would require all users of BLM-managed land, including electric utilities, to adhere to landscape health standards across their areas of use. Complying with landscape health standards will require significant adjustments to WREC's maintenance, operations, and vegetation management processes across our over 10,000 square miles of service territory at additional expense to our member consumers. The implementation of landscape health standards also may disrupt the timing of and tools used in maintenance and operations processes to ensure the safety and reliability of our infrastructure.

16.     I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will interfere with other uses, such the siting and operation of electric utility rights-of-way and infrastructure as authorized under FLPMA. Such disruptions jeopardize electric reliability by chilling expansion of our electric grid to accommodate increased electrification of our daily lives, and to utilize new and renewable sources of energy.

17.     I also understand that the Rule will expand BLM's authority to designate Areas of Critical Environmental Concern ("ACEC"), which also may interfere with the siting and operation of electric utility rights-of-way across large areas of land. Because BLM will not be required to follow public notice and comment procedures for ACEC designations, impacts to electric reliability and WREC's operations will not be considered in such designations.

18.     BLM's existing implementation of FLPMA already creates challenges and regulatory uncertainty for WREC, including delays of several years for new utility lines or rights-

4

of-way; approvals for vegetation management; and delays for grid hardening and wildfire mitigation projects.

19.     BLM's other regulatory actions, including Sage Grouse Resource Management Plans, also place restrictions on use throughout WREC's service territory. The Rule will further compound those restrictions on utility uses of public lands and will create even more operational uncertainty and increased cost for WREC. Multiple restrictions on use also may further delay permitting and other processes.

20.     The Rule's requirement that uses of BLM lands be "compatible" with conservation will further complicate and delay existing, challenging approval processes. Determining what activities are compatible with conservation creates additional operational uncertainty.

21.     The Rule causes direct expense to WREC as an organization. It will have to expend time and money to comply with landscape health standards, data and monitoring requirements, mitigation requirements, more extensive permitting requirements and time frames, ACEC designations, and to monitor and participate in nominations for proposed mitigation or restoration leases on parcels that overlap or threaten to interfere with WREC's existing or intended future ROWs.

22.     I declare under penalty of perjury that the foregoing is true and correct.

Signed by:  _Thad Ballard_

Name & Title: _Thad S. Ballard, Chief Executive Officer_

Date: _June 28, 2024_

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior*; Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior*; *and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management,*<br><br>*Defendants.* | No. 1:24-cv-_____ |

## DECLARATION OF PHILLIP COOK ON BEHALF OF GRAHAM COUNTY ELECTRIC COOPERATIVE IN SUPPORT OF PLAINTIFFS' COMPLAINT

I, Phillip Cook, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the Chief Executive Officer at Graham County Electric Cooperative ("GCEC"). I am authorized to make this declaration on GCEC's behalf, and I am familiar with

1

the activities and mission of GCEC and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

3.      GCEC is a member-owned, not-for-profit electric cooperative that provides electrical service across 1,034 miles of power line to 4,596 square miles in southeastern Arizona.

4.      GCEC provides electricity to 5,892 member-consumers, and 8,410 meters. Our members range from residential users to business owners, ranchers, and mining operations with a total load in excess of 134,875,585 KWh.

5.      GCEC operates 85 miles of overhead transmission voltage powerline, 117 miles of underground distribution voltage powerline and 832 miles of overhead distribution voltage powerline, totaling 1,034 miles to serve its members.

6.      Twenty-five percent of GCEC's service territory is public land managed by the U.S. Bureau of Land Management ("BLM"). Due to the checkerboard nature and vast quantity of BLM land holdings in GCEC's service territory, GCEC necessarily must operate within rights-of-way on BLM managed lands to provide electricity to the rural communities and industries in its service territory.

7.      I have reviewed and am familiar with the Complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the "Rule").

8.      GCEC is a member of the National Rural Electric Cooperative Association ("NRECA"). NRECA participated in the rulemaking, commented on the proposed Rule, and has engaged in educating its members on complexities and ambiguities of the Rule. *See* NRECA, Comments on the Bureau of Land Management's Proposed Rule on Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

2

9. GCEC's applications for proposed electric utility line projects on BLM-administered public lands are processed as "rights-of-way" (ROWs) under Title V of the Federal Land Policy and Management Act (FLPMA) and in accordance with 43 C.F.R. § 2800, *et seq*. With BLM-managed lands comprising twenty-five percent of GCEC's service territory, GCEC is often required to file new applications or to renew existing ROW authorizations.

10. In reviewing applications for ROWs for electric utility lines, BLM considers the Multiple Use and Sustained Yield" mandate, which directs the Agency to prioritize the authorization of "major and principle uses" of public lands including, but not limited to electric utility ROWs, recreation, grazing, timber, and mineral development.

11. GCEC relies on BLM's mandate of Multiple Use and Sustained Yield, which mandates electric utility rights-of-way as a major use, for operational certainty in obtaining, renewing, and operating within its rights-of-way across BLM-managed lands to ensure a reliable and affordable supply of electricity for rural communities in Arizona.

12. To ensure continued reliability of electric service, it is imperative that GCEC is allowed to continue to operate on BLM lands as necessary to serve its member-consumers. This includes the ability to access, operate, and maintain existing infrastructure; conduct vegetation management and wildfire mitigation; and to harden and expand infrastructure as necessary to accommodate growing electricity demand; and to incorporate new and renewable sources of energy into the electric grid; and to mitigate for wildfire and other risks.

13. Each year GCEC spends more than $200,000 for right-of-way vegetation management and wildfire mitigation across its vast service territory. A significant cost for a not-for-profit utility.

14. I understand that the Rule would require all users of BLM-managed land, including electric utilities, to adhere to landscape health standards across their areas of use. Complying with

3

land health standards will require significant adjustments to GCEC maintenance, operations, and vegetation management processes across our over 4,596 square miles of service territory at additional expense to our member consumers. The implementation of land health standards also may disrupt the timing of, and tools used in maintenance and operations processes to ensure the safety and reliability of our infrastructure. The additional costs to comply with new rules are not insignificant for a non-profit organization. Increased costs will require additional rates which will take 12- 18 months depending on the rate case. This adds an additional burden on small rural utilities.

15.    I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will interfere with other uses, such the siting and operation of electric utility rights-of-way and infrastructure as authorized under FLPMA. Such disruptions may jeopardize electric reliability by curtailing expansion of our electric grid to accommodate increased electrification of our daily lives, and to utilize new and renewable sources of energy. This is a direct conflict on the purpose of a rural electric cooperative and why cooperatives were created, to provide electricity to the rural population.

16.    I also understand that the Rule will expand BLM's authority to designate Areas of Critical Environmental Concern ("ACEC"), which also may interfere with the siting and operation of electric utility rights-of-way across large areas of land. Because BLM will not be required to follow public notice and comment procedures for ACEC designations, impacts to electric reliability and GCEC's operations will not be considered in such designations.

17.    BLM's existing implementation of FLPMA already creates challenges and regulatory uncertainty for GCEC, including delays of several years for new utility lines or rights-

4

of-way; approvals for vegetation management; and delays for grid hardening and wildfire mitigation projects.

18.     BLM's other regulatory actions, including Sage Grouse Resource Management Plans, also place restrictions on use throughout GCEC's service territory. The Rule will further compound those restrictions on utility uses of public lands and will create even more operational uncertainty and increased cost for GCEC. Multiple restrictions on use also may further delay permitting and other processes.

19.     The Rule's requirement that uses of BLM lands be "compatible" with conservation may further complicate and delay existing, challenging approval processes. Determining what activities are compatible with conservation creates additional operational uncertainty.

20.     The Rule causes direct expense to GCEC as an organization. It will have to expend time and money to comply with landscape health standards, data and monitoring requirements, mitigation requirements, more extensive permitting requirements and time frames, ACEC designations, and to monitor and participate in nominations for proposed mitigation or restoration leases on parcels that overlap or threaten to interfere with GCEC's existing or intended future ROWs.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by: _Phillip Cook_

Name & Title: Phillip Cook, CEO

Date: _6/24/2024_

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming
Farm Bureau Federation, Natrona County Farm
& Ranch Bureau, American Exploration &
Mining Association, American Forest Resource
Council, American Petroleum Institute,
American Sheep Industry Association, National
Cattlemen's Beef Association, National Mining
Association, National Rural Electric
Cooperative Association, Public Lands Council,
*and* Western Energy Alliance,

No. 1:24-cv-_____

*Plaintiffs*,

*v.*

United States Department of the Interior; United
States Bureau of Land Management; Debra
Haaland *in her official capacity as Secretary of
the Interior*; Steve Feldgus *in his official capacity
as Principal Deputy Assistant Secretary of the
Interior; and* Tracy Stone-Manning *in her official
capacity as the Director of the Bureau of Land
Management*,

*Defendants*.

## DECLARATION OF DAVID W. BALLARD IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, David W. Ballard, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to
the facts stated herein.

2.      I am David Ballard, President of Ballard Petroleum Holdings, LLC ("BPH"). I am
authorized to make this declaration on BPH's behalf and am personally familiar with the facts
stated herein.

3.      Ballard Petroleum Holdings, LLC is a member of the Western Energy Alliance.

4.      BPH is an independent producer of oil and gas. Since its founding in 1992, BPH has grown into a private partnership with about 100 investors and 45 employees. BPH focuses on the Powder River Basin in Wyoming, and it is the seventh largest oil producer in the basin for 2023, averaging 7500 BOEPD from 150 operated wells on a total net leasehold of 85,000 acres. BPH maintains an active development program, having drilled and completed and average of 11 new wells per year since 2010.

5.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will be mutually exclusive of leases issued by BLM for oil and natural gas development under the Mineral Leasing Act of 1920. Persons seeking restoration leases and mitigation leases will therefore compete for access to and use of federal lands with entities like BPH.

6.      BPH relies heavily on federal lands in Wyoming for its operations. Specifically, BPH owns interests in 240 federal, BLM-managed leases in Wyoming. These leases total 61,900 net acres which is 71% of all leases that BPH owns in Wyoming. With our predominant federal land holdings, about half (110) of all wells in which we have an interest are permitted as federal wells. BPH has drilled 59 federal wells since 2012 that produced 83% of our total operated production in 2023. BPH also holds considerable leasehold in areas of BLM-managed surface that would likely require drilling on federal lands in the development phase of the project.

7.      Prior to nominating and obtaining a lease, BPH must invest significant financial resources in exploratory research to determine which parcels of land have potential oil and gas resources warranting further expenditures of risk capital. Before bidding on federal leases at the competitive lease sales, BPH spends considerable resources identifying where to expand our leasehold based on geology, infrastructure, and technology. For example, in 2018 and 2019, BPH and its partner invested $9,500,000 in a large 3D seismic survey after previously researching the area geology. We successfully bid and won federal leases on this trend from 2017 to 2022, many of which were leased after the investment.

8.      By creating a new category of leases for public land, the Rule will bring an entirely new category of lease-seekers into the market: individuals and non-governmental organizations seeking to block oil and natural gas development with restoration leases or mitigation leases. This creates new and additional competition for access to and use of public land, introducing a new risk that public lands on which oil and natural gas leasing opportunities have been identified will be nominated and auctioned off for mitigation or restoration instead.

9.      This new competition is having an immediate impact on BPH's planning and operations. Most immediately, it has changed the risk profile that BPH must consider when deciding whether to devote its limited resources to exploration activities. For instance, on a moving forward basis, BPH will be less willing under the Rule to commit resources to particularly expensive exploratory activities such as seismic surveys. Such activities are riskier under the Rule because they may "tip off" individuals or non-governmental organizations interested in restoration leases and mitigation leases, reducing the likelihood that BPH will be able to obtain a lease from BLM when it locates prospective locations for economically recoverable hydrocarbons. The Rule thus makes it more challenging economically to invest money up-front, meaning that BPH is

shifting resources away from more expensive exploratory endeavors and instead seeking protective permits on larger tracts of land where BPH already holds non-contiguous leases.

10.     In light of new competition for the right to use federal land for mitigation and restoration, BPH will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its existing or intended future leases. If such nominations are made, BPH will have to spend time and resources protesting these competing nominations. The Rule will thus have a direct and immediate impact on the work the BPH must do to adapt to the new competitive landscape and limit the Rule's interference with its land use rights and prospects.

11.     The Rule has also required BPH to devote resources to training and educating its employees on the new leasing standards set by the Rule, including how the Rule will impact the risk profiles of future investment opportunities.

12.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and BPH would no longer have to devote time and money to education, training, or monitoring.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _Edw Mallard_____ Date: _5-24-2024_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

American Farm Bureau Federation, Wyoming Farm
Bureau Federation, Natrona County Farm & Ranch
Bureau, American Exploration & Mining Association,
American Forest Resource Council, American
Petroleum Institute, American Sheep Industry
Association, National Cattlemen's Beef Association,
National Mining Association, National Rural Electric
Cooperative Association, Public Lands Council, *and*
Western Energy Alliance,

*Plaintiffs,*

*v.*

United States Department of the Interior; United States
Bureau of Land Management; Debra Haaland *in her
official capacity as Secretary of the Interior*; Steve
Feldgus *in his official capacity as Principal Deputy
Assistant Secretary of the Interior; and* Tracy Stone-
Manning *in her official capacity as the Director of the
Bureau of Land Management,*

*Defendants.*

No. 1:24-cv-_____

## DECLARATION OF NIELS HANSEN IN SUPPORT OF
## PLAINTIFFS' COMPLAINT

I, Niels Hansen, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am President and Co-owner of P. H. Livestock Co.. P.H. Livestock Co. manages private land, Fill-more Beef, and Vasciona LLC. I am authorized to make this declaration on P.H. Livestock Co.'s behalf. I am personally familiar with the facts stated herein.

3.      Fill-more Beef manages three BLM grazing allotments in Carbon County, Wyoming.

4.      Vasciona LLC manages four BLM grazing allotments in Sweetwater County, Wyoming.

5.      I am a member of the Public Lands Council.

1

6.      P.H. Livestock Co. owns property and raises livestock in Carbon County, Wyoming.

7.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will compete against and interfere with other uses, such as grazing undertaken pursuant to permits issued by BLM under the Taylor Grazing Act.

8.      Fill-more Beef LLC currently holds a permit to three BLM grazing allotments in Carbon County, Wyoming. Pursuant to this permit, I pay money to the federal government to graze my cattle on public lands.

9.      Vasciana LLC currently holds a permit to three BLM grazing allotments in Sweetwater County, Wyoming. Pursuant to this permit, I pay money to the federal government to graze my cattle on public lands.

10.      Access to public lands for livestock grazing is crucial to the success of my business. There is a long history of grazing livestock on federal lands, and Fill-more Beef LLC and Vasciana LLC depend on grazing permits to remain financially solvent.  many ranches rely on their own acres AND federal grazing permits. The Taylor Grazing Act put tens of millions of acres of public land into grazing districts and smaller units, or allotments. Ranches like  apply for renewable 10-year permits to graze on these allotments. Each permittee must own their own base property near the allotment to be eligible and must pay for their use. Not just anyone can graze their cattle on public lands.

11.      If P.H. Livestock Co. could not graze its livestock on federal land, we would be forced to sell our land and cease operating as a ranch.

12.      The final Rule has created substantial risk and uncertainty for ranchers, including P.H. Livestock Co. Under the Rule, we can no longer be certain that the public lands on which we currently rely for grazing will remain available for grazing over the coming years. We will have to compete with new categories of leases for access to public lands for grazing livestock.

13.      P.H. Livestock Co. owns base property in Wyoming. The value of the land turns in part on its statute as base property. If it were not base property, it would be worth less than it is.

14.      Base-property status follows the land and increases the value of the land. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

15.      The Rule reduces the value of P.H. Livestock Co.'s base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits for nearby public lands. By creating new categories of leases over tracts of public land for restoration and mitigation, the Rule makes it less likely that grazing permits

2

will be issued and thus reduces the practical and economic value that prospective buyers assign to base-property status. That is because the Rule makes it less likely as a general matter that base status on any given tract of private land will in fact result in the granting of grazing permits on nearby land. This increased risk that grazing permits will be denied reduces the value of the base-status premium, and thus directly reduces the value of P.H. Livestock Co.'s property.

16.     Because it now must compete would individuals and NGOs seeking leases for mitigation and restoration, P.H. Livestock Co. will have to expend time and money to monitor nominations for such leases over parcels that overlap or threaten to interfere with P.H. Livestock Co.'s existing or intended future grazing permits. If such nominations are made, P.H. Livestock Co. will have to determine whether to participate in the auctions for any such leases. The Rule will thus have a direct and immediate impact on the work P.H. Livestock Co. must do to limit the interference that is likely to result from the Rule on P.H. Livestock Co.'s grazing permits.

17.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and P.H. Livestock Co. would no longer have to devote time and money to training or monitoring around the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _Vick Hansen_

Date: July 9, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| American Farm Bureau Federation, Wyoming Farm Bureau Federation, Natrona County Farm & Ranch Bureau, American Exploration & Mining Association, American Forest Resource Council, American Petroleum Institute, American Sheep Industry Association, National Cattlemen's Beef Association, National Mining Association, National Rural Electric Cooperative Association, Public Lands Council, *and* Western Energy Alliance, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> United States Department of the Interior; United States Bureau of Land Management; Debra Haaland *in her official capacity as Secretary of the Interior;* Steve Feldgus *in his official capacity as Principal Deputy Assistant Secretary of the Interior; and* Tracy Stone-Manning *in her official capacity as the Director of the Bureau of Land Management,* <br><br> *Defendants.* | No. 1:24-cv-_____ |

**DECLARATION OF KAITLYNN GLOVER IN SUPPORT OF PLAINTIFFS' COMPLAINT**

I, Kaitlynn Glover, hereby declare as follows:

1.    I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.    I am Executive Director for the Public Lands Council ("PLC"). I am authorized to make this declaration on PLC's behalf, and I am familiar with the activities and mission of PLC and the priorities and concerns of its members. I am personally familiar with the facts stated herein.

3.    PLC is a trade association that represents ranchers who use public lands and are committed to preserving the natural resources and unique heritage of the West. PLC works to maintain a stable business environment for ranchers in the West, where roughly half the land is

1

federally owned and many ranching operations have, for generations, depended on public lands for forage.

4.      PLC's membership consists of state and national cattle, sheep, and grasslands associations. It is committed to assisting its members by disseminating information to them and the public, meeting with legislators and agencies, drafting and commenting on legislation and agency rules, and, when necessary, participating in litigation in both state and federal courts.

5.      PLC assists its members and the livestock industry more broadly by educating its members and the public. PLC further provides education related to grazing on federal lands, including several fact sheets. PLC specifically provides educational materials designed to help producers advocate for themselves and navigate the bureaucracies necessary to obtain critical grazing permits.

6.      I have reviewed and am familiar with the complaint filed in this case. I understand that the lawsuit challenges the Bureau of Land Management's (BLM) final rule on Conservation and Landscape Health, 89 Fed. Reg. 40308 (May 9, 2024) (the Rule). I further understand that the Rule would allow persons, including concerned individuals and non-governmental organizations, to apply for restoration leases and mitigation leases on federal lands. These leases will necessarily interfere with other uses permitted under federal law, including grazing permits issued by BLM under the Taylor Grazing Act.

7.      PLC participated in the rulemaking process, commented on the proposed Rule, and engaged in education of its members on complexities and ambiguities of the Rule. *See* Grazing Coalition Comments in Response to the Bureau of Land Management's Notice of Proposed Rulemaking Related to Conservation and Landscape Health, Docket No. BLM-2023-0001 (July 5, 2023).

2

8.     PLC's members rely on federal lands in the American West to operate and sustain their businesses. Our members have and will continue to rely on federal grazing permits that allow them to move their livestock throughout and graze upon such lands. These members reside and operate throughout millions of acres of federal land, including vast tracts that the Rule now makes available for restoration leases and mitigation leases.

9.     The Rule will have immediate, concrete effects on the value of PLC's members' property. To apply for grazing permits from BLM, applicants must own or control "base property." Base property is private land that is capable of serving as a base of operation for livestock use of public lands. *See* 43 C.F.R. § 4110.2-1(a)(1).

10.     To have property recognized as base property, an applicant must go through BLM's approval process. Once approved, ownership of base property entitles an applicant to grazing preference for a specified number of "animal unit months" on public lands. A grazing preference entitles a base property owner to priority over others for receiving a grazing permit. PLC's members own base property throughout the American West.

11.     BLM's determination of base-property status follows the land. That is to say, it does not belong to the owner or applicant personally. BLM regulations specify that "[w]hen a permit or lease terminates because of a loss of ownership or control of a base property, the grazing preference shall remain with the base property." 43 C.F.R. § 4110.2-1(e).

12.     Because base-property status follows the land and confers valuable benefits on the land, base property status increases the value of the land itself. When farmers and ranchers seek to purchase or lease new parcels, land that has already been approved as base property is more valuable than land that has not been approved because of the accompanying grazing preference.

13.     The Rule threatens ranchers' and farmers' interests in base property. The value of the premium that prospective buyers place on base-property status turns on the likelihood of being able to obtain grazing permits and leases. By creating new categories of leases over tracts of public land for restoration and mitigation—tracts that otherwise would be open to grazing—the Rule makes it less likely that grazing permits will be issued and thus reduces the premium that prospective buyers place on base-property status. This increased risk that grazing permits will be denied reduces the value of the base-status premium, and thus directly reducing the value of base property held by our members.

14.     Moreover, by a creating new categories of leases over tracts of public land for restoration and mitigation, BLM has altered the competitive conditions for private use of such lands, increasing competition (and thus risk) for longstanding users of the land, such as PLC's members.

15.     Advocating against and challenging the Rule falls within PLC's mission to advance its members' longstanding interests in their grazing rights.

16.     The Rule also is inflicting direct costs on PLC as an organization. PLC invests in assisting its members on matters related to their grazing operations on federal lands. Among other things, it undertakes education and training efforts to ensure its members are apprised of the current state of the law with respect to grazing permits. PLC has spent and will continue spending money bringing its members up to speed on the Rule, as is its mission. An order vacating the Rule would save PLC those added costs.

17.     PLC also will have to expend time and money to monitor nominations for leases proposed for mitigation or restoration on parcels that overlap or threaten to interfere with its members' existing or intended future grazing permits. If such nominations are made, PLC will

4

have to determine whether to participate in the auctions for any such leases, in addition to providing public comment. The Rule will thus have a direct and immediate impact on the work PLC must do to limit the interference with its members' grazing permits under the Rule.

18.     An order of the Court vacating the Rule would redress these harms. The added competitive risks that the Rule introduces would be alleviated, and PLC would no longer have to devote time and money to education, training, or monitoring.

19.     I declare under penalty of perjury that the foregoing is true and correct.


Signed by: _____

Name & Title: Kaitlynn Glover, Executive Director

Date: June 10, 2024

5